## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| **MAYS MINING, INC.,** ) | |
| ) | |
| **Plaintiff/Counterclaim** ) | |
| **Defendant** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **NEXGEN EXTRACTIONS LLC,** ) | |
| ) | **NO. 6:20-CV-01723-GMB** |
| **Defendant/Counterclaimant** ) | |
| ) | |
| **v.** ) | |
| ) | |
| ) | |
| **RODNEY L. MAYS and QUALITY** ) | |
| **COAL CO., INC.** ) | |
| ) | |
| **Counterclaim Defendants** ) | |

## ANSWER AND COUNTERCLAIM OF NEXGEN EXTRACTIONS LLC

Defendant/Counterclaimant Nexgen Extractions LLC ("Nexgen") submits this Answer and Counterclaim to Plaintiff/Counterclaim Defendant Mays Mining Inc.'s ("Mays Mining") Amended Complaint (Doc. 6).

## ANSWER

Because the Amended Complaint is subject to a pending motion to a dismiss (Doc. 10), Nexgen refrains from admitting or denying any of its allegations at this time. If necessary, Nexgen will respond to the Amended Complaint's allegations and state affirmative defenses in a timely manner. *See* Fed. R. Civ. P. 12(a)(4)(A).

## COUNTERCLAIM

Nexgen brings this Counterclaim against Mays Mining pursuant to Federal Rules of Civil Procedure 13(a) and 13(b); against Counterclaim-Defendant Rodney L. Mays ("Rodney") pursuant to Rules 13(h), 19(a)(1), and 20(a)(2); and against Counterclaim-Defendant Quality Coal Co., Inc. ("Quality Coal") pursuant to Rules 13(h) and 20(a)(2).

## INTRODUCTION

1.     This Counterclaim is based on a series of related agreements and transactions involving the same individuals. The first set of agreements and transactions (the "Quality Coal Agreements") were entered into among Nexgen, Quality Coal, and Rodney on or around May 7, 2019.   The second set of agreements and transactions (the "Mays Mining Agreements") were entered into among Nexgen, Mays Mining, and Rodney on or around August 22, 2019. The third agreement and transaction, the Restated Profit Participation Agreement ("PPA"), was entered into between Nexgen and Mays Mining on or around December 19, 2019.

## PARTIES, JURISDICTION, JOINDER, AND VENUE

2.     Nexgen is a New Jersey limited liability company and a citizen of New Jersey.

3.     Mays Mining is an Alabama corporation operating in Walker County in the Northern District of Alabama.

4.      Quality Coal is an Alabama corporation operating in Walker County in the Northern District of Alabama.

5.      Rodney is the president, sole director, and sole shareholder of both Quality Coal and Mays Mining. He is a citizen of Alabama. Upon information and belief, Rodney resides in Jasper, Alabama.

6.      Nexgen's counterclaims against Mays Mining and Rodney related to the PPA are appropriate under Rule 13(a)(1) because they "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim[] and do[] not require adding another party over whom the court cannot acquire jurisdiction."

7.      Nexgen's counterclaims against Mays Mining relating to the Mays Mining Agreements are appropriate under Rule 13(b) because they "state as a counterclaim against an opposing party [a] claim that is not compulsory."

8.      Nexgen's  counterclaims against Rodney relating to the Mays Mining Agreements are appropriate under Rules 13(h) and 19(a)(1) because Rodney is "subject to service of process"; his "joinder will not deprive the court of subject-matter jurisdiction"; and, in Rodney's absence, "the court cannot accord complete relief among existing parties."

9.      Nexgen's counterclaims against Quality Coal and Rodney relating to the Quality Coal Agreements are appropriate under Rules 13(h) and 20(a)(2) because

Nexgen's right to relief with respect to the Quality Coal Agreements "aris[es] out of the same . . . series of transactions or occurrences" involving the PPA and the Mays Mining Agreements. *See* Doc. 6

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1).

11.     Venue is proper because Mays Mining and Quality Coal conduct business in this District, Rodney resides in this District, and because the events or occurrences giving rise to these claims occurred in this District. *See* 28 U.S.C. § 1391.

12.     The Court also has personal jurisdiction over all parties because each party, through the relevant contracts, consented to its jurisdiction.

## FACTUAL ALLEGATIONS

13.     Nexgen is a private equity firm based in New Jersey.

### The Quality Coal Agreements

14.     Quality Coal is a coal mining company based in Jasper, Alabama. Rodney is the owner and operator of Quality Coal.

15.     On or around May 7, 2019, Nexgen and Quality Coal entered into that certain Securities Purchase Agreement (Exhibit A, the "QC SPA"). Under the QC SPA, Nexgen agreed to loan $1,500,000 to Quality Coal (the "QC Loan") so that Quality Coal could purchase certain assets (the "Mine Assets") and perform certain

work pursuant to an agreement with a separate mining company (the "Lost Creek Agreement"). *See* Ex. A at Preamble; ¶ 1.1(a).

16.     Under the QC SPA, the QC Loan accrued interest at 2% per month on the outstanding amount thereof. *Id.* at ¶ 1.1(a). The QC SPA required Quality Coal to make monthly payments and ultimately repay the principal amount of the QC Loan in its entirety by approximately December 7, 2020. *Id.*

17.     The QC SPA directs that, following the required monthly payments, Quality Coal and Nexgen will split the profits, minus certain expenses, derived from the mining and work performed pursuant to the Lost Creek Agreement. Ex. A at ¶ 1.1(b).

18.     The QC Loan is evidenced by that certain Senior Secured Promissory Note (Exhibit B, the "QC Note"), which Quality Coal executed concurrently with the QC SPA.

19.     The QC Note requires Quality Coal to make certain principal and interest payments on the loan from May 2019 through April 2021, with exclusively interest payments due after December 2020.  Ex. B at Art. 2, Schedule 1.

20.     Any amount of principal or interest not paid when due under the QC Note bears interest at the rate of 24% per annum, or the maximum rate permitted by law, until it is paid in full. *Id.* at Art. 1, Art. 5.

21.     Pursuant to the QC Note, Quality Coal also grants Nexgen a "continuing and unconditional security interest" in "all of" Quality Coal's "tangible and intangible assets . . . including but not limited to cash, accounts receivable, inventory, copyrights, trademarks, tradenames, patents, contract rights and customer lists," and "all proceeds derived from" those assets. *Id.* at Art. 4.

22.     Quality Coal's obligations under the QC Note are also secured by that certain Security Agreement by Quality Coal in favor of Nexgen (Exhibit C, the "QC Security Agreement"), by that certain Secured Guaranty given by Rodney in favor of Nexgen (Exhibit D, the "QC Guaranty"), and by that certain Equity Pledge Agreement (Exhibit E, the "QC Pledge Agreement"), all of which were executed on May 7, 2019. The QC Security Agreement grants Nexgen a "continuing and unconditional security interest in" the Collateral, defined as "(1) all of the tangible and intangible assets of [Quality Coal] including, without limitation, cash, accounts receivable, inventory, copyrights, trademarks, tradenames, leases, licenses, permits, patents, contract rights and customer lists, and all Mine Assets . . ., and (ii) all Proceeds derived from the foregoing assets," with "Proceeds" being defined as "rights arising out of the Collateral and whatever is acquired, received, collected or distributed on account of the Collateral or on the sale, lease, license, holding, exchange, collection, liquidation or other disposition of the Collateral." Ex. C at ¶¶

1b, 1h, 2. The Collateral is further described in Exhibit A to the QC Security Agreement

23.     Under the QC Security Agreement, following a default under the QC Note by Quality Coal, including when principal or interest is not paid when due, Nexgen may, upon written notice, accelerate the entire amount due to Nexgen, declare it immediately due and payable, and pursue all of its rights and remedies against Quality Coal as a secured creditor, including its rights over the Collateral as described in the QC Security Agreement.  (Ex. B at ¶ 5; Ex. C at ¶¶ 1, 8, 9; Ex. C at Ex. A).

24.     Under the QC Guaranty, Rodney guaranteed Quality Coal's obligations of payment and performance under the QC SPA, the QC Note, and the QC Security Agreement. (Ex. D at ¶ 1.1).

25.     The QC Pledge Agreement also secures the QC Guaranty executed by Rodney. The QC Pledge Agreement, together with the QC SPA, the QC Note, the QC Security Agreement, the QC Guaranty, and any and all other documents evidencing and/or securing the QC Loan, are referred to herein as the "QC Loan Documents".

26.     Under the QC Pledge Agreement, Rodney pledged to Nexgen, "as collateral security for the prompt and complete payment" of all of Quality Coal's and Rodney's obligations under the QC Loan Documents, "a first priority security

interest in all of [Rodney's] right, title and interest to" Quality Coal's outstanding stock, "together with stock certificates, options or rights or any nature whatsoever which may be issued or granted by [Quality Coal] to [Rodney]," as well as Rodney's right, title, and interest in the other items identified in the QC Pledge Agreement. *See id.* at ¶¶ 1.2, 2.1.

27.    To date, Quality Coal has only made two of the monthly payments required by the QC Loan Documents, totaling $114,000.

28.    Quality Coal and Rodney are in default of their obligations under the QC Loan Documents for, among other reasons, failure to make payments as and when due thereunder (the "QC Loan Events of Default").

29.    On November 17, 2020, counsel for Nexgen sent a letter (the "QC Loan Demand Letter") to Quality Coal and Rodney informing them of the QC Loan Events of Default and demanding that they pay the then outstanding indebtedness owing under the QC Loan —$2,030,361.15—on or before November 27, 2020. (Exhibit F).

30.    To date, neither Quality Coal nor Rodney has responded to the QC Loan Demand Letter.

## **Mays Mining, and Rodney Fraudulently Induce Additional Nexgen Investment**

31.    Mays Mining is a coal mining company based in Jasper, Alabama. Rodney is the owner and operator of Mays Mining.

8

32.     Beginning in April 2019, Mays Mining and Rodney initiated a series of communications with Nexgen, both orally and in writing, for the purpose of inducing Nexgen to provide funding and investments to Mays Mining.

33.     During phone calls between April and June 2019, Rodney and Mays Mining made fraudulent representations about their finances in order to induce Nexgen to enter into a business relationship with them. Rodney and Mays Mining knew at the time they made these representations that they were false and that their financial status was on the verge of deteriorating and would significantly worsen between the time they made these representations and the time Nexgen provided them funding.

34.     On or around June 15, 2019, Rodney and Mays Mining, in an attempt to induce payment from Nexgen, sent a letter (Ex. G, "MM Letter") to Nexgen discussing Mays Mining's negotiations with Yellowhammer Energy Solutions, LLC ("Yellowhammer"), a company engaged in, among other things, coal mining. The MM Letter represented to Nexgen that if Mays Mining acquired Yellowhammer, Mays Mining would produce 864,000 tons of coal, generating an earnings before interest, taxes, depreciation, and amortization of $20,265,552.  Rodney and Mays Mining knew that this representation was false.

**The Mays Mining Agreements**

35.     On or around August 22, 2019, Nexgen and Mays Mining, entered into that certain Securities Purchase Agreement (Exhibit H, "MM SPA"). Under the MM SPA, Nexgen agreed to loan $350,000 to Mays Mining (the "MM Loan") so that Mays Mining could refinance certain debts. (*Id.* at Preamble, ¶ 1.1(a)).

36.     Under the MM SPA, the MM Loan accrued interest at 2% per month on the outstanding amount. *Id.* at ¶ 1.1(a). The MM SPA required Mays Mining to pay off the MM Loan in its entirety by December 1, 2019. *Id.*

37.     The MM Loan is evidenced by that certain Senior Secured Promissory Note (Exhibit I, "MM Note"), which was executed by Mays Mining concurrently with the MM SPA.

38.     The MM Note required Mays Mining to make certain principal and interest payments on the MM Loan on September 1, 2019, October 1, 2019, November 1, 2019, and December 1, 2019. (*Id.* at Art. 2, Schedule 1).

39.     Pursuant to the terms of the MM Note, any amount of principal or interest not paid when due bears interest at 24% per annum, or the maximum rate permitted by law, until it is paid in full. (*Id.* at Art. 1, Art. 5).

40.     Pursuant to the MM Note, Mays Mining also granted Nexgen a "continuing and unconditional security interest" in "all of" Mays Mining's "tangible and intangible assets . . . including but not limited to cash, accounts receivable,

inventory, copyrights, trademarks, tradenames, patents, contract rights and customer lists," and "all proceeds derived from" those assets. (*Id.* at Art. 4.).

41.     Mays Mining's obligations under the MM Note are also secured by that certain Security Agreement by Mays Mining in favor of Nexgen (Exhibit J, the "MM Security Agreement"), that certain Secured Guaranty given by Rodney in favor of Nexgen (Exhibit K, the "MM Guaranty"), and by that certain Equity Pledge Agreement (Exhibit L, the "MM Pledge Agreement"), all of which were executed on August 22, 2019. The MM Security Agreement grants Nexgen a "continuing and unconditional security interest in" the Collateral, defined as "(1) all of the tangible and intangible assets of [Mays Mining] including, without limitation, cash, accounts receivable, inventory, copyrights, trademarks, tradenames, leases, licenses, permits, patents, contract rights and customer lists, and (ii) all Proceeds derived from the foregoing assets," with "Proceeds" being defined as "rights arising out of the Collateral and whatever is acquired, received, collected or distributed on account of the Collateral or on the sale, lease, license, holding, exchange, collection, liquidation or other disposition of the Collateral." Ex. J at ¶¶ 1b, 1h, 2. The Collateral is further described in Exhibit A to the MM Security Agreement.

42.     Under the MM Security Agreement, in the event Mays Mining defaults on its obligations under the MM Note, Nexgen may pursue all of its rights and

remedies against the collateral as described in the MM Security Agreement. Ex. J at ¶¶ 1, 9; Ex. J at Ex. A.

43.     Under the MM Guaranty, Rodney guaranteed payment and performance of all of Mays Mining's obligations under the MM SPA, the MM Note, and the MM Security Agreement. Ex. K at ¶ 1.1.

44.     The MM Pledge Agreement also secures the MM Guaranty, executed by Rodney. The MM Pledge Agreement, together with the MM SPA, the MM Note, the MM Security Agreement, the MM Guaranty, and any and all other documents evidencing and/or securing the MM Loan, are referred to herein as the "MM Loan Documents".

45.     Under the MM Pledge Agreement, Rodney pledged to Nexgen all of Mays Mining's outstanding stock, "together with stock certificates, options or rights or any nature whatsoever which may be issued or granted by [Mays Mining] to [Rodney]." Ex. L at ¶¶ 1.2, 2.1(a).

46.     As set forth in the MM Loan Documents, the maturity date of the MM SPA Loan was December 1, 2019.  To date, neither Mays Mining nor Rodney has repaid the full amount owing under the MM Loan Documents.

47.     As a result of Mays Mining's and Rodney's failure to repay the full amount owing under the MM Loan Documents, and for other possible events of

default, Mays Mining and Rodney are in default under the MM Loan Documents (the "MM Loan Events of Default").

## The Restated Profit Participation Agreement

48.     Rodney and Mays Mining, through their false representations, including, for example, those concerning their financial conditions and the potential for earnings associated with the purchase of Yellowhammer, induced Nexgen to provide Mays Mining $2,536,776.20 (the "Investment") so that Mays Mining could acquire Yellowhammer and Endeavor Insurance Company, Inc. ("Endeavor") and operate a coal mining business. The PPA memorialized the terms and obligations relating to the Investment. (Exhibit M).

49.     In December 2019, Mays Mining purchased Yellowhammer.

50.     "Revenue" is defined under the PPA as: "[A]ny and all revenue generated by Mays [Mining] and/or any assets owned and/or controlled by Mays [Mining] from any source whatsoever, but excluding any revenue generated by Endeavor or the Endeavor Business." *Id.* at ¶ 1.

51.     Under the PPA, Mays Mining must continually operate the coal mining business and use its best efforts to maximize Revenue. *Id.* at ¶ 6.

52.     Under the PPA, Nexgen is entitled to monthly distributions of Mays Mining's Revenue equal to 12% per annum until the Investment has been paid back to Nexgen. *Id.* at ¶¶ 3, 4(b).

53.     After the Investment has been paid, Nexgen is entitled to 50% of "any and all revenue received by Mays [Mining] from any source whatsoever." *Id.* at ¶ 3.

54.     The PPA obligates Mays Mining to open "Lockbox Accounts" with a bank approved by Nexgen and deposit "all funds" paid to Mays Mining into the Lockbox Accounts. *Id.* at ¶ 4(a). Nexgen is entitled to access the Lockbox Accounts. *Id.*

55.     Each month, Nexgen's share of Mays Mining's revenue "shall be swept into an account designated by Nexgen" from the Lockbox Accounts. *Id.* at ¶ 4(b).

56.     Mays Mining has not opened the Lockbox Accounts. Nor has Mays Mining deposited its funds or revenue into an account over which Nexgen has access.

57.     Upon information and belief, Mays Mining has failed to keep funds segregated between Mays Mining and its affiliated companies as required by the PPA. *Id.* at ¶ 4(a).

58.     To date, Mays Mining has not made any of the monthly payments required by the PPA. Consequently, the full amount of the Investment, plus interest and late payment charges, remains outstanding.

59.     If Mays Mining fails to timely pay a monthly payment required by the PPA, a late payment charge equal to 10% of the delinquent payment shall apply. *Id.*

at ¶ 11. Mays Mining has not paid the late payment charges owed to Nexgen under the PPA.

60.     The PPA requires Mays Mining to provide Nexgen with regular updates regarding the business and provide supporting documentation. *Id.* at ¶ 6. Mays Mining must also provide Nexgen with access to its books and records upon request. *Id.* at ¶ 5. Nexgen has requested such update and access, but Mays Mining has refused these requests.

61.     Contrary to the representations that Mays Mining and Rodney made in the MM Letter, the cost for Mays Mining to mine the coal has been significantly higher than any revenue the coal generates.

**COUNT I – BREACH OF CONTRACT**
**(Delaware Common Law)**
**(Quality Coal –QC SPA and QC Note)**

62.     Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

63.     In consideration for Nexgen extending the QC Loan to Quality Coal, Quality Coal agreed to make monthly payments to Nexgen of the greater of $78,000 per month, or $12 multiplied by the number of tons of coal extracted by Quality Coal through the Mine Assets and sold by Quality Coal in the prior month, and, when the QC Loan was paid off, to share half of its profits with Nexgen, less approved expenses, as defined by the QC SPA.

64. Quality Coal breached the QC SPA by not making the required monthly payments to Nexgen.

65. Nexgen's loan to Quality Coal under the QC SPA was evidenced by the QC Note.

66. Under the QC Note, Quality Coal, for value received, promised to pay Nexgen $1,500,000 plus interest on the unpaid principal according to the payment schedule set out in Schedule 1 of the QC Note.

67. Principal and interest not paid to Nexgen when due bore interest at 24% per annum.

68. Quality Coal breached the QC Note by not making the required monthly payments to Nexgen.

69. Therefore, Nexgen requests damages in the amount of the outstanding amount of the QC Loan and amount stated in the QC Note, together with all applicable interest, as well reasonable attorneys' fees, costs, and all expenses, as provided by Paragraph 6.5 of the QC SPA and Article 10 of the QC Note, all relief afforded by the QC SPA and QC Note, and other relief that the Court deems proper.

## COUNT TWO – POSSESSION OF QC COLLATERAL
### (Delaware UCC)
### (QC Security Agreement)

70. Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

71.     As a result of the QC Loan Events of Default, Nexgen is entitled to possession of the QC Collateral, which is now in the custody and possession of Quality Coal, pursuant to the terms of the QC Loan Documents.

72.     Pursuant to the QC Loan Documents, Fed. R. Civ. P. 64, Del. Code Ann. tit. 6, §§ 9-601(a)(1); 9-609(a); 9-609(b)(1); 9-609(c), and any other applicable provisions of the Delaware Uniform Commercial Code, Nexgen demands possession of the QC Collateral and requests the Court to enter an order commanding Quality Coal to assemble the QC Collateral for the purposes of turnover to Nexgen, together with such additional relief as the Court deems just and appropriate to facilitate turnover of the QC Collateral to Nexgen and to compensate Nexgen for the deterioration in value of the QC Collateral caused by the neglect, abuse, or improper handling thereof by Quality Coal.

73.     Nexgen reserves the right to exercise its rights and remedies under the QC Pledge Agreement based upon the QC Loan Events of Default.

## COUNT THREE – BREACH OF CONTRACT
### (Delaware Common Law)
### (Rodney Mays – QC Guaranty)

74.     Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

75.     The QC Note was also secured by the QC Guaranty.

76. Under the QC Guaranty, Rodney unconditionally and irrevocably guaranteed all of Quality Coal's obligations under the QC SPA, the QC Note, and the QC Security Agreement.

77. Rodney breached the QC Guaranty by not fulfilling its obligations upon demand by Nexgen.

78. Therefore, Nexgen requests damages in the amount stated in the QC Note, including all applicable interest, as well reasonable attorneys' fees, costs, and all expenses, as provided by Paragraph 1.2 of the QC Guaranty, all relief afforded by the QC Guaranty, and any other relief the Court deems proper.

## COUNT FOUR – UNJUST ENRICHMENT
### (Alabama Common Law)
### (Quality Coal)

79. Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

80. Nexgen extended the QC Loan in the amount of $1,500,000 to Quality Coal so that Quality Coal could purchase the Mine Assets and perform certain work pursuant to the Lost Creek Agreement.

81. Nexgen had a reasonable expectation that the QC Loan would be repaid, and Quality Coal cannot withhold repayment in good conscience.

82.     Therefore, Nexgen demands repayment of all amounts loaned to Quality Coal in relation to the Lost Creek Agreement and any applicable interest or other equitable relief this Court deems appropriate.

### COUNT FIVE – UNJUST ENRICHMENT
**(Alabama Common Law)**
**(Rodney Mays)**

83.     Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

84.     Nexgen's extension of the QC Loan to Quality Coal resulted in material benefits for Rodney as Quality Coal's sole owner and shareholder.

85.     Nexgen had a reasonable expectation that Rodney would compensate Nexgen for these material benefits, and Rodney cannot withhold compensation in good conscience.

86.     Therefore, Nexgen demands repayment of the benefits provided to Rodney in relation to the Lost Creek Agreement and any applicable interest or other equitable relief this Court deems appropriate.

### COUNT SIX – BREACH OF CONTRACT
**(Delaware Common Law)**
**(Mays Mining – MM SPA and MM Note)**

87.     Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

88.     In consideration for Nexgen extending the MM Loan to Mays Mining, Mays Mining agreed to repay the MM Loan and applicable interest in full by December 1, 2019.

89.     Mays Mining breached the MM SPA by not repaying the MM Loan in full by December 1, 2019.

90.     Nexgen's loan to Mays Mining under the MM SPA was evidenced by the MM Note.

91.     Under the MM Note, Mays Mining, for value received, promised to pay Nexgen $350,000 plus interest on the unpaid principal according to the payment schedule set out in Schedule 1 of the MM Note.

92.     Principal and interest not paid to Nexgen when due bore interest at 24% per annum.

93.     Mays Mining breached the MM Note by not making the required monthly payments to Nexgen.

94.     Therefore, Nexgen requests damages in the amount of the loan and amount stated in the MM Note, and all applicable interest, as well reasonable attorneys' fees, court costs, and all expenses, as provided by Paragraph 6.5 of the MM SPA and Article 10 of the MM Note, all relief afforded by the MM SPA and MM Note, and other relief that the Court deems proper.

## COUNT SEVEN – POSSESSION OF MM COLLATERAL
### (Delaware UCC)
### (Mays Mining – Security Agreement)

95.     Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

96.     As a result of the MM Loan Events of Default, Nexgen is entitled to possession of the MM Collateral, which is now in the custody and possession of Mays Mining, pursuant to the terms of the MM Loan Documents.

97.     Pursuant to the MM Loan Documents, Fed. R. Civ. P. 64, Del. Code Ann. tit. 6, §§ 9-601(a)(1); 9-609(a); 9-609(b)(1); 9-609(c), and any other applicable provisions of the Delaware Uniform Commercial Code, Nexgen demands the possession of the MM Collateral and requests the Court to enter an order commanding Mays Mining to assemble the MM Collateral for the purposes of turnover to Nexgen, together with such additional relief as the Court deems just and appropriate to facilitate turnover of the MM Collateral to Nexgen and to compensate Nexgen for the deterioration in value of the MM Collateral caused by the neglect, abuse, or improper handling thereof by Mays Mining.

98.     Nexgen reserves the right to exercise its rights and remedies under the MM Pledge Agreement based upon the MM Loan Events of Default.

## COUNT EIGHT– BREACH OF CONTRACT
### (Delaware Common Law)
### (Rodney Mays – MM Guaranty)

99.     Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

100.    The MM Note was also secured by the MM Guaranty.

101.    Under the MM Guaranty, Rodney unconditionally and irrevocably guaranteed all of Mays Mining's obligations under the MM Loan Documents.

102.    Rodney breached the MM Guaranty by not fulfilling its obligations upon demand by Nexgen.

103.    Therefore, Nexgen requests damages in the amount stated in the MM Note, including all applicable interest, as well reasonable attorneys' fees, costs, and all expenses, as provided by Paragraph 1.2 of the MM Guaranty, all relief afforded by the MM Guaranty, and any other relief the Court deems proper.

## COUNT NINE – UNJUST ENRICHMENT
### (Alabama Common Law)
### (Mays Mining)

104.    Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

105.    Nexgen extended the MM Loan in the amount of $350,000 to Mays Mining so that Mays Mining could refinance certain debts.

106. Nexgen had a reasonable expectation that the MM Loan would be repaid, and Mays Mining cannot withhold repayment in good conscience.

107. Therefore, Nexgen demands repayment of the amounts loaned to Mays Mining to refinance the debts it owed and any applicable interest or other equitable relief this Court deems appropriate.

## COUNT TEN – UNJUST ENRICHMENT
### (Alabama Common Law)
### (Rodney Mays)

108. Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

109. Nexgen's extension of the MM Loan to Mays Mining resulted in material benefits for Rodney as Mays Mining's sole owner and shareholder.

110. Nexgen had a reasonable expectation that Rodney would compensate Nexgen for these material benefits and Rodney cannot withhold compensation in good conscience.

111. Therefore, Nexgen demands repayment of the MM Loan for benefits provided to Rodney and any applicable interest thereunder and any other equitable relief this Court deems appropriate.

## COUNT ELEVEN – BREACH OF CONTRACT
### (Alabama Common Law)
### (Mays Mining – Restated Profit Participation Agreement)

112.  Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

113.  In consideration for Nexgen providing Mays Mining the Investment, Mays Mining agreed to make monthly payments from the Revenue amounting to 12% of the Investment, amounting to at least $304,413.15 per year; pay late charges on delinquent payments; open Lockbox Accounts at a bank approved by Nexgen; provide Nexgen with online access to the Lockbox Accounts; provide Nexgen access to Mays Mining's books and records; and provide Nexgen regular updates and documentation upon request.

114.  Mays Mining breached the PPA in several respects, including by failing to perform any of the obligations listed in the above paragraph.

115.  Therefore, Nexgen requests damages in the amount of the Investment and all applicable interest, as well as specific performance of all contractual obligations, all costs and expenses, including attorneys' fees, as provided by Paragraph 14 of the PPA, all relief afforded by the PPA, and other relief that the Court deems proper.

## COUNT TWELVE – UNJUST ENRICHMENT
### (Alabama Common Law)
### (Mays Mining)

116. Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

117. Nexgen provided Mays Mining the Investment so that Mays Mining could acquire Yellowhammer and Endeavor and operate a coal mining business.

118. Nexgen had a reasonable expectation that its Investment would be repaid and Mays Mining cannot withhold repayment in good conscience.

119. Therefore, Nexgen demands restitution for amounts provided to Mays Mining in relation to the purchase of Yellowhammer and Endeavor and the funding of related coal operations and any applicable interest or other equitable relief this Court deems appropriate.

## COUNT THIRTEEN - ACCOUNTING
### (Alabama Common Law)
### (Mays Mining)

120. Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

121. The PPA requires Mays Mining to provide Nexgen upon request copies of accurate books and records of all its financial activities including, without limitation, any financial activity relating to Mays Mining, Yellowhammer,

Endeavor, and all revenue received by Mays Mining from any source whatsoever ("Books and Records"). Ex. M at ¶ 5.

122.   Nexgen has made such requests in the past, but Mays Mining has not complied.

123.   Nexgen demands copies of the Books and Records and requests that the Court award any costs and fees available to Nexgen under Paragraph 5 of the PPA in the event that Nexgen's inspection reveals that Mays Mining's underpayments exceed 3% of the amounts due to Nexgen during any period. *See id.*

**COUNT FOURTEEN – FRAUD**
**(Alabama Common Law)**
**(Mays Mining and Rodney Mays)**

124.   Nexgen incorporates all previous paragraphs and allegations as if specifically stated herein.

125.   Mays Mining and Rodney made false representations to Nexgen both orally and in writing from April to June 2019. These false representations were made in order to induce Nexgen to enter into the Mays Mining Agreements and the PPA.

126.   Mays Mining and Rodney, in the MM Letter, knowingly made affirmative misrepresentations to Nexgen concerning the revenue and/or profits that Mays Mining would realize by purchasing Yellowhammer. Mays Mining and Rodney made these misrepresentations in order to induce Nexgen into providing cash for Mays Mining to purchase Yellowhammer.

127. Nexgen relied on these misrepresentations when it provided cash to Mays Mining and entered into the PPA.

128. Therefore, Nexgen requests damages in the amount of the amount of the loan and amount stated in the MM Note and the Investment, all applicable interest, as well as all costs and expenses, punitive damages, and other relief that the Court deems proper.

Respectfully submitted,

 /s/ John Douglas Bethay, III
John Douglas Bethay, III
Jon L. Mills
Thomas W.H. Buck, Jr.

*Attorneys for Nexgen Extractions LLC*

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203-2618
Telephone: 205.254.1000
Fax: 205.254.1999
jbethay@maynardcooper.com
jmills@maynardcooper.com
tbuck@maynardcooper.com

## **CERTIFICATE OF SERVICE**

I hereby certify I served the foregoing on February 9, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

Additionally, the foregoing will be served in accordance with the Federal Rules of Civil Procedure upon the following counterclaim defendants:

Quality Coal, Inc.
72 Longview Drive
Jasper, Alabama 35504
Attn: Rodney L. Mays

Rodney L. Mays
345 20th Street West
Jasper, Alabama 35502

_/s/ John Douglas Bethay, III_
OF COUNSEL

# EXHIBIT A

<u>**SECURITIES PURCHASE AGREEMENT**</u>

**THIS SECURITIES PURCHASE AGREEMENT** (this "**Agreement**") is entered into effective as of May 7, 2019 ("**Effective Date**"), between Quality Coal Co., Inc., an Alabama corporation (the "**Quality**"), and Nexgen Extractions LLC, a New Jersey limited liability Quality (the "**Nexgen**"). Quality and Nexgen are individually referred to in this Agreement as a "**Party**" and collectively referred to in this Agreement as the "**Parties**".

WHEREAS, Quality is in the business of mining and selling coal and related activities;

WHEREAS, Rodney L. Mays ("**Mays**"), is the sole shareholder and owns 100% of Quality and has substantial experience in the business of mining and selling coal and related activities;

WHEREAS, Quality has entered into that certain Agreement dated as of the Effective Date ("**Lost Creek Agreement**") with Lost Creek Clay and Mineral, LLC, an Alabama limited liability company ("**Lost Creek**"), to purchase various surface and mineral leases and permits and one (1) Driltech drill from Lost Creek with respect to the McCollum Mine (as more particularly described in the Lost Creek Agreement, the "**Mine Assets**"). The mining of the McCollum Mine with and pursuant to the Mine Assets under the Lost Creek Agreement is referred to under this Agreement as the "**Project**";

WHEREAS, Quality desires to begin the Project with the Mine Assets prior to the transfer of the applicable permits by Lost Creek to Quality;

WHEREAS, Quality has determined that it requires $1,500,000 to complete the surface mining Project with and pursuant to the Mine Assets and has requested that Nexgen invest the aggregate principal amount of $1,500,000 to complete such surface mining with the Mine Assets; and

WHEREAS, subject to the terms of this Agreement, Nexgen desires to invest the amount of $1,500,000 with Quality initially in the form of a secured loan to acquire the Mine Assets and complete the surface mining Project pursuant to the Mine Assets in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      <u>Issuance of the Note; Closing</u>.

     1.1.     <u>Loan Terms</u>.

         (a)     Subject to the terms and conditions of this Agreement, Nexgen agrees to loan to Quality the aggregate principal amount of $1,500,000 ("**Loan**") to purchase the Mine Assets and complete the Project with the Mine Assets in accordance with the terms of the Lost Creek Agreement and this Agreement. The Loan shall accrue interest at two percent (2%) per month interest on the outstanding principal Loan amount. In addition to the monthly interest

payments, Quality shall reduce the principal amount of the Loan on a monthly basis in an amount equal to the greater of (i) $78,000 per month, or (ii) $12.00 multiplied by the number of tons of coal extracted by Quality through the Mine Assets and sold by Quality in the prior month. The Loan should be paid in full within approximately nineteen (19) months.

(b)     After payment of the required monthly Loan payments, each Party shall be entitled to fifty percent (50%) of the profits derived from the Project under the Lost Creek Agreement after payment of approved expenses. For purposes of calculating profits on the Project, expenses shall be calculated at the lower of (i) actual expenses, or (ii) $40.00 per ton of coal extracted and sold by Quality. If the actual expenses exceed $40.00 per ton, an adjustment will be made to allocate to Nexgen the amount that Nexgen would be entitled to if the expenses were $40.00 per ton.

1.2.     Loan Documents.  The Loan shall be evidenced by that certain Senior Secured Promissory Note in the form attached hereto as Exhibit A ("**Note**"). The Note shall be secured by (a) that certain Security Agreement by Quality in favor of Nexgen in the form attached hereto as Exhibit B ("**Security Agreement**"), and (b) that certain Secured Guaranty by Mays in favor of Nexgen in the form attached hereto as Exhibit C ("**Guaranty**").  The Guaranty shall be secured by that certain Equity Pledge Agreement in the form attached hereto as Exhibit D ("**Pledge Agreement**"). The Note, the Security Agreement, the Guaranty, the Pledge Agreement and the other documents executed in connection with the Loan are collectively referred to in this Agreement as the "**Loan Documents**".

1.3.     Closing; Funding the Loan. Concurrently with the full execution of this Agreement, Quality shall execute and deliver to Nexgen (a) a fully executed copy of the Lost Creek Agreement, (b) the Loan Documents executed by Quality and Mays, as applicable, and (c) a resolution of Quality authorizing the execution of this Agreement and the Loan Documents. Concurrently with the full execution of this Agreement, and upon receipt of the foregoing items from Quality, Nexgen shall fund the entire Loan amount (for the benefit of Quality) directly to Lost Creek by wire transfer of immediately available funds.

1.4.     Defined Terms Used in this Agreement.  In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

(a)     **"Person"** means any individual, corporation, partnership, trust, limited liability Quality, association or other entity.

(b)     "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

2.     Representations and Warranties of Quality.  Quality hereby represents and warrants to Nexgen that the following representations are true and complete as of the Closing, except as otherwise indicated.

2.1.     Organization, Good Standing, Corporate Power and Qualification. Quality is a corporation duly organized, validly existing and in good standing under the laws of the State of Alabama and has all requisite corporate power and authority to carry on its business

as presently conducted and as proposed to be conducted. Quality is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on Quality's activities.

2.2. <u>Capitalization</u>. The authorized capital of Quality consists, immediately prior to the Closing, of 1,000 shares of common stock, owned 100% by Mays. There are no outstanding options, warrants, rights or agreements, orally or in writing, to purchase or acquire from Quality any shares of Quality or any securities convertible into or exchangeable for shares of stock in Quality.

2.3. <u>Subsidiaries; Joint Ventures</u>. Quality does not own any subsidiaries and is not a participant in any joint venture, partnership or similar arrangement with respect to the Project or otherwise.

2.4. <u>Authorization</u>. All corporate action required to be taken by Quality's Board of Directors and shareholder to authorize Quality to enter into this Agreement has been taken or will be taken prior to the Closing. This Agreement, when executed and delivered by Quality, shall constitute valid and legally binding obligations of Quality, enforceable against Quality in accordance with their respective terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (c) to the extent limited by applicable federal or state securities laws.

2.5. <u>Governmental Consents and Filings</u>. Except as provided in the Lost Creek Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of Quality in connection with Project and the consummation of the transactions contemplated by this Agreement.

2.6. <u>Litigation; Guaranties</u>. There is no claim, action, suit, proceeding, arbitration, complaint, charge or, to Quality's knowledge, investigation pending or to Quality's knowledge, currently threatened against Quality or any officer or director of Quality that questions the validity of this Agreement or any of Quality's governing documents or the right of Quality to enter into them, or to consummate the transactions contemplated by this Agreement. Quality is not a guarantor or indemnitor of any indebtedness of any other Person.

2.7. <u>Compliance with Other Instruments</u>. Quality is not in violation or default (a) of any provisions of its certificate of incorporation or bylaws, (b) of any instrument, judgment, order, writ or decree, (c) under any note, indenture or mortgage, or (d) in any material respect under any lease, agreement, contract or purchase order to which it is a party.

2.8.    <u>Bankruptcy Status; Indebtedness</u>. Quality has no current intention or expectation to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one (1) year from the date of this Agreement. Quality has no loans or debt outstanding other than accounts payable in the normal course of its business all of which are current.

2.9.    <u>Tax Returns and Payments</u>.  There are no federal, state, county, local or foreign taxes due and payable by Quality which have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of Quality which are due, whether or not assessed or disputed.

2.10.    <u>Permits</u>.  Except as provided in the Lost Creek Agreement, Quality has all permits, licenses and any authority necessary for the conduct of its business and the Project, the lack of which could reasonably be expected to have a material adverse effect on Quality.  Quality is not in default in any material respect under any of such permits, licenses or other similar authority.

2.11.    <u>Environmental and Safety Laws</u>.  Except as could not reasonably be expected to have a material adverse effect (a) Quality is and has been in compliance with all applicable environmental laws; (b) there has been no release or to Quality's knowledge threatened release of any pollutant, contaminant or toxic or hazardous material, substance or waste, or petroleum or any fraction thereof (each a "**Hazardous Substance**") on, upon, into or from any site currently or heretofore owned, leased or otherwise used by Quality; (c) there have been no Hazardous Substances generated by Quality that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any governmental authority in the United States, except for the storage of hazardous waste in compliance with Environmental Laws.

For purposes of this Section, "Environmental Laws" means any law, regulation, or other applicable requirement relating to (a) releases or threatened release of Hazardous Substance; (b) pollution or protection of employee health or safety, public health or the environment; or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

2.12.    <u>Brokers</u>. No agent, broker, or other person or firm acting on behalf of or under the authority of Quality is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the transactions contemplated by this Agreement.

2.13.    <u>Reliance</u>. Quality understands that the foregoing representations and warranties shall be deemed material and to have been relied upon by Nexgen.

3.    <u>Representations and Warranties of Nexgen</u>.  Nexgen hereby represents and warrants to Quality that:

3.1.    <u>Authorization</u>.  Nexgen has full power and authority to enter into this Agreement.  This Agreement and any other agreement with Quality or Mays, to which Nexgen is

a party, when executed and delivered by Nexgen, will constitute valid and legally binding obligations of Nexgen, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (b) to the extent the indemnification provisions contained herein may be limited by applicable federal or state securities laws.

3.2.     <u>Purchase Entirely for Own Account</u>.   This Agreement is made with Nexgen in reliance upon Nexgen's representation to Quality, which by Nexgen's execution of this Agreement, Nexgen hereby confirms, that this Agreement will be executed for investment for Nexgen's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof.

3.3.     <u>Restricted Securities</u>.  Nexgen understands that the equities represented by this Agreement have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Nexgen's representations as expressed herein.

3.4.     <u>Accredited Investor</u>.  To the extent Nexgen is a "U.S. Person" (as defined in Rule 902(k) of Regulation S, promulgated under the Securities Act), Nexgen, hereby represents and warrants that Nexgen is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.5.     <u>No Other Representations</u>. Other the representations and warranties above, Nexgen makes no other representations or warranties in regard to the transactions contemplated by this Agreement.

4.     <u>Additional Rights and Obligations of the Parties</u>.

4.1.     <u>Lost Creek Agreement</u>.  Quality agrees, diligently and in good faith, at all times during the term of the Lost Creek Agreement and the Note, to perform all obligations of Quality set forth in the Lost Creek Agreement and this Agreement with respect to the Project in a first-class manner and in accordance with all applicable laws.  In the performance of Quality's obligations hereunder, Quality agrees to apply prudent and reasonable business practices to complete the Project, all of which practices shall be performed in a manner at least equivalent to the standard of care rendered by leading mining operators for mining operations similar to the Project.

4.2.     <u>Use of Proceeds</u>. The proceeds of the Loan received by Quality shall be used exclusively to obtain the Mine Assets in connection with the Project and in accordance with the Lost Creek Agreement, the Loan Documents, and this Agreement including, without limitation, the Budget set forth in <u>Exhibit E</u> attached hereto.

4.3.     <u>Distributions</u>. Pursuant to Section 1.1, after the required monthly Loan payments under the Loan Documents and after the prior written approval of both Parties, each Party shall be entitled to fifty percent (50%) of the profits derived from the Project under the

Lost Creek Agreement after payment of expenses permitted under this Agreement. For purposes of calculating profits on the Project, expenses shall be calculated at the lower of (a) actual expenses, or (b) $40.00 per ton of coal extracted and sold by Quality. If the actual expenses exceed $40.00 per ton, an adjustment will be made to allocate to Nexgen the amount that Nexgen would be entitled to if the expenses were $40.00 per ton. For example and illustrative purposes only, if Quality extracted and sold 10,000 tons of coal at $75.00 per ton and permitted Project expenses were $45.00 per ton, then the profits shall be calculated as follows:

        (i)      gross receipts of $750,000 minus permitted expenses of $450,000 is $300,000,

        (ii)     $30,000 for interest (first month),

        (iii)    $120,000 principal reduction ($100,000 x $12.00 per ton),

        (iv)    the net amount left after debt service which would be allocated between the Parties is $150,000, and

        (v)     based on this Section and the 50%/50% share of profits between the Parties, $75,000 would be allocated to Nexgen and $75,000 for Quality; provided, however, since the expenses exceeded the minimum permitted expenses by $5.00 per ton (or $50,000), then calculating the profits based on the $40.00 maximum amount would have yielded $200,000 in profits instead of $150,000 so the actual profit allocation of the $150,000 in the above case would be $100,000 to Nexgen and $50,000 to Quality.

    4.4.   <u>Bank Account; Accounting</u>.  Quality shall open and maintain a separate bank account for the Project and deposit all funds with respect to the Project in such separate bank account with a bank approved by the Parties.  Quality and a representative designated by Nexgen shall both be authorized signtors on such account. Quality shall maintain complete and accurate books of account and all other records with respect to the Project and make such records and books of account available for to Nexgen or its duly authorized representative upon request during regular business hours and at the principal office of the Company.  Each Party shall have online access to the bank account for the Project and statements.  Quality shall provide Nexgen on a monthly basis reasonable accounting records for the Project and any other business records with respect to the Project within one (1) business day upon notice of such request.

    4.5.   <u>Devotion of Time</u>.  Quality shall devote its full attention and time to the Project. Without the prior written approval of Nexgen, Quality further agrees that it shall not devote its time to any business activity that may in any way be in competition with the Project or may detract from its obligations under the Lost Creek Agreement and this Agreement. In view of the unique nature of the Project, the foregoing restriction is reasonable and necessary to protect the legitimate interests of Nexgen in the Project and that any violation thereof would result in irreparable injuries to Nexgen.

    4.6.   <u>Assignment and Assumption of the Note</u>. After the Closing, Nexgen shall form a new Alabama limited liability company ("**Newco**") and may elect to have Newco serve as the operator of the Project (after the receipt of all required licenses, permits and approvals). The reasonable costs and expenses incurred in connection with this Section shall be an expense of the

Project. Each of Quality and Nexgen shall own fifty percent (50%) of Newco. The terms of the operating agreement of Newco shall be consistent with the terms of this Agreement. The Parties shall reasonably cooperate with the formation of Newco and the transfer of all of the required licenses, permits and approvals to operate the Project. When and if Nexgen forms Newco and obtains all such required licenses, permits and approvals, Quality shall transfer the Mine Assets to Newco and Newco in exchange for fifty percent (50%) of the membership interests in Newco and Newco shall be substituted as the borrower under the Loan Documents.

4.7.    <u>Additional Capital; Cap on Costs</u>. Upon funding the Loan in accordance with this Agreement and the Note, Nexgen shall have no further obligation to make capital available to Quality (or if and as applicable, Newco) in connection with the Project or otherwise. Quality acknowledges and agrees that any costs of the Project in excess of $40.00 per ton shall be the sole responsibility of Quality.

4.8.    <u>Insurance</u>.    Quality shall maintain, as a cost of the Project and in accordance with the Budget, all policies of insurance required under the Lost Creek Agreement including, without limitation, property damage and general liability insurance policies with respect to the Project (in a form reasonably acceptable to Nexgen). All such insurance policies required to be carried by Quality shall be with insurance companies that are licensed to write insurance in Alabama and are rated no less that A-VIII by the A.M. Best Rating Agency. Quality shall furnish to Nexgen certificates of insurance evidencing all bonds and other insurance that Quality is required to maintain pursuant to this Agreement and the Lost Creek Agreement. All such insurance policies maintained shall name Nexgen as a named insured or loss payee, as applicable.

4.9.    <u>Restrictions Regarding Material Matters</u>. Without first obtaining the prior written approval of Nexgen, Quality shall not (a) sell, transfer or otherwise dispose of the shares or interests of Quality, the Mine Assets and/or the rights of Quality under the Lost Creek Agreement, (b) grant any liens, encumbrances, purchase rights or rights of first refusal with respect to the Mine Assets and/or the rights of Quality under the Lost Creek Agreement; (c) approve an expenditure not permitted by the Budget; (d) issue any additional shares, interests or securities of Quality; and/or (e) obtain any additional financing any of Quality's assets and/or the operations of Quality. Upon the completion of the Project, Quality shall sell the Mine Assets and the proceeds of such sale shall be distributed to the Parties pursuant to <u>Section 4.3</u> above.

5.    <u>Indemnification</u>. Quality shall indemnify Nexgen and hold Nexgen harmless from and against any and all losses, damages, liabilities and expenses (including reasonable attorneys' fees and costs) (collectively, "**Loss**") sustained or incurred by Nexgen as a result of (a) a breach of a representation or warranty made under <u>Section 2</u> above, or any misrepresentation thereunder, and (b) any breach or default under this Agreement, the Lost Creek Agreement and any of the Loan Documents. If any claim, suit, action or other proceeding to which the indemnity set forth herein applies is brought against Nexgen, Nexgen shall give Quality prompt notice of the same. Quality shall promptly assume the defense of Nexgen.

6.    <u>Miscellaneous</u>.

6.1.    Survival of Warranties.  Unless otherwise set forth in this Agreement, the representations and warranties of the Parties contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing.

6.2.    Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties.

6.3.    Governing Law.  This Agreement shall be governed by the internal law of the State of Delaware, without giving raise to any conflict of laws.

6.4.    Jurisdiction and Venue.  The Parties agree that any suit, action or proceeding arising out of or related to this Agreement shall be brought only in the applicable Federal or State Court in Birmingham, Alabama. To the fullest extent permissible by law, the Parties consent to the personal jurisdiction, venue and forum of such courts.

6.5.    Attorneys' Fees. If any legal action or other proceeding is brought for the enforcement of this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party, reasonable attorneys' fees, court costs and all expenses, even if not taxable as court costs (including, without limitation, all such fees, costs and expenses incident to appeals), incurred in that action or proceeding, in addition to any other relief to which such Party may be entitled.

6.6.    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.7.    Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.8.    Notices.  Except as otherwise set forth in this Agreement, all notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of:  (a) hand delivery, (b) upon receipt if delivered by a reliable overnight courier service, with receipt acknowledgment requested, or (c) upon receipt if transmitted by email, with a copy sent on the same day by one of the other permitted methods of delivery, and addressed as follows or such other address as a Party may from time to time specify in writing in with this Section:

(a)    Quality:

Quality Coal, Inc.
72 Longview Dr.
Jasper, Alabama 35504
Attention: Rodney L. Mays
Email:  maysrodney@yahoo.com

(b)     Nexgen:

Nexgen Extractions LLC
101 Chase Avenue, Suite 206
Lakewood, NJ 08701
Attention: Legal Notices
Email: isaac@nexgencapital.com

with copies to (which shall not constitute notice):

Maynard Cooper & Gale
1901 Sixth Avenue North
Regions Harbert Plaza, Suite 2400
Birmingham, AL 35203
Attention:  Jim McLaughlin
Email:  JMcLaughlin@maynardcooper.com

6.9.    Fees and Expenses.  Quality shall pay the fees and expenses of Nexgen's legal counsel as an expense of the Project.

6.10.   Amendments and Waivers.  This Agreement may be modified or amended only by agreement in writing signed by the Parties. Any waiver of compliance of any term, condition, or obligation under this Agreement shall only valid if set forth in writing signed by the Party to be bound.  Waiver of any term, condition or obligations of this Agreement by a Party shall not be construed as a waiver of any subsequent breach or waiver of the same term or condition by such Party, or a waiver of any other term or condition of this Agreement by such Party.  The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any such rights.

6.11.   Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

6.12.   Delays or Omissions.  No delay or omission to exercise any right, power or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

6.13.  <u>Further Assurances</u>. Each Party agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

6.14.  <u>Advice of Counsel</u>.  Each Party agrees and represents that it (a) has had advice of counsel of its choosing or had the opportunity of obtaining advice of counsel, in the negotiation and the preparation of this Agreement, (b) has read this Agreement, and (c) is fully aware of the contents and legal effect of this Agreement.

6.15.  <u>Entire Agreement</u>.  This Agreement and the Loan Documents constitute the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**"QUALITY":**

Quality Coal Co., Inc., an Alabama corporation

By: _Rodney L. Mays_ _____
Name: Rodney L. Mays
Title: President


**"NEXGEN":**

Nexgen Extractions LLC,
a New Jersey limited liability Quality


By: _____
    Yitzchak Abadi, Manager

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

"QUALITY":

Quality Coal Co., Inc., an Alabama corporation


By: _____
Name: Rodney L. Mays
Title: President


"NEXGEN":

Nexgen Extractions LLC,
a New Jersey limited liability Quality

By: _____
        Yitzchak Abadi, Manager

[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

# EXHIBIT B

<u>**SENIOR SECURED PROMISSORY NOTE**</u>

**$1,500,000.00**                                                            Jasper, Alabama
                                                                                    May 7, 2019

      **FOR VALUE RECEIVED**, Quality Coal Co., Inc., an Alabama corporation, as maker, having an address at 72 Longview Dr., Jasper, Alabama 35504 ("**Borrower**"), hereby unconditionally promises to pay to the order of Nexgen Extractions LLC, a New Jersey limited liability company ("**Lender**"), as payee, at 101 Chase Avenue, Suite 206, Lakewood, NJ 08701, Attention: Legal Notices, or at such other place as the holder hereof may from time to time designate in writing, the principal sum of **ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00)** ("**Loan Amount**"), together with interest on any principal amounts remaining unpaid from time to time from the date of this Secured Promissory Note ("**Note**") until payment in full, to be calculated as set forth below.

      Concurrently with the execution of this Note, Borrower and Lender have entered into that certain Securities Purchase Agreement (the "**SPA**") whereby the parties, subject to the terms and condition set forth therein, shall form a new limited liability company ("**Newco**") that shall assume the Note and Borrower shall contribute certain assets. In the interim, Borrower has requested that Lender extend the loan evidenced by this Note ("**Loan**") to provide capital to Borrower prior to the closing of the investment.  Lender has agreed to make the Loan to Borrower in accordance with and subject to the express terms and conditions of this Note.

      **NOW THEREFORE,** for good and valuable consideration, including the Loan and all other items included within the indebtedness evidenced by this Note (collectively, the "**Indebtedness**"), the receipt and sufficiency of which are hereby acknowledged, Borrower agrees as follows:

**ARTICLE 1**

**DEFINITIONS**

      All capitalized terms used in this Note shall have the following meanings:

      The term "**Business Day**" shall mean any day other than Saturday, Sunday, or public holiday or the equivalent for banks generally under the laws of the State of Delaware. Whenever any payment to be made under this Note is stated to be due on a day other than a Business Day, that payment may be made on the next succeeding Business Day, and the extension of time will in that case be included in the computation of payment of interest.  However, if the extension would cause the payment to be made in a new calendar month, that payment will be made on the next preceding Business Day, and interest will be payable for the shorter period.

      The term "**Default Rate**" shall mean a rate of interest per annum equal to the lessor of twenty-four percent (24%) or the maximum rate permitted by law.

      The term "**Interest Rate**" shall mean a rate of interest per annum equal to twenty-four percent (24%).

The term "**Loan Documents**" shall mean this Note and all other documents evidencing, or relating to the loan evidenced by this Note.

The term "**Maturity Date**" shall mean April 30, 2021, or any earlier date on which the Indebtedness evidenced by this Note is due pursuant to the terms of the Loan Documents.

The term "**Person**" shall mean any natural person, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or governmental authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

## ARTICLE 2

## PAYMENT TERMS

The principal amount advanced under this Note shall bear interest on the unpaid principal amount from the date first set forth above until repaid pursuant to the terms of this Note. Borrower shall make monthly payments in accordance with the payment scheduled attached hereto as **Schedule 1**. The entire balance of principal outstanding on the Maturity Date, together with any interest accrued thereon from such date and until paid in full, shall be paid by the Maturity Date. All payments will be applied first to payment of any costs, fees, interest, late charges, or other charges due under this Note or any Loan Documents, then to accrued interest, and then to the principal balance.

Both principal and interest are payable in lawful money of the United States of America in same day funds at Lender's address set forth above or at any place that Lender or the legal holders of this Note may, from time to time, designate to Borrower in writing. Borrower may, at its option, prepay the Indebtedness in whole or in part, without penalty; provided, however, in no event shall Borrower receive repayment of any fees or costs previously paid to Lender. Borrower may, at its option and upon at least thirty (30) days but not more than sixty (60) days prior written notice to Lender, prepay the Indebtedness in its entirety.

## ARTICLE 3

## ASSUMPTION

Provided that Borrower is not in Default under this Note, upon the closing of the investment prior to the Maturity Date, the entire outstanding Indebtedness due and owing under this Note shall be assumed by Newco according to the terms set forth in the SPA. Borrower acknowledges that the investment transaction may not close prior to the Maturity Date (or at all) and Borrower's obligations under the Note (including the obligation to pay all principal amount under this Note) are not dependent on the closing of such transaction.

## ARTICLE 4

## SECURITY

As an inducement for Lender to provide the Loan and to secure the full and punctual payment of the Indebtedness and the performance of the Borrower's obligations under this Note,

Borrower hereby grants to Lender a continuing and unconditional security interest (the "**Security Interest**") in the Collateral (as defined below) until this Note is assigned to and assumed by Newco in accordance with the SPA or the Loan is repaid in full. Subject to laws applicable to Borrower as a corporation formed in Alabama, the Security Interest shall be governed by the Uniform Commercial Code of the State of Delaware. Lender shall be permitted to file any financing statements necessary to perfect the Security Interest. For purposes of this Agreement, "Collateral" means (a) all of the tangible and intangible assets of Borrower, including but not limited to cash, accounts receivable, inventory, copyrights, trademarks, tradenames, patents, contract rights and customer lists, and (b) all proceeds derived from the foregoing assets.

## ARTICLE 5

## DEFAULT; REMEDIES

The Indebtedness shall without notice become immediately due, accelerated and payable at the option of Lender if any payment required in this Note is not paid on or prior to the Maturity Date or on the occurrence of any other default under this Note. For the avoidance of doubt, as permitted under applicable law, if the Indebtedness has been accelerated upon a default under this Note, payment of principal and interest shall be immediately due and payable.

Any amount of principal or interest that is not paid when due (whether at stated maturity, by acceleration, or otherwise) will bear interest from the date on which that amount is due until the amount is paid in full, payable on demand, at the Default Rate in effect from time-to-time. The undersigned acknowledges that, during the time that any amount is in default, Lender will incur losses that are impracticable, costly, and inconvenient to ascertain. Those losses include, without limitation, the ability to invest amounts then due at the current rate of return and the unavailability of liquid funds. Borrower agrees that the Default Rate of interest represents a reasonable sum considering all of the circumstances existing on the date of the execution of this Note and represents a reasonable estimate of the losses Lender will incur by reason of any late payment. Borrower further agrees that proof of actual losses would be costly, inconvenient, impracticable, and extremely difficult to fix. Acceptance of the interest at the Default Rate shall not constitute a waiver of any default with respect to the overdue payment and shall not prevent Lender from exercising any of the other rights and remedies available under this Note or any Loan Document. This charge shall be in addition to, and not in lieu of, any other remedy Lender may have, and is in addition to Lender's right to collect reasonable fees and charges of any agents or attorneys which Lender employs in connection with any default. Such late charges if not previously paid shall become part of the Indebtedness evidenced hereby. Failure to pay such late charges upon Lender's demand shall constitute a default and such late charges shall bear interest at the Default Rate from the date due until paid to Lender in full.

Upon the occurrence of any default under this Note or any other Loan Document, Lender may exercise any or all of the rights and remedies available to it under this Note and applicable, at its discretion. The failure of Lender to exercise any remedy provided under this Note or any other Loan Document shall not preclude the resort to any other remedy provided or prevent the subsequent or concurrent resort to any other remedy which by law or equity shall be vested in Lender for the recovery of damages or otherwise in the event of a breach of any of the undertakings of Borrower under this Note or any other Loan Document.

# ARTICLE 6

## SAVINGS CLAUSE

All agreements between Borrower and Lender are expressly limited so that in no event will the amount paid or agreed to be paid to Lender for the use, forbearance, or detention of the money to be advanced under this Note exceed the highest lawful rate permissible under applicable law.  If, from any circumstance, fulfillment of any provision of this Note or any Loan Document, at the time performance or the provision is due, is prohibited by law, then the obligation to be fulfilled will be reduced to the maximum rate not so prohibited, and if from any circumstance Lender should ever receive as interest under this Note an amount that would exceed the highest lawful rate, the amount that would be excessive interest will be applied to the reduction of the principal of this Note and not to the payment of interest.  This provision will control every other provision of all agreements between Borrower and Lender with respect to the Loan Documents.

# ARTICLE 7

## NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

# ARTICLE 8

## WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Indebtedness do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note or any other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Indebtedness, under this Note or any other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note or any other Loan Documents.

# ARTICLE 9

## TRANSFER

Upon the transfer of this Note by Lender, Borrower hereby waiving notice of any such transfer, Lender may deliver all the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged

from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 10

## ATTORNEYS' FEES AND COSTS

Borrower agrees to pay all costs (including, without limitation, reasonable attorneys' fees, witness fees and all other costs) incurred by Lender in enforcing payment or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, whether or not suit is filed, and including, without limitation, all costs, reasonable attorneys' fees, and expenses incurred by Lender in connection with any bankruptcy (including any action for relief from the automatic stay of any bankruptcy proceeding), reorganization, arrangement, or other similar proceedings involving the undersigned that in any way affects the exercise by the holder of this Note of its rights and remedies under this Note. All costs incurred by the holder of this Note in any action undertaken to obtain relief from the stay of bankruptcy statutes are specifically included in those costs and expenses to be paid by the undersigned. Borrower will pay to Lender all attorneys' fees and other costs referred to in this Article on demand, together with interest from the date of the demand at the Default Rate until paid in full.

## ARTICLE 11

## REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower represents and warrants that as of the date hereof and as of each disbursement under this Note the following representations and warranties will be true and correct:

11.1     <u>Power; Authorization; Enforceable Obligations</u>. Borrower is organized under the laws of the State of Alabama and has full power, authority and legal right to execute, deliver and perform all obligations under this Note. This Note constitutes legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms.

11.2     <u>No Violations</u>. Borrower is not in default in any material respect under any agreement to which it is a party, or under any applicable statute, rule, order, decree or regulation of any court, arbitrator or governmental body or agency having jurisdiction over Borrower.

11.3     <u>No Legal Conflicts</u>. The borrowing of the Loan Amount and Borrower's execution, delivery and performance of the obligations under this Note and any Loan Documents will not: (a) violate, conflict with or result in a default under any agreement or other instrument to which Borrower is a party; (b) violate any law or regulation or any order or decree of any court or governmental instrumentality; (c) require any authorization or consent from, or any filing with, any governmental authority; (d) result in the creation of any lien, charge or encumbrance upon any of the property of the Borrower; nor (e) will Borrower be insolvent at the time of such disbursement under this Note.

11.4     <u>No Litigation</u>. No action, suit, proceeding or investigation, judicial, administrative or otherwise (including, without limitation, any reorganization, bankruptcy,

insolvency or similar proceeding) currently is pending or, to the best of Borrower's knowledge, threatened or contemplated against or affecting Borrower.

Borrower acknowledges that, but for the representations and warranties in this Article, Lender would not grant the Loan to Borrower on the terms represented in this Note. Borrower further acknowledges that Lender is relying exclusively on Borrower's representations and warranties in this Article, and will disburse the Loan Amount in material reliance on such representations and warranties.

## ARTICLE 12

### INDEPENDENT COUNSEL; CONSTRUCTION

Each party acknowledges that it has been represented by independent counsel throughout all of the negotiations which preceded the execution of this Note and the other Loan Documents, and that it has executed this Note with the consent and upon the advice of such independent counsel. Each party further acknowledges that this Note and the other Loan Documents have been drafted as a result of negotiations between the parties, and therefore, no provision shall be construed so as to favor or disfavor either party hereto.

## ARTICLE 13

### CONDITIONS

As a condition precedent to the Lender's extension of the Loan proceeds to Borrower, Borrower shall reimburse Lender all of the legal fees incurred by Lender in connection with the documentation of the Loan.

## ARTICLE 14

### GOVERNING LAW; LITIGATION PROVISIONS

This Note shall be governed by the laws of the State of Delaware. Borrower consents and submits to the jurisdiction of any State or Federal court located in Birmingham, Alabama, in which any legal proceeding may be commenced or pending relating in any manner to this Note or any other Loan Document. Borrower agrees that process in any legal proceeding relating to this Note or any other Loan Document may be served on Borrower at any address of Borrower. Borrower agrees that any legal proceeding relating to this Note or any other Loan Document may be brought against Borrower in any State or Federal court located in Birmingham, Alabama. Borrower waives any objection to venue in any such court and waives any right it may have to transfer or change the venue from any such court. Borrower agrees that it will not commence any legal proceeding against lender relating in any manner to this Note or any other Loan Document in any court other than a State or Federal court located in Birmingham, Alabama, or if a legal proceeding is commenced by Lender against Borrower in a court in another location, by way of a counterclaim in such legal proceeding.

## ARTICLE 15

## USE OF PROCEEDS

Borrower agrees with and represents to Lender that the Loan disbursed by Lender pursuant to this Note shall be used by Borrower solely in accordance with the SPA and exclusively for the acquisition of those certain lease mining rights, contract mining rights, permits, and other assets more particularly described in that certain Agreement dated as of the date of this Note ("**Lost Creek Agreement**"), between Borrower and Lost Creek Clay and Mineral, LLC, an Alabama limited liability company ("**Lost Creek**"). Borrower hereby instructs Lender to fund the Loan Amount directly to Lost Creek in accordance with the Lost Creek Agreement. Borrower acknowledges that, but for this agreement and representation of Borrower, Lender would not grant the Loan to Borrower on the terms represented in this Note or the Loan Documents. Borrower further acknowledges that Lender is relying exclusively on Borrower's agreement and representation hereunder in Lender's determination of the use of the Loan Amount, and will make disbursements under the Note in material reliance on such agreement and representation.

## ARTICLE 16

## NOTICES

All notices and other communications provided for in this Note (each a "**Notice**") shall be in writing. The addresses for Notices to the parties for purposes of this Note are set forth above or such other address as a party may designate by Notice duly given in accordance with this Article. All Notices shall be: (a) hand-delivered, effective upon receipt; or (b) sent by a national overnight courier, effective upon receipt; or (c) sent by certified mail, return receipt requested, shall be deposited in the United States mail, with postage thereon fully prepaid and shall be deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three (3) business days after the date of mailing, whichever is the earlier in time. The party giving a Notice shall have the burden of establishing the fact and date of delivery or refusal of delivery of a Notice. The address of Borrower set forth in the Preamble of this Note shall be the mailing address of Borrower as debtor under the Delaware Uniform Commercial Code.

## ARTICLE 17

## MISCELLANEOUS

Borrower shall, at its cost and expense, upon request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and do and cause to be done such further acts that may be necessary or proper in the opinion of Lender to carry out more effectually the provisions and purpose of this Note. This Note shall be binding upon the parties hereto and upon their respective heirs, executors, administrators, successors and assigns, and shall inure to the benefit of the successors and assigns of Lender. Notwithstanding the foregoing, Borrower shall not have the right to assign any interest in this Note or any of the Loan Documents without the prior written consent of Lender (which may be withheld in Lender's sole discretion). Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or

unenforceability without invalidating the remainder of such provision or the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

**[No Further Text on this Page; Signature of Borrower Follows Immediately]**

**IN WITNESS WHEREOF**, Borrower has duly executed this Note as of the date first set forth above.

> **"Borrower"**:
>
> Quality Coal Co., Inc., an Alabama corporation
>
> By: _Rodney Mays_
> Name: Rodney L. Mays
> Its: President

## Schedule 1

[See Attached]

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Loan amount:** | $ 1,500,000.00 | | | | | | | | | | | | | | | | | | | | | | | |
| **Rate per. mo.** | 2.00% | | | | | | | | | | | | | | | | | | | | | | | |

| May 2019 | June | July | Aug | Sep | Oct | Nov | Dec | Jan 2020 | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan 2021 | Feb | Mar | Apr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30,000 | 28,440 | 26,880 | 25,320 | 23,760 | 22,200 | 20,640 | 19,080 | 17,520 | 15,960 | 14,400 | 12,840 | 11,280 | 9,720 | 8,160 | 6,600 | 5,040 | 3,480 | 1,920 | 360 | (1,200) | (2,760) | (4,320) | (5,880) |
| 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 |
| **1,422,000** | **1,344,000** | **1,266,000** | **1,188,000** | **1,110,000** | **1,032,000** | **954,000** | **876,000** | **798,000** | **720,000** | **642,000** | **564,000** | **486,000** | **408,000** | **330,000** | **252,000** | **174,000** | **96,000** | **18,000** | **(60,000)** | **(138,000)** | **(216,000)** | **(294,000)** | **(372,000)** |

Total monthly payment due on the 5th calendar day of each calendar month prior to the Maturity Date

| 108,000 | 106,440 | 104,880 | 103,320 | 101,760 | 100,200 | 98,640 | 97,080 | 95,520 | 93,960 | 92,400 | 90,840 | 89,280 | 87,720 | 86,160 | 84,600 | 83,040 | 81,480 | 79,920 | 78,360 | 76,800 | 75,240 | 73,680 | 72,120 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

# EXHIBIT C

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made and entered into as of May 7, 2019 ("**Effective Date**"), between Quality Coal Co., Inc., an Alabama corporation ("**Borrower**"), in favor of Nexgen Extractions LLC, a New Jersey limited liability company ("**Lender**"), to record the grant of a security interest in all of the tangible and intangible assets of Borrower as further described in this Agreement. Each of Borrower and Lender are sometimes referred to herein as a "**Party**", and collectively, as the "**Parties**".

A.  Concurrently with the execution of this Agreement, Borrower has executed and delivered to Lender a Senior Secured Promissory Note, of even date herewith, in the original principal amount of $1,500,000.00 (the "**Note**").

B.  To induce Lender to make the loan evidenced by the Note, Borrower has agreed to grant a security interest in the Assets (defined below) of Borrower to secure Borrower's obligations to Lender under the Note.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  **Definitions**. Unless otherwise defined herein or unless the context otherwise requires, terms used in this Agreement, including its preamble and recitals, have the meanings provided in the Uniform Commercial Code in effect in the State of Delaware (the "**UCC**"). In addition, the following terms when used in this Agreement shall have the following meanings:

a.  "**Transaction Documents**" shall mean (i) this Agreement, (ii) the Note, and (iii) the UCC-1 statements filed in connection herewith.

b.  "**Collateral**" shall mean (i) all of the tangible and intangible assets of Borrower including, without limitation, cash, accounts receivable, inventory, copyrights, trademarks, tradenames, leases, licenses, permits, patents, contract rights and customer lists, and all Mine Assets (as defined in that certain Agreement dated as of the Effective Date between Borrower and Lost Creek Clay and Mineral, LLC, an Alabama limited liability company, with respect to the McCollum Mine), and (ii) all Proceeds derived from the foregoing assets. The Collateral is more fully described in Exhibit A attached hereto.

c.  "**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

d.  "**Lien**" shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of the foregoing (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

e.     "**Obligations**" shall mean all amounts owed by Borrower to Lender under the Note.

f.     "**Permitted Encumbrances**" shall mean (i) Liens imposed by law for taxes and other governmental charges not yet delinquent or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP; (ii) Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and other Liens imposed by law or contract created in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP; (iii) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; and (iv) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business.

g.     "**Person**" shall mean any individual, partnership, firm, corporation, association, joint venture, limited liability company, trust or other entity, or any Governmental Authority.

h.     "**Proceeds**" means rights arising out of the Collateral and whatever is acquired, received, collected or distributed on account of the Collateral or on the sale, lease, license, holding, exchange, collection, liquidation or other disposition of the Collateral.

i.     "**UCC**" means the Uniform Commercial Code of the State of Delaware or any successor statute or, when the laws of another jurisdiction governs the method or manner of the creation of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of that jurisdiction.

**2.     Grant and Perfection of Security Interest**. To secure the full and punctual payment and performance of the Obligations, Borrower hereby grants to Lender a continuing and unconditional security interest in the Collateral. From time-to-time at the request of Lender, Borrower shall execute, deliver, file, and record all assignments, notices of lien, financing statements, continuation statements, statements of change, certificates of title, patents, copyrights and trademark filings and other documents, pay the cost of preparing, processing, and filing or recording them in every place specified by Lender, and do all other acts and things as Lender may request from time to time to create, perfect, and preserve a valid security interest in the Collateral, free from all other Liens, except as expressly allowed in writing by Lender or as permitted under this Agreement, to secure the full and punctual payment and performance of the Obligations or to enable Lender to exercise and enforce Lender's rights and powers under this Agreement with respect to the Collateral. Lender shall furnish to Borrower a copy of any UCC financing or continuation statement filed by Lender with respect to the security interests granted by this Agreement.

At the request and option of Lender, Borrower shall use all commercially reasonable efforts to take any and all reasonable action requested by Lender that is necessary or useful for the attachment, perfection, and priority of, and the ability of Lender to enforce, Lender's security

interest in any and all of the Collateral, including (a) obtaining (in form and substance reasonably acceptable to Lender) all waivers, consents, and approvals from each person that Lender deems reasonably necessary, (b) executing, delivering, and, where appropriate, filing financing statements and related amendments under the UCC, to the extent if any, that Borrower's signature is required, (c) complying with any law, if compliance with the law is a condition to the attachment, perfection, or priority of, or ability of Lender to enforce, its security interest in that Collateral, and (d) causing Lender's name to be noted as secured party on any certificate of title for a titled good if the notation is a condition to the attachment, perfection, or priority of, or ability of Lender to enforce its security interest in that Collateral.

3. **Representations and Warranties**. Borrower represents and warrants that as of the Effective Date:

a. Borrower has the authority to grant to Lender a security interest in the Collateral pursuant to this Agreement;

b. Borrower has not filed any financing statements in any public office covering any of the Collateral (except for the Liens to be satisfied with the proceeds of the Note);

c. Borrower is the sole legal and equitable owner of all the Collateral, except for the security interests granted to Lender in this Agreement;

d. This Agreement has been duly authorized, executed, and delivered on behalf of Borrower and constitutes a valid and binding agreement that is enforceable against Borrower by Lender in accordance with its terms, except to the extent limited by bankruptcy, insolvency, debtor relief, and other laws of general application affecting the enforcement of creditors' rights and debtors' obligations;

e. The Collateral is free and clear of all Liens, charges, and assessments of every kind and nature, except for: (i) liens for taxes and assessments of governmental authorities that are not yet due and for which adequate reserves are recorded in Borrower's books of account; and (ii) security interests granted in favor of Lender or allowed in writing by Lender;

f. Borrower's chief executive offices and the places where Borrower keeps the Collateral and all the records pertaining to the Collateral are at the address of Borrower listed in Section 13 of this Agreement;

g. The exact legal name and state of organization of Borrower are as set forth in the first paragraph of this Agreement, and Borrower does not transact any business under any name other than the exact legal name set forth in the first paragraph of this Agreement; and

h. The execution, delivery, and performance of this Agreement by Borrower: (i) have been duly authorized by all requisite corporate action of Borrower; (ii) will not result in the creation of any Lien on any property of Borrower (other than the security interests created pursuant to this Agreement); (iii) will not contravene the articles of incorporation or bylaws or articles of formation or company agreement, as applicable, of Borrower; (iv) do not require any consent, filing, approval, or other action by or with any Person; (v) will not accelerate the maturity or time for performance of any Indebtedness of Borrower; and (vi) will not constitute a

breach, a default, or an event that (with notice, lapse of time, or both) would be a breach or default, under any order, decree, lease, judgment, agreement, or instrument to which Borrower is a party or otherwise subject.

**4.** **Affirmative Covenants**. Until the Obligations have been paid in full, Borrower shall (a) furnish to Lender any information received by Borrower pertaining to claims made by third parties to the Collateral, (b) promptly notify Lender after Borrower learns of any event that would constitute an Event of Default, (c) promptly pay all indebtedness in accordance with the terms of the Note, (d) conduct and maintain its affairs and business according to its usual and ordinary course, maintain itself at all times as a legal entity organized and existing in good standing under the laws of its states of organization, and comply with all laws applicable to the Collateral, (e) keep books, records, and accounts that fairly reflect all dealings and transactions related to the Collateral and to Borrower's business and activities, permit Lender or its agents or representatives, at any time during normal business hours, to copy, examine, and make extracts from all of Borrower's records pertaining to the Collateral, and compile, prepare, and furnish to Lender all data, reports, schedules, information, and certificates concerning the Collateral as Lender may reasonably request from time to time, (f) promptly pay all filing, recording, and certification fees and charges and other direct costs incurred by Lender to perfect the security interests created by this Agreement, whether incurred before or after the Effective Date, (g) maintain insurance on the Collateral against all risks to which the Collateral may be exposed, with all such insurance policies to name Lender as an additional insured and loss payee as its interests may appear, (h) defend its title or interest in the Collateral against any and all Liens, charges, offsets, defenses, and assessments of every kind and nature, except for Permitted Encumbrances and for Liens which are permitted under the Transaction Documents, and (i) perform its obligations, under each material contract and other agreement constituting part of the Collateral to ensure that no breach, default, or event of default will occur under such contract or agreement.

Borrower acknowledges that Lender has no obligation to preserve the Collateral or to pay taxes, assessments, insurance premiums, and indebtedness secured by a Lien on the Collateral. Any payments made by Lender or actions taken by Lender to preserve the Collateral will not constitute a cure or waiver of any Default. Additionally, Borrower confirms to Lender that Borrower bears all risk of loss associated with the Collateral and that Lender has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral.

**5.** **Negative Covenants**. Without the prior written consent of Lender, in Lender's sole discretion, and except as expressly permitted by the Note, Borrower shall not:

      a.    Take any action or fail to take any action that will impair the rights of Lender in the Collateral;

      b.    Use the Collateral, or permit it to be used, in violation of any law, agreement, or policy of insurance;

      c.    Sell, lease, license, transfer, or otherwise dispose (or offer to do so) of any of the Collateral or any interest in it except in the ordinary course of its business;

d.     Grant or transfer any lien, pledge, mortgage, restriction, security interest, or other encumbrance on any of the assets of Borrower, except as permitted under the Transaction Documents;

e.     Enter into any contract, arrangement, or commitment (oral or written) that is reasonably likely to have a material adverse effect on Borrower's duties or the rights of Lender under the Transaction Documents, or that limits, abrogates, or is inconsistent with any of the Transaction Documents;

f.     Except for Permitted Encumbrances and as otherwise permitted under the Transaction Documents: (i) borrow on the security of the Collateral from anyone except Lender; (ii) pledge or grant a Lien on the Collateral to anyone except Lender; (iii) permit any levy on the Collateral pursuant to legal process; or (iv) permit any lien, security interest, or encumbrance to attach to any of the Collateral, except for security interests in favor of Lender or expressly allowed in writing by Lender;

g.     Breach or default under the terms of any other agreement between Lender and Borrower, except for breaches or defaults which are cured under any applicable cure period; or

h.     Sell, assign, convey, pledge, transfer, hypothecate, or in any other way encumber or dispose of any Collateral, except in the ordinary course of its business or as permitted under the Transaction Documents, without the advance written approval of Lender (which it may withhold in its sole discretion), except for the security interests granted to Lender in this Agreement.

**6.     Secured Party Rights**. Lender may elect (but is not obligated) to do any of the following at any time and from time-to-time: (a) receive or release other security for payment of any of the Obligations; (b) release any party primarily or secondarily liable for payment of any of the Obligations; (c) apply any other security held by it to the satisfaction of the Obligations; and (d) except for Liens otherwise permitted under the Transaction Documents, discharge any Lien on the Collateral that not been expressly allowed in writing by it and pay the costs of insuring, maintaining, and preserving the Collateral; in each case without prejudice to any of its rights under this Agreement.

**7.     Rights with Respect to Collateral**. As long as an Event of Default has not occurred and is not continuing, Borrower may use and sell the Collateral in the ordinary course of its business. If an Event of Default has occurred, and until the Obligations have been fully paid, Borrower shall hold all cash or other property that it receives as a payment or other distribution in respect of the Collateral under an express trust for the sole benefit of Lender and deliver that cash or other property to Lender within 48 hours after Borrower receives it, in the form received (except for any endorsement or assignment required to transfer it to Lender), for application to payment of the Obligations.

**8.     Events of Default**. The occurrence of any event that constitutes a default under the Note shall constitute a Default under this Agreement. In addition, the following events or conditions shall constitute a Default: (a) a levy, execution, or attachment on any of the Collateral by a third party other than Lender; (b) the transfer or disposition of any Collateral, except as

expressly permitted by this Agreement or the other Transaction Documents; or (c) except as otherwise permitted under the Transaction Documents, Lender at any time receives a report from a Governmental Authority indicating that Lender's security interest in some or all of the Collateral is not prior to all other security interests or other interests reflected in the report, and such situation is not cured within ten (10) days following written notice by Lender to Borrower of such situation.

9. **Default Remedies**. At any time after a Default, Lender may elect (but is not obligated) to do any of the following:

a. Upon written notice to Borrower, accelerate the maturity date of the Obligations and declare them to be immediately due and payable; and

b. Exercise from time to time all rights and remedies of a secured creditor under applicable law, including the UCC.

Lender may exercise any of its rights or remedies serially, wholly, partially, or collectively, and the exercise of any one right does not preclude the exercise of any other right. Lender has no obligation to attempt to satisfy the Obligations by collecting from any other Person, and Lender may release, modify, or waive any collateral provided by another person to secure any of the Obligations without affecting in any manner Lender's rights against Borrower or the Collateral. Borrower waives any right it might have to require Lender to pursue any Person for any of the Obligations. Borrower waives any and all rights that it might have to a judicial hearing in advance of the enforcement of any of Lender's rights and remedies under this Agreement, including Lender's right after an Event of Default to take immediate possession of the Collateral to exercise Lender's rights and remedies with respect to the Collateral.

After a Default, Borrower, at its sole expense and at Lender's request, shall assemble any Collateral that is not in Lender's possession and make it available to Lender at a convenient place acceptable to Lender. **Any notice of sale, disposition, or other intended action by Lender that is given to Borrower at the address for Borrower listed in this Agreement at least ten (10) days before the action is taken will constitute reasonable notice of disposition to Borrower.** Lender may sell the Collateral without giving any warranties as to the Collateral and may specifically disclaim warranties of title and other warranties without adversely affecting the commercial reasonableness of any sale or other disposition of the Collateral.

Lender is not obligated to resort to any Collateral or other assurances of payment in any particular order. Lender may apply any Proceeds from a disposition of any of the Collateral toward payment of any of the Obligations, in such order of application as Lender elects in its sole discretion, and Borrower is liable to Lender for any deficiency between the Proceeds realized on any disposition of the Collateral and the amount of Obligations remaining unpaid. Borrower promptly shall pay to Lender, on demand, all costs incurred by Lender in connection with the enforcement, interpretation, and administration of its rights under this Agreement.

Borrower shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all amounts to which Lender is entitled, including all costs and expenses that Lender is permitted to deduct from such proceeds pursuant to this

Agreement and all reasonable fees and disbursements of any attorneys employed by Lender to collect such deficiency.

**10.** **Power of Attorney**. Borrower irrevocably appoints Lender as its agent and attorney-in-fact with full power and authority and with full power of substitution, **whether or not any Default exists**, to sign on behalf of Borrower any registration, notice of lien, financing statement, or other document covering the Collateral as Lender reasonably considers necessary in its sole discretion to create, perfect, and preserve a valid security interest in the Collateral in favor of Lender, and, **after a Default**, to do any of the following as fully as Borrower lawfully might do at Borrower's sole expense:

a. Make claims with respect to the Collateral under any insurance policy of Borrower and to otherwise act to collect any insurance proceeds with respect to the Collateral;

b. Exchange, surrender, or substitute any Collateral;

c. Renew or extend any liability owing to Borrower under any Collateral;

d. Defend, settle, prosecute, or compromise any claim, action, or proceeding with respect to the Collateral;

e. Sell, assign, pledge, indorse, transfer, grant a security interest in, and make any agreement with respect to, any of the Collateral; and

f. Demand, collect, receive, and apply to any of the Obligations, in any order of application that Lender elects in its sole discretion, all Proceeds and payments or monies due or to become due to Borrower in respect of the Collateral.

This power of attorney is a power coupled with an interest. Lender is under no duty to exercise or withhold the exercise of any of the rights, powers, privileges, and options expressly or implicitly granted to Lender in this Agreement and is not liable for any failure to do so or any delay in doing so. Lender is not liable for any act, mistake, omission, or error of judgment in its individual capacity or in its capacity as attorney-in-fact except acts or omissions resulting from its willful misconduct.

**11.** **Termination**. This Agreement and the security interests of Lender under it will terminate when the all the Obligations have been paid in full in cash, but only if Borrower does not file (and none of the creditors of Borrower file against them), within 91 calendar days after the first date when all the Obligations are paid and performed in full, a petition seeking relief under any bankruptcy, insolvency, reorganization, or debtor relief law and a claim for recovery or repayment of any amount paid on the Obligations or for avoidance of any security interest in the Collateral. An affidavit or written statement of Lender, or any duly appointed agent or attorney-in-fact for Lender, that shows or asserts that any of the Obligations remain unpaid will constitute presumptive evidence of the continuing effectiveness of this Agreement and the security interests of Lender under it, and any interested person is authorized to rely on it. When all of the Obligations have been fully paid, Lender promptly shall: (i) deliver to Borrower the original Note, marked "cancelled"; and (ii) assign, indorse, deliver and transfer to Borrower, against receipt, without recourse to or warranty by Lender, any and all Collateral (if any) that is

then held by Lender under this Agreement and has not been sold or otherwise applied pursuant to the terms of this Agreement. On termination of this Agreement and at the request and at the expense of Borrower, Lender shall terminate all effective financing statements in favor of Lender that are then on file or recorded with respect to the Collateral.

12. **Legal Proceedings**. The validity, construction, interpretation, and enforceability of this Agreement are governed by the laws of the State of Delaware except to the extent the UCC provides for the application of the law of another state. Borrower consents to the personal jurisdiction of the state and federal courts in the State of Alabama, stipulates that the proper and convenient venue for any legal proceeding between them that pertains to either this Agreement or the Note is in Birmingham, Alabama, and waives any defenses, whether asserted by motion or pleading, that this venue is improper or inconvenient.

Except as expressly prohibited by law, Borrower waives any right it might have to claim or recover any special, exemplary, punitive, or consequential damages or any damages other than, or in addition to, actual damages. Borrower certifies that neither Lender, nor any agent, attorney, or representative of Lender has represented, expressly or otherwise, that Lender would not seek to enforce the foregoing waivers or other waivers contained in this Agreement, and acknowledge that Lender has relied on, among other things, the foregoing waivers and certification.

In any legal proceeding between Borrower and Lender that arises out of this Agreement and pertains to the validity or enforcement of this Agreement or Lender's security interests in the Collateral granted under it, the non-prevailing Party will reimburse the prevailing Party for all reasonable costs incurred by the prevailing Party as a result of the legal proceeding. The phrase "prevailing party" as used in this Section shall mean the party who receives substantially the relief desired whether by dismissal, summary judgment or otherwise. If Lender becomes a party to any legal proceeding arising out of this Agreement that is initiated by any person other than Borrower and that pertains to the validity or enforcement of this Agreement or Lender's security interests in the Collateral granted under it, Borrower shall reimburse Lender for all reasonable costs incurred by it in connection with the legal proceeding, regardless of who prevails.

**BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A JURY TRIAL IN ANY LAWSUIT BY LENDER TO ENFORCE THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS.**

13. **Notices**. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, or (iii) delivered by nationally recognized courier service (i.e. UPS or FedEx) with charges prepaid, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective upon the earlier of (a) receipt or (b) the scheduled delivery date if by mail or nationally recognized air courier (if delivered on a business day during normal business hours where such notice is to be received). The addresses for such communications shall be:

If to Borrower:

Quality Coal Co., Inc.
72 Longview Dr.
Jasper, Alabama 35504
Attention: Rodney L. Mays
Email:  maysrodney@yahoo.com

If to the Lender:

Nexgen Extractions LLC
101 Chase Avenue, Suite 206
Lakewood, NJ 08701
Attention: Legal Notices
Email: isaac@nexgencapital.com

with copies to (which shall not constitute notice):

Maynard Cooper & Gale
1901 Sixth Avenue North
Regions Harbert Plaza, Suite 2400
Birmingham, AL 35203
Attention:  Jim McLaughlin
Email:  JMcLaughlin@maynardcooper.com

**14.**    **Waiver and Amendment; Assignment**.

a.     A waiver, amendment, modification, or termination of this Agreement will be valid and effective only if it is in writing and signed by Borrower and Lender. In addition, a written waiver by Lender of a Default under this Agreement will not operate as a waiver of any other Default or of a succeeding Default under the same provision or as a waiver of the provision itself. A delay, omission, or course of dealing on the part of Lender in exercising any right, power, or remedy will not operate as a waiver of it, except when this Agreement expressly requires the right, power, or remedy to be exercised within a specified time, and a single or partial exercise by Lender of any right, power, or remedy does not preclude any further exercise of it or the exercise of any other right, power, or remedy. Lender's exercise or failure to exercise any right, power, or remedy does not constitute a waiver of any Default by Borrower under this Agreement. This Agreement is not assignable (by operation of law or otherwise) by Borrower without the advance written approval of Lender, which it may withhold in its sole discretion.

b.     The assignment of this Agreement by Borrower without the advance written approval of Lender will constitute a Default by Borrower and will be invalid and unenforceable as to Lender.

c.     Lender may assign its rights and interests under this Agreement, and if Lender assigns those rights and interests, Borrower shall render performance under this Agreement to the assignee.

**15.** <u>**Miscellaneous**</u>. Time is of the essence with respect to the performance of Borrower's obligations under this Agreement. When any provision of this Agreement requires or prohibits action to be taken by a person, the provision applies regardless of whether the action is taken directly or indirectly by the person. The headings preceding the sections of this Agreement are solely for convenient reference and neither constitute a part of this Agreement nor affect its meaning, interpretation, or effect. This Agreement inures to the benefit of Lender and its assignees and successors in interest and is binding on Borrower and its assignees and successors in interest and shall bind all persons that become bound as a debtor to this Agreement. No reference in this Agreement to "**Proceeds**" authorizes any sale, transfer, or other disposition of any Collateral by Borrower except in the ordinary course of its business. Each provision of this Agreement should be construed and interpreted so it is valid and enforceable under applicable law. If a provision of this Agreement (or the application of it) is held by a court to be invalid or unenforceable under applicable law, that provision will be deemed separable from the remaining provisions of this Agreement and will not affect the validity or interpretation of the other provisions of this Agreement or the application of that provision to a person or circumstance to which it is valid and enforceable.

**(Signature Page Follows Immediately)**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date.

"BORROWER":

Quality Coal Co., Inc., an Alabama corporation

By: _Rodney L Mays_

Rodney L. Mays, President

Acknowledged by Lender:

"LENDER":

Nexgen Extractions LLC,
a New Jersey limited liability company

By: _____

Yitzchak Abadi, Manager

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the Effective Date.

"BORROWER":

Quality Coal Co., Inc., an Alabama corporation

By: _____
Rodney L. Mays, President

Acknowledged by Lender:

"LENDER":

Nexgen Extractions LLC,
a New Jersey limited liability company

By: _____
Yitzchak Abadi, Manager

Scanned with CamScanner

## <u>Exhibit A</u>

## DESCRIPTION OF COLLATERAL

The Collateral includes all of the assets of Borrower including, without limitation, each of the following:

**Equipment:** All equipment means all goods, machinery, furniture, furnishings, fixtures, tools, supplies, motor vehicles and all other property used or useful in the business of Borrower, now or hereafter owned or possessed or hereafter acquired by Borrower, and including specifically (without limitation) all equipment included within the Mine Assets and accessions thereto, all substitutions and replacements thereof, and all deposits made on any such equipment;

**Deposit Accounts and Other Cash:** All deposits and deposit accounts with any bank, savings and loan association, credit union or like organization, and all funds and amounts therein, and whether or not held in trust, or in custody or safekeeping, or otherwise restricted or designated for a particular purpose, and all other cash or marketable securities on hand, whether held in-vault or otherwise;

**Receivables:** Each and every right of the Borrower to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property, out of a rendering of services, or of a loan, out of the overpayment of taxes or other liabilities, or any other transaction or event, whether such right to payment is created, generated or earned by Borrower or by some other person who subsequently transfers his, her or its interest to Borrower, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and other security interests) which Borrower may at any time have by law or agreement against any account debtor or other person obligated to make such payment or against any property of such account debtor or other persons including, but not limited to, all present and future accounts, contract rights, chattel paper, bonds, notes and other debt instruments, and rights to payment in the nature of general intangibles;

**General Intangibles:** All general intangibles of the Borrower whether now owned or hereafter acquired, including (without limitation) all general intangibles (as defined in the UCC); and

**Securities:** All securities, joint venture and other equity interests now owned or hereafter acquired by the Borrower.

The collateral shall include (i) all substitutes and replacements for and proceeds of any and all of the foregoing property, and in the case of all tangible collateral, all accessions, accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or use in connection with any such goods, and (ii) all warehouse receipts, bills of lading and other documents of titles now or hereafter covering such goods.

# EXHIBIT D

# SECURED GUARANTY

**THIS SECURED GUARANTY** ("<u>Guaranty</u>") is executed as of May 7, 2019, by Rodney L. Mays, an individual ("<u>Guarantor</u>"), with a Social Security Number of 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, for the benefit of Nexgen Extractions LLC, a New Jersey limited liability company ("<u>Lender</u>"), with reference to the following:

A.    Lender has agreed to loan the amount of $1,500,000.00 (the "<u>Loan</u>") to Quality Coal Co., Inc., an Alabama corporation (<u>"Borrower"</u>), pursuant to that certain Senior Secured Promissory Note of even date herewith (as such note may be amended from time-to-time, collectively, the <u>"Note"</u>) and secured by that certain Security Agreement of even date herewith (the <u>"Security Agreement"</u>).  Capitalized terms in this Guaranty not defined in this Guaranty shall have the meaning given to such terms in the Note or the Security Agreement, as applicable. The <u>"Guaranteed Obligations"</u> are the obligations of Guarantor pursuant to <u>Sections 1.1</u> and <u>1.2</u> of this Guaranty; and

B.    Guarantor is the sole shareholder of Borrower and shall derive substantial and material benefits from Lender's granting of the Loan to Borrower. This Guaranty is secured by that certain Equity Pledge Agreent of even date herewith (the "<u>Pledge Agreement</u>"); and

C.    As a condition to the making of the Loan, Lender has required that Guarantor guarantee the Guaranteed Obligations and execute the Pledge Agreement, and Guarantor desires to do so to induce Lender to make the Loan.

**NOW, THEREFORE**, in consideration of Lender's agreement to make the Loan and as an inducement to Lender to do so, Guarantor covenants and agrees with Lender, for the benefit of the holder of the Note as follows:

## ARTICLE 1 — AGREEMENTS

1.1    <u>Repayment Guaranty</u>.    Guarantor unconditionally and irrevocably guarantees the full and prompt payment and performance, when due, whether upon demand, maturity, by required prepayment, acceleration or otherwise, and at all times thereafter, of: (a) payment of all obligations at any time owing under the Note; (b) payment and performance of all obligations of Borrower under the Security Agreement and the SPA; and (c) payment and performance of all other obligations of Borrower under the Loan Documents.  Upon Lender's demand, Guarantor shall assume all responsibility for the payment and/or performance of such obligations in accordance with the Loan Documents, at Guarantor's own cost and expense.

If Guarantor does not perform any of the Guaranteed Obligations (in accordance with the Loan Documents), Lender may, at its option but without obligation to do so, pay such obligations and take such actions as Lender shall deem necessary or desirable.  In the event Lender elects to do so, all expenditures made by Lender shall be immediately due and payable from Guarantor to Lender and shall bear interest at the Default Rate, as defined in the Note.

1.2    <u>Expenses</u>.  Guarantor agrees to pay all costs and expenses, including reasonable attorneys' fees, which may be incurred by Lender in any effort to collect the Loan or

enforce any of the Loan Documents or the obligations of Guarantor hereunder, whether or not any lawsuit is filed, including, without limitation, all costs and attorneys' fees incurred by Lender in any Insolvency Proceeding (as defined below) (including, without limitation, any action for relief from the automatic stay of any bankruptcy proceeding) and in any judicial or nonjudicial foreclosure action.  Such amounts shall bear interest until paid at a rate equal to the Default Rate as defined in the Note.

       1.3   <u>Nature of Guaranty</u>.  The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collection or collectability only and the obligations hereunder shall be absolute, independent and unconditional under any and all circumstances.

       1.4   <u>Obligations Absolute</u>.  The obligations of Guarantor hereunder shall remain fully effective without regard to, and shall not be affected or impaired by the following, any of which may be taken, at any time, without the consent of, or notice to, Guarantor, nor shall any of the following give Guarantor any recourse or right of action against Lender:

       (a)   Any express or implied amendment, modification, renewal, addition, supplement, extension (including, without limitation, extensions beyond the original term) or acceleration of or to any provisions of the Loan Documents;

       (b)   Any exercise or non-exercise by Lender of any right or privilege under this Guaranty or any of the Loan Documents;

       (c)   Any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding (each, an "<u>Insolvency Proceeding</u>") relating to Guarantor, Borrower, any affiliate of Borrower or any guarantor (which term shall mean any other party at any time directly or contingently liable for any of the Borrower's obligations under the Loan Documents);

       (d)   Any action taken with respect to this Guaranty by any trustee or receiver, or by any court, in any Insolvency Proceeding, whether or not Guarantor shall have had notice or knowledge of any of the foregoing;

       (e)   Any release, discharge, modification, impairment or limitation of the liability of Borrower from its liability under any of the Loan Documents or any release or discharge of any endorser or guarantor or of any other party at any time directly or contingently liable for the Guaranteed Obligations, whether or not consented to by Lender;

       (f)   Any subordination, compromise, release (by operation of law or otherwise), discharge, compound, collection or liquidation of any or all of the collateral described in any of the Loan Documents or otherwise in any manner, or any substitute or replacement for such collateral;

       (g)   Any assignment or other transfer of this Guaranty in whole or in part or of any of the Loan Documents;

(h)     Any acceptance of partial performance of the Guaranteed Obligations or the obligations of Borrower under the Loan Documents or of any obligations of Guarantor under this Guaranty or of any obligations of any other guarantor;

(i)     Any consent to the transfer of the collateral described in the Loan Documents or any portion thereof; and

(j)     Any bid or purchase at any sale of the collateral described in the Loan Documents or any portion thereof.

1.5     <u>Waivers</u>.     Guarantor unconditionally waives all defenses to the enforcement of this Guaranty, including, without limitation:

(a)     All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty;

(b)     Any right to require Lender to proceed against Borrower or any guarantor at any time, or to proceed against or exhaust any security held by Lender at any time, or to pursue any other remedy whatsoever at any time;

(c)     The defense of any statute of limitations affecting the liability of Guarantor hereunder, the liability of Borrower or any guarantor under the Loan Documents, or the enforcement hereof, to the extent permitted by law;

(d)     Any defense arising by reason of any invalidity or unenforceability of any of the Loan Documents or any provision thereof, or any disability of Borrower or any guarantor or of any manner in which Lender has exercised its rights and remedies under the Loan Documents, or by any cessation from any cause whatsoever of the liability of Borrower or any guarantor;

(e)     Any defense based on any action taken or omitted by Lender in any Insolvency Proceeding involving Borrower or any guarantor, including any election to have Lender's claim allowed as being secured, partially secured or unsecured, any extension of credit by Lender to Borrower in any Insolvency Proceeding and the taking and holding by Lender of any security for any such extension of credit;

(f)     Any defense based upon an election of remedies by Lender;

(g)     Any right Guarantor may have under applicable laws including, without limitation, any right to a hearing with respect to the fair market value of any collateral, either before or after foreclosure, and any right Guarantor may have to require Lender to proceed against any collateral before seeking to obtain a judgment against Guarantor hereunder;

(h)     Any duty of Lender to advise Guarantor of any information known to Lender regarding the financial condition of Borrower and all other circumstances affecting Borrower's ability to perform its obligations to Lender; Guarantor assumes the responsibility for being and keeping informed regarding such condition or any such circumstances;

(i)     Any rights of subrogation, reimbursement, exoneration, contribution and indemnity, and any rights or claims of any kind or nature against Borrower which arise out of or are caused by this Guaranty, and any rights to enforce any remedy which Lender now has or may hereafter have against Borrower, and any benefit of, and any right to participate in, any security now or hereafter held by Lender; and

(j)     Any right Guarantor might have, under any applicable laws or otherwise, to revoke this Guaranty as to any advances made by Lender to or on behalf of Borrower or pursuant to the terms of any of the Loan Documents.

1.6     <u>Waivers to Be Effective to Maximum Permissible Extent</u>.  Guarantor acknowledges and agrees that all waivers of defenses arising from any impairment of Guarantor's rights of subrogation, reimbursement, contribution and indemnification and waivers of any other rights, privileges, defenses or protections available to Guarantor by reason of any applicable laws.

1.7     <u>Waiver of Defense Based on Elimination of Right of Subrogation</u>.

(a)     Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against Borrower by the operation of any applicable laws or otherwise.

(b)     Without limiting the generality of any other provision of this Guaranty, Guarantor understands that, if Lender conducts a non judicial foreclosure sale under the Security Agreement or the Pledge Agreement, Guarantor may have a defense to a deficiency judgment under this Guaranty because the non judicial foreclosure would eliminate Guarantor's right of subrogation. In addition to the other waivers set forth in this Guaranty, Guarantor specifically waives this defense and agrees that Guarantor will be liable for any deficiency remaining after a non judicial foreclosure sale, even though such non judicial foreclosure destroys Guarantor's right of subrogation. Guarantor will not assert any defense arising from such disclosure in any action or proceeding which Lender may commence to enforce this Guaranty.

(c)     Guarantor waives all rights and defenses that Guarantor may have because the Borrower's debt to Lender is secured by the Security Agreement. This means, among other things that Lender may collect from Guarantor without first foreclosing on any collateral pledged by Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the Borrower's debt is secured by the collateral.

1.8     <u>Subrogation</u>.  Guarantor understands that the exercise by Lender of certain rights and remedies under the Pledge Agreement or other Loan Documents may affect or eliminate Guarantor's right of subrogation against Borrower or any guarantor and that Guarantor may therefore incur partially or totally nonreimbursable liability hereunder.  Nevertheless, Guarantor hereby authorizes and empowers Lender, its successors, endorsees and/or assigns, to

exercise in its or their sole discretion, any rights and remedies, or any combination thereof, which may then be available, it being the purpose and intent of Guarantor that the obligations hereunder shall be absolute, continuing, independent and unconditional under any and all circumstances. Notwithstanding any other provision of this Guaranty to the contrary, Guarantor hereby waives any claim or other rights which Guarantor may now have or hereafter acquire against Borrower or any other guarantor of all or any of the obligations of Guarantor hereunder that arise from the existence or performance of Guarantor's obligations under this Guaranty or any of the other Loan Documents, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification, any right to participate in any claim or remedy of Lender against Borrower or any collateral which Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, by any payment made hereunder or otherwise, including, without limitation, the right to take or receive from Borrower, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim or other rights.

      1.9   <u>Additional Waivers</u>. Guarantor shall not be released or discharged, either in whole or in part, by Lender's failure or delay to (a) perfect or continue the perfection of any lien or security interest in any collateral described in the Loan Documents or otherwise, which secures the obligations of Borrower, Guarantor or any other guarantor, or (b) protect the property covered by such lien or security interest.

      1.10   <u>Independent and Separate Obligations</u>. The obligation of Guarantor hereunder is independent of the obligation of Borrower and, after the occurrence of any Default or Event of Default, a separate action or actions may be brought and prosecuted against Guarantor whether or not Guarantor is the alter ego of Borrower, and whether or not Borrower is joined therein or a separate action or actions are brought against Borrower.

      1.11   <u>Bankruptcy No Discharge</u>. So long as any of the obligations guaranteed hereunder shall be owing to Lender, Guarantor shall not, without Lender's prior written consent, commence or join with any other party in commencing any Insolvency Proceedings of or against Borrower. Guarantor understands and acknowledges that by virtue of this Guaranty, Guarantor has specifically assumed any and all risks of a bankruptcy or reorganization case or other Insolvency Proceeding with respect to Borrower. As an example and not in any way of limitation, a subsequent modification of the Guaranteed Obligations or any other obligations of Borrower under the Loan Documents in any reorganization case concerning Borrower shall not affect the obligation of Guarantor to pay and perform the Guaranteed Obligations in accordance with their respective original terms.

      1.12   <u>Repayment</u>. If claim is ever made upon Lender for repayment of any amount or amounts received by Lender in payment of the obligations under the Loan Documents or hereunder (whether or not all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid by Lender) and Lender repays all or any part of said amount, then, notwithstanding any revocation or termination of this Guaranty or the cancellation of the Note or any other instrument evidencing the Loan, Guarantor shall be and remain liable to Lender for the amount so repaid to the same extent as if such amount had never originally been received by Lender.

1.13　Setoff.　Lender shall have a right of setoff against, and Guarantor hereby grants to Lender a security interest in, all moneys, securities and other property of Guarantor now or hereafter in the possession of, or on deposit with Lender, whether held in a general or special account or deposit, or for safekeeping or otherwise.　Such right is in addition to any right of setoff Lender may have by law.　All rights of setoff may be exercised without demand to Guarantor.　No right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right of setoff, or by any delay in doing so.　Every right of setoff shall continue in full force and effect until specifically waived or released by an instrument in writing executed by Lender.

1.14　Subordination.　In the event any default or Event of Default, any indebtedness of Borrower now or hereafter owing to Guarantor (including without limitation all interest thereon accruing after the commencement of any Insolvency Proceeding) is hereby subordinated to the obligations of Borrower to Lender under the Loan Documents (including without limitation all interest thereon accruing after the commencement of any Insolvency Proceeding).　If requested by Lender, such indebtedness shall be collected, enforced and received by Guarantor as trustee for Lender and paid over to Lender on account of the Loan Documents.　However, no such payment shall reduce or affect in any manner the absolute, unconditional and independent liability of Guarantor under this Guaranty, except to the extent such payment is applied against the Guaranteed Obligations, subject to Section 1.11.

1.15　Payments.　Guarantor understands that the obligations of Borrower to Lender may at any time and from time to time exceed the aggregate liability of Guarantor hereunder without impairing this Guaranty.　Guarantor shall not be credited for payment of any of the Guaranteed Obligations unless such payment is received by Lender in immediately available funds and is made by Guarantor after a demand made by Lender pursuant to this Guaranty.　Guarantor agrees that whenever Guarantor shall make any payment to Lender hereunder on account of the liability hereunder, Guarantor will deliver such payment to Lender at the address provided in Section 3.1 below and notify Lender in writing that such payment is made under this Guaranty for such purpose. Lender, without impairing this Guaranty, may apply payments from Borrower to the Guaranteed Obligations, or to such other obligations owed by Borrower to Lender, in such amounts and in such order as Lender in its complete discretion determines. No payment made hereunder by Guarantor to Lender shall cause Guarantor to be or become a creditor of Lender.

1.16　Financial Statements.　Guarantor will deliver to Lender, in form and detail satisfactory to Lender, within twenty (20) days after Lender's written request, a consolidated balance sheet of Guarantor, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP (or other customary accounting method approved by Lender), accompanied by a report and opinion of an independent certified public accountant reasonably acceptable to Lender, which report and opinion shall be prepared in accordance with GAAP (or other customary accounting method approved by Lender).　Guarantor shall promptly provide Lender with any additional financial information that Guarantor may obtain, as well as signed copies of any tax returns and such other information as Lender may reasonably request concerning the affairs and properties of Guarantor.　Guarantor further covenants and agrees to immediately notify Lender of any material adverse change in Guarantor's financial condition.　For purposes of this Guaranty, "GAAP"

means prepared in conformity with accounting principles generally accepted in the United States of America consistently applied in accordance with past practices.

## ARTICLE 2 — REPRESENTATIONS AND WARRANTIES

Guarantor makes the following representations and warranties which shall be continuing representations and warranties until this Guaranty terminates in accordance with its terms:

2.1 <u>Existence and Rights</u>. Guarantor has the power and authority to make and carry out this Guaranty.

2.2 <u>Guaranty Authorized and Binding</u>. The execution, delivery and performance of this Guaranty are duly authorized and do not require the consent or approval of any third party, including, without limitation, any governmental body or other regulatory authority. This Guaranty is a valid and legally binding obligation of Guarantor enforceable in accordance with its terms.

2.3 <u>No Conflict</u>. The execution and delivery of this Guaranty are not, and the performance of this Guaranty will not be, in contravention of, or in conflict with, any agreement, indenture or undertaking to which Guarantor is a party or by which Guarantor or any of Guarantor's property is or may be bound or affected and do not, and will not, cause any security interest, lien or other encumbrance to be created or imposed upon any such property.

2.4 <u>Litigation</u>. There is no litigation or other proceeding pending or, to the best of Guarantor's knowledge, threatened against, or affecting, Guarantor or Guarantor's properties which, if determined adversely to Guarantor, would have a materially adverse effect on the financial condition, properties, businesses or operations of Guarantor, or which prevents or interferes with or adversely affects Guarantor's entering into this Guaranty or the validity of this Guaranty or the carrying out of the terms hereof. Guarantor is not in default with respect to any order, writ, injunction, decree or demand of any court or other governmental or regulatory authority.

2.5 <u>Financial Condition</u>. Guarantor's financial statements, which have been submitted in writing by Guarantor to Lender in connection with the Loan or otherwise, are true and correct and fairly present the financial condition of Guarantor for the period covered thereby. Since the date of said financial statements, there has been no materially adverse change in Guarantor's financial condition. Guarantor has no knowledge of any liabilities, contingent or otherwise, as of the date of said financial statements which are not reflected in said financial statements. Guarantor has not entered into any commitments or contracts which are not reflected in said financial statements or which may have a materially adverse effect upon Guarantor's financial condition.

2.6 <u>Solvency</u>. Guarantor is not Insolvent (as defined below) as of the date hereof and the execution and delivery of this Guaranty will not (a) render Guarantor insolvent under generally accepted accounting principles nor render Guarantor Insolvent (as defined below), or (b) leave Guarantor with remaining assets which constitute unreasonably small capital given the nature of Guarantor's business, or (c) result in the incurrence of Debts (defined below) beyond Guarantor's ability to pay them when and as they mature. For the purposes of this

Section, "<u>Insolvent</u>" means that the present fair salable value of assets is less than the amount that will be required to pay the probable liability on existing Debts as they become absolute and matured. For the purposes of this Section, "<u>Debts</u>" includes any legal liability for indebtedness, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

       2.7   <u>Financial or other Benefit or Advantage</u>.  Guarantor hereby acknowledges and warrants that Guarantor has derived or expects to derive a financial or other benefit or advantage from the Loan and from each and every renewal, extension, release of collateral or other relinquishment of legal rights made or granted or to be made or granted by Lender to Borrower in connection with the Loan.  Guarantor acknowledges that Borrower is not merely the agent, instrumentality or alter ego of Guarantor, and that Borrower is an independent and separate entity.

       2.8   <u>Advice of Counsel</u>.  Guarantor has consulted with its attorneys or had the opportunity to consult with its attorneys, regarding the terms and conditions and waivers set forth in this Guaranty.  Guarantor's attorneys have advised Guarantor of the true legal consequences of each waiver set forth in this Guaranty, including the rights Guarantor would have in the absence of such waivers.

## ARTICLE 3 — MISCELLANEOUS

       3.1   <u>Notices</u>.  All notices, demands and other communications between Lender and Guarantor pursuant to this Guaranty shall be in writing, shall be addressed to the appropriate address set forth in this Section, or at such other place as Lender or Guarantor, as the case may be, may from time to time designate in writing by ten (10) days prior written notice thereof, and shall be:  (a) hand-delivered, effective upon receipt; or (b) sent by a national overnight courier, effective upon receipt; or (c) sent by certified mail, return receipt requested, shall be deposited in the United States mail, with postage thereon fully prepaid and shall be deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three (3) business days after the date of mailing, whichever is the earlier in time. The addresses of the parties are as follows:

|  |  |
|---|---|
| To Guarantor: | Rodney L. Mays<br>345 20th Street West<br>Jasper, AL 35502 |
| To Lender: | Nexgen Extractions LLC<br>101 Chase Avenue, Suite 206<br>Lakewood, NJ 08701<br>Attention: Legal Notices |
|  | with copies to (which shall not constitute notice): |
|  | Maynard Cooper & Gale<br>1901 Sixth Avenue North<br>Regions Harbert Plaza, Suite 2400<br>Birmingham, AL 35203 |

      3.2    <u>Amendments</u>.  Neither this Guaranty nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

      3.3    <u>Successors</u>.  All of the terms of this Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  The term "Borrower" shall mean both the named Borrower and any other person or entity at any time assuming or otherwise becoming primarily liable for all or any part of the obligations set forth in the Loan Documents.

      3.4    <u>Miscellaneous</u>.  No delay or failure by Lender to exercise any remedy against Borrower or Guarantor will be construed as a waiver of that right or remedy.  All remedies of Lender are cumulative.  In the event that the provisions of this Guaranty are claimed or held to be inconsistent with any other instrument evidencing or securing the Loan, or the obligations of Guarantor, the terms of this Guaranty shall remain fully valid and effective.  Any married person executing this Guaranty agrees that recourse may be had against community assets and against such person's separate property for the satisfaction of the obligations hereby guaranteed.  When the context in which the words are used in this Guaranty indicates that such is the intent, words in the singular number shall include the plural and vice-versa.  If any one or more of the provisions of this Guaranty should be determined to be illegal or unenforceable, all other provisions shall remain effective.  Guarantor shall not have the right to assign any of Guarantor's rights or obligations under this Guaranty.

      3.5    <u>Governing Law and Jurisdiction</u>.  As a further material part of the consideration to Lender to extend the Loan, Guarantor agrees:

      (a)    The validity, construction, interpretation, and enforceability of this Agreement are governed by the laws of the State of Delaware;

      (b)    That any suit, action or proceeding arising directly or indirectly from this Guaranty or the subject matter thereof shall be litigated only in courts located within Birmingham, Alabama;

      (c)    Guarantor hereby irrevocably consents to the jurisdiction of any local, state or federal court located in Birmingham, Alabama;

      (d)    Guarantor hereby waives personal service of any and all process upon it and consents to all such service of process in the manner and at the address set forth in <u>Section 3.1</u> above; and

      (e)    Without limiting the generality of the foregoing, Guarantor hereby waives and agrees not to assert by way of motion, defense or otherwise in any suit, action or proceeding any claim that Guarantor is not personally subject to the jurisdiction of the above-named courts, that such suits, action or proceeding is brought in an inconvenient forum or that the venue of such action, suit or proceeding is improper.

3.6     Assignability by Lender.  Lender may, at any time and from time to time, assign, conditionally or otherwise, all of the rights of Lender under the Loan Documents and under this Guaranty, whereupon such assignee shall succeed to all rights of Lender hereunder to the extent of such assignment. Lender, or each successor holder of the Note, may give written notice to Guarantor of any such assignment, but any failure to give, or delay in giving, such notice shall not affect the validity or enforceability of any such assignment.

3.7     Demands.    Each demand by Lender for performance or payment hereunder shall be in writing and shall be made in the manner set forth in Section 3.1.  A dated statement signed by an officer of Lender setting forth the amount of indebtedness at the time owing to Lender by Borrower under the Loan Documents shall be conclusive evidence thereof as between Guarantor and Lender in any legal proceedings against Guarantor in connection with this Guaranty.

3.8     Term.    The obligations of Guarantor under this Guaranty and any instrument which grants collateral to secure such obligations and the rights of Lender under this Guaranty shall continue in full force and effect until the earlier of:

(a)     The last date that all of the following have occurred: the obligations under the Loan Documents have been fully paid and performed, Lender's commitment to make advances under the Loan Documents has been terminated or has expired and the period of time has expired during which any payment received by Lender under the Loan Documents may be deemed to be a preferential or fraudulent transfer under the United States Bankruptcy Code or other similar applicable laws; or

(b)     The last date that all of the following have occurred: Guarantor has performed all of its obligations under this Guaranty and paid any amounts payable hereunder in accordance with the terms of this Guaranty and the period of time has expired during which any payment received by Lender under the Loan Documents or act performed by Guarantor may be determined to be a preferential or fraudulent transfer under the United States Bankruptcy Code or other similar applicable laws.

3.9     Complete Agreement.  This Guaranty, together with the Note and the Loan Documents, supersedes any prior negotiations-discussions or communications between Guarantor and Lender and constitutes the entire agreement between Lender and Guarantor with respect to the Guaranteed Obligations.

3.10     Waiver of Right to Trial by Jury.  To extent permitted by applicable law and to facilitate the desire of Lender and Guarantor to resolve disputes in an efficient and economical manner, Lender, by its acceptance of this Guaranty, and Guarantor, by its execution hereof, expressly waive any right to trial by jury of any claim, demand, action or cause of action: (a) arising under this Guaranty or any other Loan Document, or (b) in any way connected with or related or incidental to the dealings of Lender and Guarantor or either of them with respect to this Guaranty or any other Loan Document, or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether arising in contract or tort or otherwise.  Any such claim, demand, action or cause of action shall be decided by court trial without a jury.  Guarantor or Lender may file an original counterpart or a copy of this Section

with any court as written evidence of the consent of the Guarantor and Lender hereto to the waiver of their right to trial by jury.

**[No Further Text on this Page; Signature of Guarantor Follows Immediately]**

**IN WITNESS WHEREOF**, the undersigned has executed this Guaranty as of the date first set forth above.

"**Guarantor**":

_Rodney L. Mays_

Rodney L. Mays, an individual

## SPOUSAL CONSENT TO GUARANTY

The undersigned individual, being the spouse of Rodney L. Mays, hereby acknowledges that she has read, understands and consents to the execution of the attached Guaranty dated as of May 7, 2019, for the benefit of Nexgen Extractions LLC, a New Jersey limited liability company, to the extent that her community property or spousal interest may be affected thereby.


By: _Crystal Mays_
Name: [Crystal Mays], an individual
Date: May 7, 2019

# EXHIBIT E

# EQUITY PLEDGE AGREEMENT

**THIS EQUITY PLEDGE AGREEMENT** (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "<u>Agreement</u>") is entered into as of May 7, 2019, between Rodney L. Mays, an individual ("<u>Pledgor</u>"), and Nexgen Extractions LLC, a New Jersey limited liability company (together with its successors and assigns in such capacity, "<u>Nexgen</u>").

A.      Nexgen has agreed to loan the amount of $1,500,000.00 (the "<u>Loan</u>") to Quality Coal Co., Inc., an Alabama corporation (<u>"Borrower"</u>), pursuant to that certain Senior Secured Promissory Note of even date herewith (as such note may be amended from time-to-time, collectively, the "<u>Note</u>") and secured by that certain Security Agreement of even date herewith (the <u>"Security Agreement"</u>).

B.      Pledgor is the President and sole shareholder of Borrower and shall derive substantial direct and indirect benefits from the transactions contemplated by the Note. As a condition to Lender's grant of the Loan, Pledgor has guaranteed the obligations of Borrower under the Note, the Security and the loan documents executed in connection therewith, pursuant to that certain Secured Guaranty of even date herewith ("<u>Guaranty</u>" and collectively with the Note, the Security Agreement and the loan documents executed in connection therewith, the "<u>Loan Documents</u>").

C.      To induce Nexgen to grant the Loan and enter into the Security Agreement, Pledgor has agreed to pledge all of its right, title and interest in, to and under the Pledged Equity Interests.  Pledgor acknowledges and agrees that Nexgen would not have granted the Loan or entered into the Security Agreement without Pledgor's execution and delivery of this Agreement.

**NOW, THEREFORE**, in consideration of Lender's agreement to make the Loan and as an inducement to Lender to do so, Pledgor covenants and agrees with Lender, for the benefit of the holder of the Note as follows:

## ARTICLE 1

## DEFINITIONS

**1.1      Terms Defined in the Loan Documents or UCC**.  All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Documents. Terms defined in the Uniform Commercial Code ("<u>UCC</u>") which are not otherwise defined in this Agreement are used herein as defined in the UCC.

**1.2      Definitions of Certain Terms Used Herein**. As used in this Agreement the following terms shall have the corresponding meanings:

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph hereto.

"<u>Article 8 Matter</u>" means any action, decision, determination or election by the Borrower or its owners that the equity interests of the Borrower, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to

any such action, decision, determination or election.

"Borrower" has the meaning set forth in the recitals hereto.

"Event of Default" means (i) any failure by Borrower to pay the Obligations as and when the same are due and payable under the Loan Documents and the SPA; (ii) any Event of Bankruptcy with respect to Borrower; (iii) any other failure on the part of Borrower to perform or observe any covenant to be performed on its part under the Loan Documents; and (iv) any failure on the part of Pledgor to perform or observe any covenant to be performed on its part under this Agreement and/or the Guaranty.

"Obligations" means, collectively, (i) each and all of the obligations of the Borrower under the Loan Documents and the SPA, and (ii) each and all of the obligations of the Pledgor under the Guaranty.

"Nexgen" has the meaning set forth in the introductory paragraph hereto.

"Pledged Collateral" has the meaning set forth in Section 2.1 of this Agreement.

"Pledged Equity Interests" means 100% of all of the outstanding stock of Borrower, together with stock certificates, options or rights of any nature whatsoever which may be issued or granted by Borrower to Pledgor while this Agreement is in effect.

"Pledgor" has the meaning set forth in the introductory paragraph hereto.

"Proceeds" means (i) Pledgor's share, right, title and interest in and to all distributions, monies, fees, payments, compensations and proceeds now or hereafter becoming due and payable to Pledgor by the Borrower with respect to the Pledged Equity Interests whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Pledgor relating to the foregoing; and (iii) all cash or non-cash proceeds of any of the foregoing.

"Securities Act" means the Securities Act of 1933, as amended.

## ARTICLE 2

## GRANT OF SECURITY INTEREST

**2.1      Pledge; Grant of Security Interest**.  Pledgor hereby pledges and grants to Nexgen, as collateral security for the prompt and complete payment of the Obligations, a first priority security interest in all of Pledgor's right, title and interest to the following (collectively, the "Pledged Collateral"):

(a)      all Pledged Equity Interests;

(b)      all securities, moneys or property representing dividends or interest on any of the Pledged Equity Interests, or representing a distribution in respect of the Pledged Equity

Interests, or resulting from a split-up, revision, reclassification or other like change of the Pledged Equity Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity Interests;

(c)     any policy of insurance payable by reason of loss or damage to the Pledged Equity Interests;

(d)     all "accounts", "general intangibles", "instruments" and "Pledged Collateral" (in each case as defined in the UCC) constituting or relating to the foregoing; and

(e)     all Proceeds of any of the foregoing property of Pledgor (including any proceeds of insurance thereon, all "accounts", "general intangibles", "instruments" and "Pledged Collateral", in each case as defined in the UCC, constituting or relating to the foregoing).

**2.2**     **Certificates**.  Concurrently with the execution of this Agreement, Pledgor shall deliver to Nexgen each original certificate evidencing the Pledged Equity Interests (which certificates shall constitute "security certificates" (as defined in the UCC)), together with an undated stock power covering each such certificate, duly executed in blank.

**2.3**     **Financing Statements**.     Pledgor hereby authorizes the filing of financing statements, and continuation statements and amendments thereto and assignments thereof, describing the Pledged Collateral covered thereby (a) as "all of debtor's right, title and interest in, to and under all Pledged Collateral, whether now owned or hereafter acquired, now existing or hereafter created, and wherever located" or words to that effect, notwithstanding that such wording may be broader in scope than the collateral described in this <u>Article II</u> and regardless of whether any particular asset comprised in the Pledged Collateral falls within the scope of Article 9 of the UCC or (b) as being of an equal or lesser scope or with greater detail, and any other filing, recording or registration (including any filing, recording or registration that may be necessary or appropriate under <u>Article II</u> that Nexgen may deem necessary or appropriate to further protect or maintain the perfection of the security interests).  A photocopy or other reproduction of this Agreement shall be sufficient as a financing statement where permitted by law.  This Agreement shall constitute a security agreement under applicable law.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Pledgor represents and warrants to Nexgen as of the date hereof as follows:

**3.1**     **Ownership of Pledged Collateral**.  Pledgor is the direct and beneficial owner of all Pledged Equity Interests, including all Pledged Equity Interests which have been delivered to Nexgen by or on behalf of Pledgor free and clear of any Liens, except for the security interest granted to Nexgen hereunder.  Pledgor further represents and warrants that all such Pledged Equity Interests have been duly and validly issued and, as of the date hereof, constitute 100% of the equity interests of Pledgor in Borrower.

**3.2**     **No Prohibition on Pledge**.  Except for restrictions and limitations imposed by

securities laws generally, (a) the Pledged Collateral is and will continue to be freely transferable and assignable and (b) none of the Pledged Collateral is or will be subject to any option, right of first refusal, contractual restriction or applicable laws of any nature that might prohibit, impair, delay or otherwise affect in any manner material and adverse to Nexgen (i) the pledge of such Pledged Collateral hereunder, (ii) the sale or disposition thereof pursuant hereto, or (iii) the exercise by Nexgen of rights and remedies hereunder.

3.3 **Perfection**.  Upon the (a) delivery to Nexgen of the original certificates evidencing the Pledged Equity Interests, and (b) filing of the financing statement referred to in <u>Section 2.3</u> with the Secretary of State of the state or states where the Pledged Collateral is located, the Lien granted pursuant to this Agreement will constitute a valid, perfected Lien on the Pledged Collateral, enforceable against all creditors of Pledgor and any Persons purporting to purchase any Pledged Collateral and related Proceeds from Pledgor, free from any adverse claim, enforceable against all creditors of Pledgor and any Persons purporting to purchase any Pledged Equity Interests and related Proceeds from Pledgor.  No financing statement or security agreement describing all or any portion of the Pledged Collateral which has not lapsed or been terminated naming Pledgor as debtor has been filed or is of record in any jurisdiction except financing statements naming Nexgen as the secured party.

3.4 **Certificated Securities**.  The Pledged Equity Interests are (a) "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC) and (b) "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC).  The certificates evidencing the Pledged Equity Interests state that the Pledged Equity Interests are "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC).  There currently exist no certificates, instruments or writings representing the Pledged Equity Interests other than those delivered to Nexgen.

## ARTICLE 4

## COVENANTS

From the date of this Agreement and thereafter until the indefeasible payment in full of the Obligations, Pledgor agree as follows:

4.1 **Acknowledgements of Parties**.

(a) If Pledgor shall, as a result of his ownership of the Pledged Equity Interests, become entitled to receive or shall receive any equity ownership certificate (including any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any shares of the Pledged Equity Interests, or otherwise in respect thereof, Pledgor shall accept the same as Nexgen's agent, hold the same in trust for Nexgen and deliver the same forthwith to Nexgen in the exact form received, duly endorsed by Pledgor to Nexgen, together with an undated stock power covering such certificate duly executed in blank, to be held by Nexgen hereunder as additional security for the Obligations. Any sums paid upon or in respect of the Pledged Equity Interests upon the liquidation or dissolution of the Borrower shall be paid over to Nexgen to be held by it hereunder as additional security for the Obligations, and in case any

distribution of capital shall be made on or in respect of the Pledged Equity Interests or any property shall be distributed upon or with respect to the Pledged Equity Interests pursuant to the recapitalization or reclassification of the capital of the Borrower or pursuant to the reorganization thereof, the property so distributed shall be delivered to Nexgen to be held by it, subject to the terms hereof, as additional security for the Obligations. If any sums of money or property so paid or distributed in respect of the Pledged Equity Interests shall be received by Pledgor, Pledgor shall deliver the same to Nexgen and, until such money or property is paid or delivered to Nexgen, hold such money or property in trust for Nexgen, segregated from other funds of Pledgor, as additional security for the Obligations.

(b)     Without the prior written consent of Nexgen, Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit, the Borrower to issue any additional equity interests or to issue any other securities convertible into or granting the right to purchase or exchange for any equity interests in the Borrower, or (ii) except as permitted by Nexgen in writing, sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Pledged Collateral, or any interest therein, except for the Lien provided for by this Agreement. Pledgor shall defend the right, title and interest of Nexgen in, to and under the Pledged Collateral against the claims and demands of all Persons whomsoever.

(c)     At any time and from time to time, upon the written request of Nexgen, and at the sole expense of Pledgor, Pledgor shall promptly and duly give, execute, deliver file and/or record such further instruments and documents and take such further actions as Nexgen may reasonably request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including filing UCC financing or continuation statements, provided that the amount of the Obligations shall not be increased thereby. Pledgor hereby authorizes Nexgen to file any such financing statement or continuation statement without the signature of Pledgor to the extent permitted by law.

**4.2     UCC Article 8**.  The Pledged Equity Interests shall at all times continue to be (a) "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC) and (b) "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC).  The certificates evidencing the Pledged Equity Interests each shall at all times state that the Pledged Equity Interests are "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC).

**4.3     Cash Dividends; Voting Rights**.  Unless an Event of Default shall have occurred and be continuing, Pledgor shall be permitted to receive all distributions or cash dividends paid in the normal course of business of the Borrower and to exercise all voting or other rights with respect to the Pledged Equity Interests, provided that no vote shall be cast or right exercised or other action taken which could reasonably be expected to impair the Pledged Collateral.

**4.4     Registration and Exercise of Rights**.  At any time after the occurrence and during the continuance of an Event of Default: (a) at the request of Nexgen, Pledgor will permit any registrable Pledged Collateral owned by Pledgor to be registered in the name of Nexgen or its nominee, and (b) Pledgor will permit Nexgen or its nominee, without notice, to exercise or

refrain from exercising any and all voting and other consensual rights pertaining to the Pledged Collateral owned by Pledgor or any part thereof, and to receive all dividends and interest in respect of such Pledged Collateral.

## ARTICLE 5

## REMEDIES UPON EVENT OF DEFAULT

**5.1     Acceleration and Remedies**.

(a)     Upon the occurrence and during the continuation of an Event of Default, Nexgen may exercise any or all rights and remedies at law or in equity or otherwise including, without limitation, the following:

(i)     Those rights and remedies available to a secured party under the UCC or under any other applicable law when a debtor is in default under a security agreement;

(ii)     Upon notice to Pledgor, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Pledged Collateral or any part thereof in one or more parcels at public or private sale or sales (which sales may be adjourned or continued from time to time with or without notice and may take place at Pledgor's premises of elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as Nexgen may deem commercially reasonable;

(iii)     Concurrently with written notice to Pledgor, transfer, exchange and register in its name or in the name of its nominee the whole or any part certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations, to exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon and to otherwise act with respect to the Pledged Collateral as though Nexgen was the outright owner thereof; or

(iv)     The right to exercise sole voting power and control on all of the Pledged Equity Interests.

(b)     Nexgen may comply with any applicable state or federal law requirements in connection with a disposition of the Pledged Collateral, and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Pledged Collateral.

(c)     Nexgen shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of Nexgen, the whole or any part of the Pledged Collateral so sold, free of any right of equity redemption, which equity redemption Pledgor hereby expressly release.

(d)     Until Nexgen is able to effect a sale, lease, or other disposition of Pledged

6

Collateral, Nexgen shall have the right to hold or use Pledged Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Pledged Collateral or its value or for any other purpose deemed appropriate by Nexgen. Nexgen may, if it so elects, seek the appointment of a receiver or keeper to take possession of Pledged Collateral and to enforce any of Nexgen's remedies, with respect to such appointment without prior notice or hearing as to such appointment.

(e)     Notwithstanding the foregoing, Nexgen shall not be required to (i) make any demand upon, or pursue or exhaust any of its rights or remedies against Pledgor, any other obligor, guarantor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any of its rights or remedies with respect to any Pledged Collateral therefor, any other Pledged Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Pledged Collateral, any such other Pledged Collateral or any guarantee of the Obligations or to resort to the Pledged Collateral, any such other Pledged Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Pledged Collateral.

**5.2     Certain Rights Relating to Equity Interests**.

(a)     Pledgor recognizes that Nexgen may be unable to effect a public sale of any or all Pledged Equity Interests, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for its own account for investment and not with a view to the distribution or resale thereof.  Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale.  Nexgen shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit Pledgor to register such Pledged Collateral for public sale under the Securities Act or under applicable state securities laws, even if Pledgor would agree to do so.

(b)     Pledgor further shall use its best efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Pledged Equity Interests pursuant to this Section 5.2 valid and binding and in compliance with any and all applicable laws.  Pledgor further agrees that a breach of any of the covenants contained in this Section 5.2 will cause irreparable injury to Nexgen, that Nexgen has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 5.2 shall be specifically enforceable against Pledgor, and Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Loan Documents and SPA.

(c)     The UCC states that Nexgen is able to purchase the Pledged Equity Interests only if it is sold at a public sale.  Nexgen has advised Pledgor that SEC staff personnel have issued various No-Action Letters describing procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9

of the UCC, yet not public for purposes of Section 4(2) of the Securities Act. The UCC permits Pledgor to agree on the standards for determining whether Nexgen has complied with its obligations under Article 9. Pursuant to the UCC, Pledgor specifically agrees (i) that it shall not raise any objection to Nexgen's purchase of the Pledged Equity Interests (through bidding on the Obligations or otherwise), and (ii) that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (A) shall be considered to be a "public" sale for purposes of the UCC; (B) will be considered commercially reasonable notwithstanding that Nexgen has not registered or sought to register the Pledged Equity Interests under applicable securities laws, even if Pledgor agree to pay all costs of the registration process; and (C) shall be considered to be commercially reasonable notwithstanding that Nexgen purchases the Pledged Collateral at such a sale.

(d)     Pledgor agrees that Nexgen shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Pledged Collateral sold by Nexgen pursuant to this Agreement. Nexgen may, among other things, accept the first offer received, or decide to approach or not to approach any potential purchasers.

**5.3     Pledgor's Obligations Upon an Event of Default**. Upon the request of Nexgen after the occurrence of an Event of Default, Pledgor will: (a) furnish to Nexgen, or cause the Pledgor's Companies to furnish to Nexgen, any information regarding the Pledged Collateral in such detail as Nexgen may reasonably require, and (b) take, or cause the Borrower to take, any and all actions necessary to register or qualify the Pledged Collateral to enable Nexgen to consummate a public sale or other disposition of the Pledged Collateral.

**5.4     Notice of Disposition of Pledged Collateral; Condition of Pledged Collateral**. Pledgor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Pledged Collateral may be made. To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Pledgor, addressed as set forth in <u>Section 6.13</u>, at least five (5) days (but no more than thirty (30) days) prior to (a) the date of any such public sale, or (b) the time after which any such private sale or other disposition may be made. To the maximum extent permitted by applicable law, Pledgor waives all claims, damages, and demands against Nexgen arising out of the repossession, retention or sale of the Pledged Collateral, except such as arise solely out of the gross negligence, fraud or willful misconduct of Nexgen. To the extent it may lawfully do so, Pledgor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against Nexgen, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Pledged Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise. Except as otherwise specifically provided herein, Pledgor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Pledged Collateral.

**5.5     Limitation on Nexgen's Duty with Respect to the Pledged Collateral**. Nexgen shall have no obligation to prepare the Pledged Collateral for sale. Nexgen shall use reasonable care with respect to the Pledged Collateral in its possession or under its control. Nexgen shall

not have any other duty as to any Pledged Collateral in its possession or control or in the possession or control of any agent or nominee of Nexgen, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

**5.6     Nexgen Performance of Pledgor's Obligations**.  Without having any obligation to do so, after the occurrence and during the continuance of (a) a Default, if Nexgen reasonably determines it to be necessary or advisable to preserve or protect the Pledged Collateral, upon three (3) days' notice to Pledgor (unless Nexgen reasonably determines such notice is not practical given the nature of Default), or (b) an Event of Default, Nexgen may perform or pay any obligation which Pledgor have agreed to perform or pay in this Agreement and Pledgor shall reimburse Nexgen for any reasonable amounts paid by Nexgen pursuant to this <u>Section 5.6</u>. Pledgor's obligation to reimburse Nexgen pursuant to the preceding sentence shall be an Obligation payable on demand.

**5.7     Authorization for Nexgen to Take Certain Action**.   Pledgor irrevocably authorizes Nexgen at any time and from time to time in the sole discretion of Nexgen and irrevocably appoints Nexgen as its attorney in fact, coupled with an interest, (a) to execute on behalf of Pledgor as debtor and to file financing statements necessary or desirable in Nexgen's sole discretion to perfect and to maintain the perfection and priority of Nexgen's security interest in the Pledged Collateral, (b) to indorse and collect any cash Proceeds of the Pledged Collateral, (c) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Pledged Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as Nexgen deems necessary or desirable to perfect and to maintain the perfection and priority of Nexgen's security interest in the Pledged Collateral, (d) to apply the Proceeds of any Pledged Collateral received by Nexgen to the Obligations, and (e) to discharge past due taxes, assessments, charges, fees or Liens on the Pledged Collateral (except for such Liens as are specifically permitted hereunder), and Pledgor agrees to reimburse Nexgen on demand for any reasonable payment made or any reasonable expense incurred by Nexgen in connection therewith, provided that this authorization shall not relieve Pledgor of any of its Obligations under this Agreement.  Nexgen agrees not to exercise the power of attorney granted under clauses (b), (d) and (e) of this <u>Section 5.7</u> except after the occurrence and during the continuance of an Event of Default.

**5.8     Irrevocable Proxy**. Solely with respect to Article 8 Matters, Pledgor hereby irrevocably grants and appoints Nexgen, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as such Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Pledged Equity Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy granted and appointed in this <u>Section 5.8</u> shall include the right to sign Pledgor's name to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Equity Interests that applicable law may permit or require, to cause the Pledged Equity Interests to be voted in accordance with the preceding sentence.  Pledgor hereby represents and warrants that there are no other proxies and powers of attorney with respect to any Article 8 Matter that such Pledgor may have granted or appointed. Pledgor shall not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Equity Interests with respect to any Article 8 Matter and any attempt to do so with

respect to any Article 8 Matter will be void and of no effect. The proxies and powers granted by Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of the Obligations.

**5.9** **Specific Performance of Certain Covenants**. Pledgor acknowledges and agrees that a breach of any of the covenants contained in <u>Sections 2.2</u> or <u>5.3</u> hereof will cause irreparable injury to Nexgen, that Nexgen has no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of Nexgen to seek and obtain specific performance of other Obligations of Pledgor contained in this Agreement, that the covenants of Pledgor contained in the sections referred to in this <u>Section 5.9</u> shall be specifically enforceable against Pledgor.

# ARTICLE 6

# GENERAL PROVISIONS

**6.1** **Reinstatement**. This Agreement shall remain in full force and effect and continue to be effective should any Event of Bankruptcy occur with respect to the Borrower or Pledgor, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**6.2** **Benefit of Agreement**. The terms and provisions of this Agreement shall be binding upon and inure to the benefit of Pledgor, Nexgen and its respective successors and assigns (including all persons who become bound as a debtor to this Agreement), except that Pledgor shall not have the right to assign its rights or delegate its Obligations under this Agreement or any interest herein, without the prior written consent of Nexgen. No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to Nexgen hereunder and any attempted assignment without consent will be null and void. Nexgen shall have the right to assign or transfer its rights under this Agreement in connection with any assignment of its rights under the Loan Documents and the SPA, and any assignee or transferee shall be entitled to all the benefits afforded to Nexgen under this Agreement.

**6.3** **Survival**. Without prejudice to the survival of any other agreement of Pledgor under this Agreement, the agreements and obligations of Pledgor contained in <u>Sections 6.1</u> and <u>6.12</u>, and the representations and warranties of Pledgor contained in this Agreement shall (a) survive until the Obligations have been paid in full and (b) be deemed to have been relied upon by Nexgen notwithstanding any investigation heretofore or hereafter made by Nexgen or on its behalf. This Agreement and the interests of Nexgen under it will terminate when all the Obligations have been paid in full in cash or otherwise fully satisfied in accordance with the Loan Documents and the SPA, but only if the Borrower does not file (and none of the creditors of Borrower files against it), within 91 calendar days after the first date when all the Obligations

are paid and performed in full, a petition seeking relief under any bankruptcy, insolvency, reorganization, or debtor relief law and a claim for recovery or repayment of any amount paid on the Obligations.

6.4 **Principles of Construction**. The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Assignment unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Assignment shall refer to this Assignment as a whole and not to any particular provision hereof or thereof. When used in this Assignment, the word "including" shall mean "including but not limited to". Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

6.5 **Termination and Release**. This Agreement and the security interests granted herein shall continue in full force and effect until, subject to reinstatement pursuant to Section 6.1, payment in full of the Obligations. In connection with any termination or release pursuant to this Section 6.6, Nexgen shall execute and deliver to Pledgor, at Pledgor's expense, all documents that Pledgor shall reasonably request to evidence such termination or release and shall perform such other actions reasonably requested by Pledgor to effect such release, including delivery of certificates, securities and instruments. Any execution and delivery of documents pursuant to this Section 6.6 shall be without recourse to or warranty by Nexgen.

6.6 **Entire Agreement**. This Agreement embodies the entire agreement and understanding between Pledgor and Nexgen relating to the Pledged Collateral and supersedes all prior agreements and understandings between the Pledgor and Nexgen relating to the Pledged Collateral.

6.7 **Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a) GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.

(b) CONSENT TO JURISDICTION. ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST PLEDGOR OR NEXGEN ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN BIRMINGHAM, ALABAMA. PLEDGOR AND NEXGEN HEREBY (i) IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (ii) IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (iii) IRREVOCABLY CONSENT TO SERVICE OF PROCESS BY MAIL, PERSONAL SERVICE OR IN ANY OTHER MANNER PERMITTED BY

APPLICABLE LAW, AT THE ADDRESS SPECIFIED ON THE SIGNATURE PAGES HERETO (AND AGREES THAT SUCH SERVICE AT SUCH ADDRESS IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER ITSELF IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT).

(c)     WAIVER OF JURY TRIAL.  PLEDGOR AND NEXGEN, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY NEXGEN AND PLEDGOR AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  NEXGEN AND PLEDGOR ARE EACH HEREBY INDIVIDUALLY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

**6.8    Modifications**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor or Nexgen therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on, Pledgor shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Nexgen in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, Nexgen shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or to declare a default for failure to effect prompt payment of any such other amount.  Nexgen shall have the right to waive or reduce any time periods that Nexgen is entitled to under this Agreement in its sole and absolute discretion.

**6.9    Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid pursuant to all applicable laws, but if any provision of this Agreement shall be prohibited by or invalid pursuant to applicable laws, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**6.10    Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Copies of originals, including copies delivered by facsimile, pdf or other electronic means, shall have the same import and effect as original

counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

**6.11    Payment of Expenses**.

(a)    Pledgor shall reimburse Nexgen for any and all costs and expenses (including attorneys' fees and expenses and auditors' and accountants' fees) paid or incurred by Nexgen in connection with the preparation, execution, delivery, administration, collection and enforcement of this Agreement and in the audit, analysis, administration, collection, preservation or sale of the Pledged Collateral (including the expenses and charges associated with any periodic or special audit of the Pledged Collateral).  Any and all costs and expenses incurred by Pledgor in the performance of actions required pursuant to the terms hereof shall be borne solely by Pledgor.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (OTHER THAN INTEREST, FEES AND OTHER AMOUNTS DUE AND PAYABLE UNDER THE LOAN DOCUMENTS, THE SPA AND/OR ARISING OUT OF CLAIMS BY THIRD PARTIES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY.

(c)    All amounts due under this Section shall be payable promptly (and in any event within ten (10) days after demand therefor).

**6.12    Notices**.    All notices, consents, approvals and requests required or permitted hereunder shall be given in writing by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of delivery or attempted delivery, addressed as set forth on the signature pages hereto (except that any party hereto may change its address and other contact information for purposes hereof at any time by sending a written notice to the other parties to this Agreement in the manner provided for in this Section).  A notice shall be deemed to have been given when delivered or upon refusal to accept delivery.

(Signature Page Immediately Follows)

IN WITNESS WHEREOF, Pledgor and Nexgen have executed this Agreement as of the date first above written.

**"PLEDGOR":**                                        **"NEXGEN":**

                                                      Nexgen Extractions LLC,
                                                      a New Jersey limited liability company

_____                      By: _____
Rodney L. Mays                                               Yitzchak Abadi, Manager

Address:                                              Address:
345 20th Street West                                  Nexgen Extractions LLC
Jasper, AL 35502                                      101 Chase Avenue, Suite 206
Email: maysrodney@yahoo.com                           Lakewood, NJ 08701
                                                      Attention: Legal Notices
                                                      Email: isaac@nexgencapital.com

# EXHIBIT F



**John D. Bethay, III**
DIRECT  205.254.1841
EMAIL    JBethay@maynardcooper.com

November 17, 2020

**VIA CERTIFIED MAIL AND EMAIL**
C. Ellis Brazeal III
Jones Walker LLP
Suite 1100
420 20th Street North
Birmingham, AL 35203
ebrazeal@joneswalker.com

> Re:    Nexgen Extractions LLC - Notice of Default by Quality Coal Co, Inc. and
> Rodney Mays

Ellis:

On behalf of Nexgen Extractions LLC ("Nexgen"), we write to notify you that Quality Coal Co., Inc. ("Quality Coal") and Rodney Mays ("Mays", together with Quality Coal, the "Obligors") are in default of those certain agreements, including, but not limited to the following: (1) Senior Secured Promissory Note, dated May 7, 2019, executed by Quality Coal, in favor of Nexgen ("Secured Note"), (2) Security Agreement, dated May 7, 2019, between Quality Coal and Nexgen ("Security Agreement"), (3) Secured Guaranty, dated May 7, 2019, executed by Mays and consented to by Crystal Mays ("Guaranty"), and (4) Equity Pledge Agreement, dated May 7, 2019, between Mays and Nexgen ("Pledge Agreement", together with the Secured Note, Security Agreement, Guaranty, and any and all other documents evidencing and/or securing the Loan (as hereinafter defined), the "Loan Documents"), pursuant to which Nexgen issued a $1.5 million secured loan to Quality Coal (the "Loan"). To secure the Loan, Quality Control granted Nexgen a security interest in all of its tangible and intangible assets, and Mays pledged his equity interests in Quality Coal (collectively, the "Collateral"). In connection with and as a condition to the issuance of the Loan, Quality Coal and Nexgen also executed that certain Securities Purchase Agreement, dated May 7, 2019 ("SPA"). Capitalized terms not otherwise defined in this notice have the meaning given to such terms in the Loan Documents and the SPA, as applicable.

Obligors are in default of their obligations under the Loan Documents for, among other things, failure to make payments as and when due thereunder. As of the date of this letter, the past due amount owing under the Loan Documents is $2,030,361.15, inclusive of interest, fees and other charges (the "Indebtedness"). Interest and other charges may continue to accrue on the Indebtedness pursuant to the Loan Documents and applicable law.

**Nexgen hereby demands that Obligors pay the Indebtedness, in full, by 5:00 p.m. (CST) on November 27, 2020 (the "Payment Deadline").**

If Nexgen has not received payment of the Indebtedness in full by the Payment Deadline, Nexgen will pursue all legal rights and remedies available to it to collect all obligations owed by Obligors to Nexgen in connection with the Loan Documents, including, without limitation, (i) acceleration of the entire balance of the Loan; (ii) commencement of litigation against Obligors; (iii) foreclosure of Nexgen's security interests in the Collateral; and (iv) the exercise of any other rights and remedies available to Nexgen under the Loan Documents or in equity or under applicable law.

Nexgen further demands that Obligors provide an accounting of the Collateral by the Payment Deadline. (*See* Security Agreement, ¶ 4(e); Pledge Agreement ¶ 5.3(a)). The Collateral was pledged as security for the Loan, and Nexgen has reason to believe certain of the Collateral, including, but not limited to, equipment, may have been fraudulently transferred by Quality Coal and/or Mays after execution of the Loan Documents. Nexgen may have a right to recover these assets.

Pursuant to the SPA, Quality Coal is obligated to pay Nexgen fifty percent (50%) of the profits derived from the Project under the Lost Creek Agreement after payment of expenses permitted under the SPA. (*See* SPA, ¶ 1.1 and ¶ 4.3). Nexgen further demands that Quality Coal provide an accounting of the profits generated by the Project and provide access to the books of account and all other records with respect to the Project by the Payment Deadline. (*See* SPA ¶ 4.4). Please contact me to coordinate online access to the books of account.

Please be advised that Nexgen intends to seek reimbursement for all additional costs and expenses incurred by Nexgen in connection with its efforts to collect the unpaid balance of the Indebtedness and to secure compliance with the Loan Documents, including without limitation attorneys' fees and other costs of collection, enforcement, and protection of Nexgen's rights (such interest and other fees and charges, together with the Indebtedness, the "Obligations"). (*See* Secured Note, Article 10; Guaranty, ¶ 1.2; Pledge Agreement, ¶ 6.11).

Neither this letter, nor the past or future acceptance of any partial payments toward the Obligations—other than payment in full of the Indebtedness by the Payment Deadline—shall constitute or be construed as a waiver of any default or other rights which Nexgen may have under the Loan Documents, the SPA, any agreement with either Obligor, and applicable law or equity, and shall not, in any event, result in any extension, reinstatement, waiver, or other modification thereof. You are also advised that any failure or delay on the part of Nexgen to exercise any right, remedy, power, or privilege under the Loan Documents, or the SPA, or provided by statute or at law or equity, or otherwise, shall not impair or operate as a waiver of any such right, remedy, power, or privilege or be construed as a waiver of any default or as an acquiescence therein. Nexgen expressly reserves all rights in full with respect to such matters.

I look forward to your prompt response. Please let me know at your earliest convenience if you do not represent Quality Coal or Mays.

In accordance with the Loan Documents and the SPA, I am also sending this notice to the following addresses:

Quality Coal Co., Inc.
72 Longview Dr.
Jasper, AL 35504
Attn: Rodney Mays

Rodney L. Mays
345 20th Street West
Jasper, AL 35502

Thank you for your attention to this urgent matter. Please contact me directly to make arrangements for payment in advance of the Payment Deadline or if you have any questions.

Sincerely,

John D. Bethay, III

cc:     Isaac Abadi
        Aaron Abadi
        Andrew Muller
        Quality Coal Co., Inc.
        Rodney L. Mays

# EXHIBIT G



Mays Mining, Inc. (MMI) has engaged in negotiations with Yellowhammer Energy Solutions, LLC (YES) concerning the acquisition of their company. YES is a coal mining company headquartered in Birmingham, Alabama with mining operations near Jasper, Alabama. YES began as a coal brokerage firm in 2016, along with a reclamation company. Coal was recovered as part of their reclamation activities. The actual coal mining began in late 2017, on a project referred to as the Slate Creek Mine. They continue to operate their brokerage and mine reclamation. However, we have only focused on their mining division and the current YES owners will retain the other businesses.

The primary asset of YES is their sales portfolio. YES is a member of the Alabama Coal Cooperative who has had a coal sales contract with Alabama Power since the early 1990's. This 1.8 million ton per year contract is for the Gorgas Steam plant and Wilsonville Steam Plant, which is exclusive to Alabama Coal Cooperative members. The YES portion of this contract is approximately 200,000 tons per year for an average coal quality of 11,750 Btu and 1.30% sulfur. 2018 pricing averaged $78.25 on 186,000 tons. This Coop contract has a tremendous upside for MMI. The new MMI mines have better overall coal quality than YES. This will allow MMI to ship tons on this contract and realize better pricing premiums, due to better coal quality. In 2018, MMI shipped approximately 100,000 into the Alabama Coal Cooperative, through two members at an average pricing of $70/ton. If MMI shipped the identical tons and quality with control of the YES contract, the net realization with the base pricing and quality premiums would have been in excess of $80/ton or a $10/ton differential. The Coop currently has six producing members. The only access into the Cooperative is by acquiring an existing member. If a member has production issues other members have the opportunity to cover the shortfall. The permitted reserve position of MMI should position us well to not only fill the YES portion, but any shortfall from another member.

Yellowhammer Energy Solutions is mining their permitted reserve referred to as the Slate Creek Mine. This location contains approximately 1.1 million tons of fully permitted recoverable coals. Approximately 50% of this reserve is owned by the YES owners individually. This mine began in late 2017 with approximately 55,000 tons produced generating a net income of $685,650. In 2018, Slate Creek produced 185,000 at an average cost of $64.76 and sales of $78.25 generating net income of $2,217,570. It would be our plan to modify their existing mine plan and highwall mine the high ratio portion, which is currently active. New development

would be directed to lower mining ratio resulting in a significant cost reduction. It is our belief that by lowering the overall mining ratio, we will have the financial impact of reducing the mining costs into the mid $50's.

Yellowhammer has a large fleet of Caterpillar, Komatsu, and Hitachi mining equipment. Equipment is both owned and leased, including a recent equipment purchase of a $1.4M Komatsu PC1250 Excavator. We believe that YES has excess equipment onsite. If this transaction is consummated, we plan to utilize some of the equipment to enhance our Mays Mining fleet.

The Yellowhammer project is a single coal mine producing 18,000 tons per month. We have the ability to manage this operation as part of the Mays Mining. An additional coal mine also builds our critical mass to allow us more vendor buying power, regarding parts and supplies. Combining the YES Mine, Mays Mining's Cordova, and Fishtrap Mine will result in combined monthly production of 72,000 saleable tons. Average realization will be $82.32 per ton, with projected mining costs of $58.86 per ton. These three mines will generate monthly revenue of $5,927,040 and a monthly EBITDA of $1,688,796. On an annualized basis the Mays Mining group of mines will produce 864,000 tons generating an EBITDA of $20,265,552. YES is a positive acquisition as a standalone project. However, it will greatly enhance our current position with Mays Mining.

# EXHIBIT H

<u>**SECURITIES PURCHASE AGREEMENT**</u>

**THIS SECURITIES PURCHASE AGREEMENT** (this "**Agreement**") is entered into effective as of August 22, 2019 ("**Effective Date**"), between Mays Mining, Inc., an Alabama corporation ("**Mays Mining**"), and Nexgen Extractions LLC, a New Jersey limited liability company ("**Nexgen**"). Mays Mining and Nexgen are individually referred to in this Agreement as a "**Party**" and collectively referred to in this Agreement as the "**Parties**".

WHEREAS, Mays Mining is in the business of mining and selling coal and related activities ("**Business**") and is the sole owner of the rights to extract coal from that certain mine referred to as the No. 5 Mine (the "**Mine**") and located in Walker County, Alabama, as further depicted on <u>Exhibit A</u> attached hereto;

WHEREAS, Rodney L. Mays ("**Mays**"), is the sole shareholder and owns 100% of Mays Mining and has substantial experience in the business of mining and selling coal and related activities;

WHEREAS, Mays Mining has determined that it requires $350,000 to refinance certain debts to continue operating the Business including activities with respect to the Mine; and

WHEREAS, subject to the terms of this Agreement, Nexgen desires to invest the amount of $350,000 with Mays Mining in the form of a secured loan in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     <u>Issuance of the Note; Closing</u>.

    1.1.   <u>Loan Terms</u>.

       (a)    Subject to the terms and conditions of this Agreement, Nexgen agrees to loan to Mays Mining the aggregate principal amount of $350,000 ("**Loan**") to pay certain liabilities with respect to the Business in accordance with the terms of this Agreement. The Loan shall accrue interest at two percent (2%) per month interest on the outstanding principal Loan amount. The Loan should be paid in full by December 1, 2019.

       (b)    Reserved.

    1.2.   <u>Loan Documents</u>. The Loan shall be evidenced by that certain Senior Secured Promissory Note in the form attached hereto as <u>Exhibit A</u> ("**Note**"). The Note shall be secured by (a) that certain Security Agreement by Mays Mining in favor of Nexgen in the form attached hereto as <u>Exhibit B</u> ("**Security Agreement**"), and (b) that certain Secured Guaranty by Mays in favor of Nexgen in the form attached hereto as <u>Exhibit C</u> ("**Guaranty**"). The Guaranty shall be secured by that certain Equity Pledge Agreement in the form attached hereto as <u>Exhibit D</u> ("**Pledge Agreement**"). The Note, the Security Agreement, the Guaranty, the Pledge

Agreement and the other documents executed in connection with the Loan are collectively referred to in this Agreement as the "**Loan Documents**".

1.3.    Closing; Funding the Loan. Concurrently with the full execution of this Agreement, Mays Mining shall execute and deliver to Nexgen (a) the Loan Documents executed by Mays Mining and Mays, as applicable, and (b) a resolution of Mays Mining authorizing the execution of this Agreement and the Loan Documents.  Concurrently with the full execution of this Agreement, and upon receipt of the foregoing items from Mays Mining, Nexgen shall fund the entire Loan amount (for the benefit of Mays Mining) as follows: (i) $133,000.00 of the Loan Amount shall be funded to Mays Mining which shall be utilized solely to satisfy certain debts of Mays Mining, and (ii) $217,000.00 of the Loan Amount shall be funded directly to Quality Coal Co. Inc., an Alabama corporation, and an affiliate of Mays Mining, to satisfy a debt of Mays Mining.

1.4.    Defined Terms Used in this Agreement.  In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

(a)    **"Person"** means any individual, corporation, partnership, trust, limited liability Mays Mining, association or other entity.

(b)    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

2.    Representations and Warranties of Mays Mining.  Mays Mining hereby represents and warrants to Nexgen that the following representations are true and complete as of the Closing, except as otherwise indicated.

2.1.    Organization, Good Standing, Corporate Power and Qualification.  Mays Mining is a corporation duly organized, validly existing and in good standing under the laws of the State of Alabama and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted.  Mays Mining is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on Mays Mining's activities.

2.2.    Capitalization.  The authorized capital of Mays Mining consists, immediately prior to the Closing, of 100 shares of common stock, owned 100% by Mays. There are no outstanding options, warrants, rights or agreements, orally or in writing, to purchase or acquire from Mays Mining any shares of Mays Mining or any securities convertible into or exchangeable for shares of stock in Mays Mining.

2.3.    Subsidiaries; Joint Ventures. Mays Mining does not own any subsidiaries and is not a participant in any joint venture, partnership or similar arrangement with respect to the Mine or otherwise.

2.4.    Authorization.    All corporate action required to be taken by Mays Mining's Board of Directors and shareholder to authorize Mays Mining to enter into this Agreement has been taken or will be taken prior to the Closing.  This Agreement, when executed

and delivered by Mays Mining, shall constitute valid and legally binding obligations of Mays Mining, enforceable against Mays Mining in accordance with their respective terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (c) to the extent limited by applicable federal or state securities laws.

2.5.     <u>Governmental Consents and Filings</u>.  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of Mays Mining in connection with Business and the consummation of the transactions contemplated by this Agreement.

2.6.     <u>Litigation; Guaranties</u>.  There is no claim, action, suit, proceeding, arbitration, complaint, charge or, to Mays Mining's knowledge, investigation pending or to Mays Mining's knowledge, currently threatened against Mays Mining or any officer or director of Mays Mining that questions the validity of this Agreement or any of Mays Mining's governing documents or the right of Mays Mining to enter into them, or to consummate the transactions contemplated by this Agreement. Mays Mining is not a guarantor or indemnitor of any indebtedness of any other Person.

2.7.     <u>Compliance with Other Instruments</u>.  Mays Mining is not in violation or default (a) of any provisions of its certificate of incorporation or bylaws, (b) of any instrument, judgment, order, writ or decree, (c) under any note, indenture or mortgage, or (d) in any material respect under any lease, agreement, contract or purchase order to which it is a party.

2.8.     <u>Bankruptcy Status; Indebtedness</u>. Mays Mining has no current intention or expectation to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one (1) year from the date of this Agreement. Mays Mining has no loans or debt outstanding other than accounts payable in the normal course of its business all of which are current.

2.9.     <u>Tax Returns and Payments</u>.  There are no federal, state, county, local or foreign taxes due and payable by Mays Mining which have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of Mays Mining which are due, whether or not assessed or disputed.

2.10.    <u>Permits</u>.   Mays Mining has all permits, licenses and any authority necessary for the conduct of its Business including with respect to the Mine, the lack of which could reasonably be expected to have a material adverse effect on Mays Mining.  Mays Mining is not in default in any material respect under any of such permits, licenses or other similar authority.

2.11.    <u>Environmental and Safety Laws</u>.   Except as could not reasonably be expected to have a material adverse effect (a) Mays Mining is and has been in compliance with all applicable environmental laws; (b) there has been no release or to Mays Mining's knowledge threatened release of any pollutant, contaminant or toxic or hazardous material, substance or

waste, or petroleum or any fraction thereof (each a "**Hazardous Substance**") on, upon, into or from any site currently or heretofore owned, leased or otherwise used by Mays Mining; (c) there have been no Hazardous Substances generated by Mays Mining that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any governmental authority in the United States, except for the storage of hazardous waste in compliance with Environmental Laws.

For purposes of this Section, "Environmental Laws" means any law, regulation, or other applicable requirement relating to (a) releases or threatened release of Hazardous Substance; (b) pollution or protection of employee health or safety, public health or the environment; or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

2.12.   Brokers. No agent, broker, or other person or firm acting on behalf of or under the authority of Mays Mining is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the transactions contemplated by this Agreement.

2.13.   Reliance. Mays Mining understands that the foregoing representations and warranties shall be deemed material and to have been relied upon by Nexgen.

3.      Representations and Warranties of Nexgen.   Nexgen hereby represents and warrants to Mays Mining that:

3.1.   Authorization.   Nexgen has full power and authority to enter into this Agreement.   This Agreement and any other agreement with Mays Mining or Mays, to which Nexgen is a party, when executed and delivered by Nexgen, will constitute valid and legally binding obligations of Nexgen, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (b) to the extent the indemnification provisions contained herein may be limited by applicable federal or state securities laws.

3.2.   Purchase Entirely for Own Account.   This Agreement is made with Nexgen in reliance upon Nexgen's representation to Mays Mining, which by Nexgen's execution of this Agreement, Nexgen hereby confirms, that this Agreement will be executed for investment for Nexgen's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof.

3.3.   Restricted Securities.   Nexgen understands that the equities represented by this Agreement have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Nexgen's representations as expressed herein.

3.4.    <u>Accredited Investor</u>.  To the extent Nexgen is a "U.S. Person" (as defined in Rule 902(k) of Regulation S, promulgated under the Securities Act), Nexgen, hereby represents and warrants that Nexgen is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.5.    <u>No Other Representations</u>. Other the representations and warranties above, Nexgen makes no other representations or warranties in regard to the transactions contemplated by this Agreement.

4.    <u>Additional Rights and Obligations of the Parties</u>.

4.1.    <u>Operation of the Business</u>.  Mays Mining agrees, diligently and in good faith, at all times during the term of the Note, to operate the Business in a first-class manner and in accordance with all applicable laws.  In the performance of Mays Mining's obligations hereunder, Mays Mining agrees to apply prudent and reasonable business practices to operate the Business, all of which practices shall be performed in a manner at least equivalent to the standard of care rendered by leading mining operators for mining operations similar to the Mine.

4.2.    <u>Use of Proceeds</u>. The proceeds of the Loan received by Mays Mining shall be used exclusively in accordance with Section 1.3 and in accordance with the Loan Documents.

4.3.    <u>Reserved</u>.

4.4.    <u>Bank Account; Accounting</u>.  Mays Mining shall maintain complete and accurate books of account and all other records with respect to the Mine and make such records and books of account available for to Nexgen or its duly authorized representative upon request during regular business hours and at the principal office of Mays Mining.  Mays Mining shall provide Nexgen on a monthly basis reasonable accounting records for the Business and the Mine within one (1) business day upon notice of such request.

4.5.    <u>Devotion of Time</u>.  Mays Mining shall devote its full attention and time to the Business.

4.6.    <u>Reserved</u>.

4.7.    <u>Additional Capital; Cap on Costs</u>. Upon funding the Loan in accordance with this Agreement and the Note, Nexgen shall have no further obligation to make capital available to Mays Mining in connection with the Business or otherwise.

4.8.    <u>Reserved</u>.

4.9.    <u>Restrictions Regarding Material Matters</u>.  Without first obtaining the prior written approval of Nexgen, Mays Mining shall not (a) sell, transfer or otherwise dispose of the shares or interests of Mays Mining, and/or the Business, (b) grant any liens, encumbrances, purchase rights or rights of first refusal with respect to Mays Mining; (c) issue any additional shares, interests or securities of Mays Mining; and/or (d) obtain any additional financing any of Mays Mining's assets and/or the operations of Mays Mining.

5. <u>Indemnification</u>. Mays Mining shall indemnify Nexgen and hold Nexgen harmless from and against any and all losses, damages, liabilities and expenses (including reasonable attorneys' fees and costs) (collectively, "**Loss**") sustained or incurred by Nexgen as a result of (a) a breach of a representation or warranty made under <u>Section 2</u> above, or any misrepresentation thereunder, and (b) any breach or default under this Agreement, and any of the Loan Documents. If any claim, suit, action or other proceeding to which the indemnity set forth herein applies is brought against Nexgen, Nexgen shall give Mays Mining prompt notice of the same. Upon demand of Nexgen, Mays Mining shall promptly assume the defense of Nexgen.

6. <u>Miscellaneous</u>.

6.1. <u>Survival of Warranties</u>. Unless otherwise set forth in this Agreement, the representations and warranties of the Parties contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing.

6.2. <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties.

6.3. <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without giving raise to any conflict of laws.

6.4. <u>Jurisdiction and Venue</u>. The Parties agree that any suit, action or proceeding arising out of or related to this Agreement shall be brought only in the applicable Federal or State Court in Birmingham, Alabama. To the fullest extent permissible by law, the Parties consent to the personal jurisdiction, venue and forum of such courts.

6.5. <u>Attorneys' Fees</u>. If any legal action or other proceeding is brought for the enforcement of this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party, reasonable attorneys' fees, court costs and all expenses, even if not taxable as court costs (including, without limitation, all such fees, costs and expenses incident to appeals), incurred in that action or proceeding, in addition to any other relief to which such Party may be entitled.

6.6. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.7. <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.8. <u>Notices</u>. Except as otherwise set forth in this Agreement, all notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of: (a) hand delivery, (b) upon receipt if delivered by a reliable overnight courier service, with receipt acknowledgment requested, or (c) upon receipt if transmitted by email, with a copy sent on the same day by one of the other permitted methods of

delivery, and addressed as follows or such other address as a Party may from time to time specify in writing in with this Section:

    (a)    Mays Mining:

    Mays Mining, Inc.
    72 Longview Dr.
    Jasper, Alabama 35504
    Attention: Rodney L. Mays
    Email:  maysrodney@yahoo.com

    (b)    Nexgen:

    Nexgen Extractions LLC
    101 Chase Avenue, Suite 206
    Lakewood, NJ 08701
    Attention: Legal Notices
    Email: isaac@nexgencapital.com

    with copies to (which shall not constitute notice):

    Maynard Cooper & Gale
    1901 Sixth Avenue North
    Regions Harbert Plaza, Suite 2400
    Birmingham, AL 35203
    Attention:  Jim McLaughlin
    Email:  JMcLaughlin@maynardcooper.com

    6.9.   <u>Fees and Expenses</u>.  Mays Mining shall pay the fees and expenses of Nexgen's legal counsel in connection with this Agreement.

    6.10.   <u>Amendments and Waivers</u>.  This Agreement may be modified or amended only by agreement in writing signed by the Parties. Any waiver of compliance of any term, condition, or obligation under this Agreement shall only valid if set forth in writing signed by the Party to be bound.  Waiver of any term, condition or obligations of this Agreement by a Party shall not be construed as a waiver of any subsequent breach or waiver of the same term or condition by such Party, or a waiver of any other term or condition of this Agreement by such Party.  The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any such rights.

    6.11.   <u>Severability</u>.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

    6.12.   <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power or remedy of such non-breaching

or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

6.13.  Further Assurances. Each Party agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

6.14.  Advice of Counsel. Each Party agrees and represents that it (a) has had advice of counsel of its choosing or had the opportunity of obtaining advice of counsel, in the negotiation and the preparation of this Agreement, (b) has read this Agreement, and (c) is fully aware of the contents and legal effect of this Agreement.

6.15.  Entire Agreement. This Agreement and the Loan Documents constitute the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**"MAYS MINING":**

Mays Mining, Inc., an Alabama corporation

By: _____
Name: Rodney L. Mays
Title: President and Secretary

**"NEXGEN":**

Nexgen Extractions LLC,
a New Jersey limited liability company

By: _____
      Yitzchak Abadi, Manager

[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

# EXHIBIT I

# SENIOR SECURED PROMISSORY NOTE

**$350,000.00**                                                    Jasper, Alabama
                                                                  August 22, 2019

   **FOR VALUE RECEIVED**, Mays Mining, Inc., an Alabama corporation, as maker, having an address at 72 Longview Dr., Jasper, Alabama 35504 ("**Borrower**"), hereby unconditionally promises to pay to the order of Nexgen Extractions LLC, a New Jersey limited liability company ("**Lender**"), as payee, at 101 Chase Avenue, Suite 206, Lakewood, NJ 08701, Attention: Legal Notices, or at such other place as the holder hereof may from time to time designate in writing, the principal sum of **THREE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($350,000.00)** ("**Loan Amount**"), together with interest on any principal amounts remaining unpaid from time to time from the date of this Secured Promissory Note ("**Note**") until payment in full, to be calculated as set forth below.

   Concurrently with the execution of this Note, Borrower and Lender have entered into that certain Securities Purchase Agreement (the "**SPA**") whereby Borrower has requested that Lender extend the loan evidenced by this Note ("**Loan**") to provide capital to Borrower. Lender has agreed to make the Loan to Borrower in accordance with and subject to the express terms and conditions of this Note.

   **NOW THEREFORE,** for good and valuable consideration, including the Loan and all other items included within the indebtedness evidenced by this Note (collectively, the "**Indebtedness**"), the receipt and sufficiency of which are hereby acknowledged, Borrower agrees as follows:

## ARTICLE 1

## DEFINITIONS

   All capitalized terms used in this Note shall have the following meanings:

   The term "**Business Day**" shall mean any day other than Saturday, Sunday, or public holiday or the equivalent for banks generally under the laws of the State of Delaware. Whenever any payment to be made under this Note is stated to be due on a day other than a Business Day, that payment may be made on the next succeeding Business Day, and the extension of time will in that case be included in the computation of payment of interest. However, if the extension would cause the payment to be made in a new calendar month, that payment will be made on the next preceding Business Day, and interest will be payable for the shorter period.

   The term "**Default Rate**" shall mean a rate of interest per annum equal to the lessor of twenty-four percent (24%) or the maximum rate permitted by law.

   The term "**Interest Rate**" shall mean a rate of interest per annum equal to twenty-four percent (24%).

   The term "**Loan Documents**" shall mean this Note and all other documents evidencing, or relating to the loan evidenced by this Note.

The term "**Maturity Date**" shall mean December 1, 2019, or any earlier date on which the Indebtedness evidenced by this Note is due pursuant to the terms of the Loan Documents.

The term "**Person**" shall mean any natural person, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or governmental authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

## ARTICLE 2

## PAYMENT TERMS

The principal amount advanced under this Note shall bear interest on the unpaid principal amount from the date first set forth above until repaid pursuant to the terms of this Note. Borrower shall make monthly payments in accordance with the payment scheduled attached hereto as **Schedule 1**. The entire balance of principal outstanding on the Maturity Date, together with any interest accrued thereon from such date and until paid in full, shall be paid by the Maturity Date. All payments will be applied first to payment of any costs, fees, interest, late charges, or other charges due under this Note or any Loan Documents, then to accrued interest, and then to the principal balance.

Both principal and interest are payable in lawful money of the United States of America in same day funds at Lender's address set forth above or at any place that Lender or the legal holders of this Note may, from time to time, designate to Borrower in writing. Borrower may, at its option, prepay the Indebtedness in whole or in part, without penalty; provided, however, in no event shall Borrower receive repayment of any fees or costs previously paid to Lender. Borrower may, at its option and upon at least thirty (30) days but not more than sixty (60) days prior written notice to Lender, prepay the Indebtedness in its entirety.

## ARTICLE 3

## RESERVED

## ARTICLE 4

## SECURITY

As an inducement for Lender to provide the Loan and to secure the full and punctual payment of the Indebtedness and the performance of the Borrower's obligations under this Note, Borrower hereby grants to Lender a continuing and unconditional security interest (the "**Security Interest**") in the Collateral (as defined below) until this Note is repaid in full. Subject to laws applicable to Borrower as a corporation formed in Alabama, the Security Interest shall be governed by the Uniform Commercial Code of the State of Delaware. Lender shall be permitted to file any financing statements necessary to perfect the Security Interest. For purposes of this Agreement, "Collateral" means (a) all of the tangible and intangible assets of Borrower, including but not

limited to cash, accounts receivable, inventory, copyrights, trademarks, tradenames, patents, contract rights and customer lists, and (b) all proceeds derived from the foregoing assets.

## ARTICLE 5

## DEFAULT; REMEDIES

The Indebtedness shall without notice become immediately due, accelerated and payable at the option of Lender if any payment required in this Note is not paid on or prior to the Maturity Date or on the occurrence of any other default under this Note. For the avoidance of doubt, as permitted under applicable law, if the Indebtedness has been accelerated upon a default under this Note, payment of principal and interest shall be immediately due and payable.

Any amount of principal or interest that is not paid when due (whether at stated maturity, by acceleration, or otherwise) will bear interest from the date on which that amount is due until the amount is paid in full, payable on demand, at the Default Rate in effect from time-to-time. The undersigned acknowledges that, during the time that any amount is in default, Lender will incur losses that are impracticable, costly, and inconvenient to ascertain. Those losses include, without limitation, the ability to invest amounts then due at the current rate of return and the unavailability of liquid funds. Borrower agrees that the Default Rate of interest represents a reasonable sum considering all of the circumstances existing on the date of the execution of this Note and represents a reasonable estimate of the losses Lender will incur by reason of any late payment. Borrower further agrees that proof of actual losses would be costly, inconvenient, impracticable, and extremely difficult to fix. Acceptance of the interest at the Default Rate shall not constitute a waiver of any default with respect to the overdue payment and shall not prevent Lender from exercising any of the other rights and remedies available under this Note or any Loan Document. This charge shall be in addition to, and not in lieu of, any other remedy Lender may have, and is in addition to Lender's right to collect reasonable fees and charges of any agents or attorneys which Lender employs in connection with any default. Such late charges if not previously paid shall become part of the Indebtedness evidenced hereby. Failure to pay such late charges upon Lender's demand shall constitute a default and such late charges shall bear interest at the Default Rate from the date due until paid to Lender in full.

Upon the occurrence of any default under this Note or any other Loan Document, Lender may exercise any or all of the rights and remedies available to it under this Note and applicable, at its discretion. The failure of Lender to exercise any remedy provided under this Note or any other Loan Document shall not preclude the resort to any other remedy provided or prevent the subsequent or concurrent resort to any other remedy which by law or equity shall be vested in Lender for the recovery of damages or otherwise in the event of a breach of any of the undertakings of Borrower under this Note or any other Loan Document.

## ARTICLE 6

## SAVINGS CLAUSE

All agreements between Borrower and Lender are expressly limited so that in no event will the amount paid or agreed to be paid to Lender for the use, forbearance, or detention of the money to be advanced under this Note exceed the highest lawful rate permissible under

applicable law. If, from any circumstance, fulfillment of any provision of this Note or any Loan Document, at the time performance or the provision is due, is prohibited by law, then the obligation to be fulfilled will be reduced to the maximum rate not so prohibited, and if from any circumstance Lender should ever receive as interest under this Note an amount that would exceed the highest lawful rate, the amount that would be excessive interest will be applied to the reduction of the principal of this Note and not to the payment of interest. This provision will control every other provision of all agreements between Borrower and Lender with respect to the Loan Documents.

## ARTICLE 7

## NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 8

## WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Indebtedness do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note or any other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Indebtedness, under this Note or any other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note or any other Loan Documents.

## ARTICLE 9

## TRANSFER

Upon the transfer of this Note by Lender, Borrower hereby waiving notice of any such transfer, Lender may deliver all the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 10

### ATTORNEYS' FEES AND COSTS

Borrower agrees to pay all costs (including, without limitation, reasonable attorneys' fees, witness fees and all other costs) incurred by Lender in enforcing payment or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, whether or not suit is filed, and including, without limitation, all costs, reasonable attorneys' fees, and expenses incurred by Lender in connection with any bankruptcy (including any action for relief from the automatic stay of any bankruptcy proceeding), reorganization, arrangement, or other similar proceedings involving the undersigned that in any way affects the exercise by the holder of this Note of its rights and remedies under this Note. All costs incurred by the holder of this Note in any action undertaken to obtain relief from the stay of bankruptcy statutes are specifically included in those costs and expenses to be paid by the undersigned. Borrower will pay to Lender all attorneys' fees and other costs referred to in this Article on demand, together with interest from the date of the demand at the Default Rate until paid in full.

## ARTICLE 11

### REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower represents and warrants that as of the date hereof and as of each disbursement under this Note the following representations and warranties will be true and correct:

11.1  Power; Authorization; Enforceable Obligations. Borrower is organized under the laws of the State of Alabama and has full power, authority and legal right to execute, deliver and perform all obligations under this Note. This Note constitutes legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms.

11.2  No Violations. Borrower is not in default in any material respect under any agreement to which it is a party, or under any applicable statute, rule, order, decree or regulation of any court, arbitrator or governmental body or agency having jurisdiction over Borrower.

11.3  No Legal Conflicts. The borrowing of the Loan Amount and Borrower's execution, delivery and performance of the obligations under this Note and any Loan Documents will not: (a) violate, conflict with or result in a default under any agreement or other instrument to which Borrower is a party; (b) violate any law or regulation or any order or decree of any court or governmental instrumentality; (c) require any authorization or consent from, or any filing with, any governmental authority; (d) result in the creation of any lien, charge or encumbrance upon any of the property of the Borrower; nor (e) will Borrower be insolvent at the time of such disbursement under this Note.

11.4  No Litigation.  No action, suit, proceeding or investigation, judicial, administrative or otherwise (including, without limitation, any reorganization, bankruptcy, insolvency or similar proceeding) currently is pending or, to the best of Borrower's knowledge, threatened or contemplated against or affecting Borrower.

Borrower acknowledges that, but for the representations and warranties in this Article, Lender would not grant the Loan to Borrower on the terms represented in this Note. Borrower further acknowledges that Lender is relying exclusively on Borrower's representations and warranties in this Article, and will disburse the Loan Amount in material reliance on such representations and warranties.

## ARTICLE 12

## INDEPENDENT COUNSEL; CONSTRUCTION

Each party acknowledges that it has been represented by independent counsel throughout all of the negotiations which preceded the execution of this Note and the other Loan Documents, and that it has executed this Note with the consent and upon the advice of such independent counsel. Each party further acknowledges that this Note and the other Loan Documents have been drafted as a result of negotiations between the parties, and therefore, no provision shall be construed so as to favor or disfavor either party hereto.

## ARTICLE 13

## CONDITIONS

As a condition precedent to the Lender's extension of the Loan proceeds to Borrower, Borrower shall reimburse Lender all of the legal fees incurred by Lender in connection with the documentation of the Loan.

## ARTICLE 14

## GOVERNING LAW; LITIGATION PROVISIONS

This Note shall be governed by the laws of the State of Delaware. Borrower consents and submits to the jurisdiction of any State or Federal court located in Birmingham, Alabama, in which any legal proceeding may be commenced or pending relating in any manner to this Note or any other Loan Document. Borrower agrees that process in any legal proceeding relating to this Note or any other Loan Document may be served on Borrower at any address of Borrower. Borrower agrees that any legal proceeding relating to this Note or any other Loan Document may be brought against Borrower in any State or Federal court located in Birmingham, Alabama. Borrower waives any objection to venue in any such court and waives any right it may have to transfer or change the venue from any such court. Borrower agrees that it will not commence any legal proceeding against lender relating in any manner to this Note or any other Loan Document in any court other than a State or Federal court located in Birmingham, Alabama, or if a legal proceeding is commenced by Lender against Borrower in a court in another location, by way of a counterclaim in such legal proceeding.

## ARTICLE 15

### USE OF PROCEEDS

Borrower agrees with and represents to Lender that the Loan disbursed by Lender pursuant to this Note shall be used by Borrower solely in accordance with the SPA. Borrower hereby instructs Lender to fund the Loan Amount in accordance with the SPA. Borrower acknowledges that, but for this agreement and representation of Borrower, Lender would not grant the Loan to Borrower on the terms represented in this Note or the Loan Documents. Borrower further acknowledges that Lender is relying exclusively on Borrower's agreement and representation hereunder in Lender's determination of the use of the Loan Amount, and will make disbursements under the Note in material reliance on such agreement and representation.

## ARTICLE 16

### NOTICES

All notices and other communications provided for in this Note (each a "**Notice**") shall be in writing. The addresses for Notices to the parties for purposes of this Note are set forth above or such other address as a party may designate by Notice duly given in accordance with this Article. All Notices shall be: (a) hand-delivered, effective upon receipt; or (b) sent by a national overnight courier, effective upon receipt; or (c) sent by certified mail, return receipt requested, shall be deposited in the United States mail, with postage thereon fully prepaid and shall be deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three (3) business days after the date of mailing, whichever is the earlier in time. The party giving a Notice shall have the burden of establishing the fact and date of delivery or refusal of delivery of a Notice. The address of Borrower set forth in the Preamble of this Note shall be the mailing address of Borrower as debtor under the Delaware Uniform Commercial Code.

## ARTICLE 17

### MISCELLANEOUS

Borrower shall, at its cost and expense, upon request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and do and cause to be done such further acts that may be necessary or proper in the opinion of Lender to carry out more effectually the provisions and purpose of this Note. This Note shall be binding upon the parties hereto and upon their respective heirs, executors, administrators, successors and assigns, and shall inure to the benefit of the successors and assigns of Lender. Notwithstanding the foregoing, Borrower shall not have the right to assign any interest in this Note or any of the Loan Documents without the prior written consent of Lender (which may be withheld in Lender's sole discretion). Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remainder of such provision or the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

**[No Further Text on this Page; Signature of Borrower Follows Immediately]**

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first set forth above.

"Borrower":

Mays Mining, Inc., an Alabama corporation

By: _____
Name: Rodney L. Mays
Its: President

# Schedule 1

| | | | Due on | Due on | Due on | Due on |
|---|---|---|---|---|---|---|
| | | 8/22/2019 | 9/1/2019 | 10/1/2019 | 11/1/2019 | 12/1/2019 |
| 133,000 | 2.00% | | 858.06 | 2,373.98 | 1,582.65 | 791.33 |
| | | | 14,301.08 | 39,566.31 | 39,566.31 | 39,566.31 |
| | Total due | | 15,159.14 | 41,940.29 | 41,148.96 | 40,357.63 |
| | | | | | | |
| | | | | | | - |
| | | | | | | |
| | | Loan closed | Due on | Due on | Due on | Due on |
| | | 8/22/2019 | 9/1/2019 | 10/1/2019 | 11/1/2019 | 12/1/2019 |
| 217,000 | 2.00% | | 1,400.00 | 4,340.00 | 4,340.00 | 4,340.00 |
| | | | | | | 217,000.00 |
| | Total due | | 1,400.00 | 4,340.00 | 4,340.00 | 221,340.00 |

# EXHIBIT J

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made and entered into as of August 22, 2019 ("**Effective Date**"), between Mays Mining, Inc., an Alabama corporation ("**Borrower**"), in favor of Nexgen Extractions LLC, a New Jersey limited liability company ("**Lender**"), to record the grant of a security interest in all of the tangible and intangible assets of Borrower as further described in this Agreement. Each of Borrower and Lender are sometimes referred to herein as a "**Party**", and collectively, as the "**Parties**".

A.   Concurrently with the execution of this Agreement, Borrower has executed and delivered to Lender a Senior Secured Promissory Note, of even date herewith, in the original principal amount of $350,000.00 (the "**Note**").

B.   To induce Lender to make the loan evidenced by the Note, Borrower has agreed to grant a security interest in the Assets (defined below) of Borrower to secure Borrower's obligations to Lender under the Note.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.**    **Definitions**. Unless otherwise defined herein or unless the context otherwise requires, terms used in this Agreement, including its preamble and recitals, have the meanings provided in the Uniform Commercial Code in effect in the State of Delaware (the "**UCC**"). In addition, the following terms when used in this Agreement shall have the following meanings:

a.    "**Transaction Documents**" shall mean (i) this Agreement, (ii) the Note, and (iii) the UCC-1 statements filed in connection herewith.

b.    "**Collateral**" shall mean (i) all of the tangible and intangible assets of Borrower including, without limitation, cash, accounts receivable, inventory, copyrights, trademarks, tradenames, leases, licenses, permits, patents, contract rights and customer lists, and (ii) all Proceeds derived from the foregoing assets. The Collateral is more fully described in Exhibit A attached hereto.

c.    "**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

d.    "**Lien**" shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of the foregoing (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

interest in any and all of the Collateral, including (a) obtaining (in form and substance reasonably acceptable to Lender) all waivers, consents, and approvals from each person that Lender deems reasonably necessary, (b) executing, delivering, and, where appropriate, filing financing statements and related amendments under the UCC, to the extent if any, that Borrower's signature is required, (c) complying with any law, if compliance with the law is a condition to the attachment, perfection, or priority of, or ability of Lender to enforce, its security interest in that Collateral, and (d) causing Lender's name to be noted as secured party on any certificate of title for a titled good if the notation is a condition to the attachment, perfection, or priority of, or ability of Lender to enforce its security interest in that Collateral.

**3.** **Representations and Warranties**. Borrower represents and warrants that as of the Effective Date:

a. Borrower has the authority to grant to Lender a security interest in the Collateral pursuant to this Agreement;

b. Borrower has not filed any financing statements in any public office covering any of the Collateral (except for the Liens to be satisfied with the proceeds of the Note);

c. Borrower is the sole legal and equitable owner of all the Collateral, except for the security interests granted to Lender in this Agreement;

d. This Agreement has been duly authorized, executed, and delivered on behalf of Borrower and constitutes a valid and binding agreement that is enforceable against Borrower by Lender in accordance with its terms, except to the extent limited by bankruptcy, insolvency, debtor relief, and other laws of general application affecting the enforcement of creditors' rights and debtors' obligations;

e. The Collateral is free and clear of all Liens, charges, and assessments of every kind and nature, except for: (i) liens for taxes and assessments of governmental authorities that are not yet due and for which adequate reserves are recorded in Borrower's books of account; and (ii) security interests granted in favor of Lender or allowed in writing by Lender;

f. Borrower's chief executive offices and the places where Borrower keeps the Collateral and all the records pertaining to the Collateral are at the address of Borrower listed in Section 13 of this Agreement;

g. The exact legal name and state of organization of Borrower are as set forth in the first paragraph of this Agreement, and Borrower does not transact any business under any name other than the exact legal name set forth in the first paragraph of this Agreement; and

h. The execution, delivery, and performance of this Agreement by Borrower: (i) have been duly authorized by all requisite corporate action of Borrower; (ii) will not result in the creation of any Lien on any property of Borrower (other than the security interests created pursuant to this Agreement); (iii) will not contravene the articles of incorporation or bylaws or articles of formation or company agreement, as applicable, of Borrower; (iv) do not require any consent, filing, approval, or other action by or with any Person; (v) will not accelerate the maturity or time for performance of any Indebtedness of Borrower; and (vi) will not constitute a

breach, a default, or an event that (with notice, lapse of time, or both) would be a breach or default, under any order, decree, lease, judgment, agreement, or instrument to which Borrower is a party or otherwise subject.

**4.** **Affirmative Covenants**. Until the Obligations have been paid in full, Borrower shall (a) furnish to Lender any information received by Borrower pertaining to claims made by third parties to the Collateral, (b) promptly notify Lender after Borrower learns of any event that would constitute an Event of Default, (c) promptly pay all indebtedness in accordance with the terms of the Note, (d) conduct and maintain its affairs and business according to its usual and ordinary course, maintain itself at all times as a legal entity organized and existing in good standing under the laws of its states of organization, and comply with all laws applicable to the Collateral, (e) keep books, records, and accounts that fairly reflect all dealings and transactions related to the Collateral and to Borrower's business and activities, permit Lender or its agents or representatives, at any time during normal business hours, to copy, examine, and make extracts from all of Borrower's records pertaining to the Collateral, and compile, prepare, and furnish to Lender all data, reports, schedules, information, and certificates concerning the Collateral as Lender may reasonably request from time to time, (f) promptly pay all filing, recording, and certification fees and charges and other direct costs incurred by Lender to perfect the security interests created by this Agreement, whether incurred before or after the Effective Date, (g) maintain insurance on the Collateral against all risks to which the Collateral may be exposed, with all such insurance policies to name Lender as an additional insured and loss payee as its interests may appear, (h) defend its title or interest in the Collateral against any and all Liens, charges, offsets, defenses, and assessments of every kind and nature, except for Permitted Encumbrances and for Liens which are permitted under the Transaction Documents, and (i) perform its obligations, under each material contract and other agreement constituting part of the Collateral to ensure that no breach, default, or event of default will occur under such contract or agreement.

Borrower acknowledges that Lender has no obligation to preserve the Collateral or to pay taxes, assessments, insurance premiums, and indebtedness secured by a Lien on the Collateral. Any payments made by Lender or actions taken by Lender to preserve the Collateral will not constitute a cure or waiver of any Default. Additionally, Borrower confirms to Lender that Borrower bears all risk of loss associated with the Collateral and that Lender has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral.

**5.** **Negative Covenants**. Without the prior written consent of Lender, in Lender's sole discretion, and except as expressly permitted by the Note, Borrower shall not:

a. Take any action or fail to take any action that will impair the rights of Lender in the Collateral;

b. Use the Collateral, or permit it to be used, in violation of any law, agreement, or policy of insurance;

c. Sell, lease, license, transfer, or otherwise dispose (or offer to do so) of any of the Collateral or any interest in it except in the ordinary course of its business;

d.    Grant or transfer any lien, pledge, mortgage, restriction, security interest, or other encumbrance on any of the assets of Borrower, except as permitted under the Transaction Documents;

e.    Enter into any contract, arrangement, or commitment (oral or written) that is reasonably likely to have a material adverse effect on Borrower's duties or the rights of Lender under the Transaction Documents, or that limits, abrogates, or is inconsistent with any of the Transaction Documents;

f.    Except for Permitted Encumbrances and as otherwise permitted under the Transaction Documents: (i) borrow on the security of the Collateral from anyone except Lender; (ii) pledge or grant a Lien on the Collateral to anyone except Lender; (iii) permit any levy on the Collateral pursuant to legal process; or (iv) permit any lien, security interest, or encumbrance to attach to any of the Collateral, except for security interests in favor of Lender or expressly allowed in writing by Lender;

g.    Breach or default under the terms of any other agreement between Lender and Borrower, except for breaches or defaults which are cured under any applicable cure period; or

h.    Sell, assign, convey, pledge, transfer, hypothecate, or in any other way encumber or dispose of any Collateral, except in the ordinary course of its business or as permitted under the Transaction Documents, without the advance written approval of Lender (which it may withhold in its sole discretion), except for the security interests granted to Lender in this Agreement.

**6.    Secured Party Rights**. Lender may elect (but is not obligated) to do any of the following at any time and from time-to-time: (a) receive or release other security for payment of any of the Obligations; (b) release any party primarily or secondarily liable for payment of any of the Obligations; (c) apply any other security held by it to the satisfaction of the Obligations; and (d) except for Liens otherwise permitted under the Transaction Documents, discharge any Lien on the Collateral that not been expressly allowed in writing by it and pay the costs of insuring, maintaining, and preserving the Collateral; in each case without prejudice to any of its rights under this Agreement.

**7.    Rights with Respect to Collateral**. As long as an Event of Default has not occurred and is not continuing, Borrower may use and sell the Collateral in the ordinary course of its business. If an Event of Default has occurred, and until the Obligations have been fully paid, Borrower shall hold all cash or other property that it receives as a payment or other distribution in respect of the Collateral under an express trust for the sole benefit of Lender and deliver that cash or other property to Lender within 48 hours after Borrower receives it, in the form received (except for any endorsement or assignment required to transfer it to Lender), for application to payment of the Obligations.

**8.    Events of Default**. The occurrence of any event that constitutes a default under the Note shall constitute a Default under this Agreement. In addition, the following events or conditions shall constitute a Default: (a) a levy, execution, or attachment on any of the Collateral by a third party other than Lender; (b) the transfer or disposition of any Collateral, except as

expressly permitted by this Agreement or the other Transaction Documents; or (c) except as otherwise permitted under the Transaction Documents, Lender at any time receives a report from a Governmental Authority indicating that Lender's security interest in some or all of the Collateral is not prior to all other security interests or other interests reflected in the report, and such situation is not cured within ten (10) days following written notice by Lender to Borrower of such situation.

9. **Default Remedies**. At any time after a Default, Lender may elect (but is not obligated) to do any of the following:

a. Upon written notice to Borrower, accelerate the maturity date of the Obligations and declare them to be immediately due and payable; and

b. Exercise from time to time all rights and remedies of a secured creditor under applicable law, including the UCC.

Lender may exercise any of its rights or remedies serially, wholly, partially, or collectively, and the exercise of any one right does not preclude the exercise of any other right. Lender has no obligation to attempt to satisfy the Obligations by collecting from any other Person, and Lender may release, modify, or waive any collateral provided by another person to secure any of the Obligations without affecting in any manner Lender's rights against Borrower or the Collateral. Borrower waives any right it might have to require Lender to pursue any Person for any of the Obligations. Borrower waives any and all rights that it might have to a judicial hearing in advance of the enforcement of any of Lender's rights and remedies under this Agreement, including Lender's right after an Event of Default to take immediate possession of the Collateral to exercise Lender's rights and remedies with respect to the Collateral.

After a Default, Borrower, at its sole expense and at Lender's request, shall assemble any Collateral that is not in Lender's possession and make it available to Lender at a convenient place acceptable to Lender. **Any notice of sale, disposition, or other intended action by Lender that is given to Borrower at the address for Borrower listed in this Agreement at least ten (10) days before the action is taken will constitute reasonable notice of disposition to Borrower.** Lender may sell the Collateral without giving any warranties as to the Collateral and may specifically disclaim warranties of title and other warranties without adversely affecting the commercial reasonableness of any sale or other disposition of the Collateral.

Lender is not obligated to resort to any Collateral or other assurances of payment in any particular order. Lender may apply any Proceeds from a disposition of any of the Collateral toward payment of any of the Obligations, in such order of application as Lender elects in its sole discretion, and Borrower is liable to Lender for any deficiency between the Proceeds realized on any disposition of the Collateral and the amount of Obligations remaining unpaid. Borrower promptly shall pay to Lender, on demand, all costs incurred by Lender in connection with the enforcement, interpretation, and administration of its rights under this Agreement.

Borrower shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all amounts to which Lender is entitled, including all costs and expenses that Lender is permitted to deduct from such proceeds pursuant to this

Agreement and all reasonable fees and disbursements of any attorneys employed by Lender to collect such deficiency.

**10.** **Power of Attorney**. Borrower irrevocably appoints Lender as its agent and attorney-in-fact with full power and authority and with full power of substitution, **whether or not any Default exists**, to sign on behalf of Borrower any registration, notice of lien, financing statement, or other document covering the Collateral as Lender reasonably considers necessary in its sole discretion to create, perfect, and preserve a valid security interest in the Collateral in favor of Lender, and, **after a Default**, to do any of the following as fully as Borrower lawfully might do at Borrower's sole expense:

      a.     Make claims with respect to the Collateral under any insurance policy of Borrower and to otherwise act to collect any insurance proceeds with respect to the Collateral;

      b.     Exchange, surrender, or substitute any Collateral;

      c.     Renew or extend any liability owing to Borrower under any Collateral;

      d.     Defend, settle, prosecute, or compromise any claim, action, or proceeding with respect to the Collateral;

      e.     Sell, assign, pledge, indorse, transfer, grant a security interest in, and make any agreement with respect to, any of the Collateral; and

      f.     Demand, collect, receive, and apply to any of the Obligations, in any order of application that Lender elects in its sole discretion, all Proceeds and payments or monies due or to become due to Borrower in respect of the Collateral.

This power of attorney is a power coupled with an interest. Lender is under no duty to exercise or withhold the exercise of any of the rights, powers, privileges, and options expressly or implicitly granted to Lender in this Agreement and is not liable for any failure to do so or any delay in doing so. Lender is not liable for any act, mistake, omission, or error of judgment in its individual capacity or in its capacity as attorney-in-fact except acts or omissions resulting from its willful misconduct.

**11.** **Termination**. This Agreement and the security interests of Lender under it will terminate when the all the Obligations have been paid in full in cash, but only if Borrower does not file (and none of the creditors of Borrower file against them), within 91 calendar days after the first date when all the Obligations are paid and performed in full, a petition seeking relief under any bankruptcy, insolvency, reorganization, or debtor relief law and a claim for recovery or repayment of any amount paid on the Obligations or for avoidance of any security interest in the Collateral. An affidavit or written statement of Lender, or any duly appointed agent or attorney-in-fact for Lender, that shows or asserts that any of the Obligations remain unpaid will constitute presumptive evidence of the continuing effectiveness of this Agreement and the security interests of Lender under it, and any interested person is authorized to rely on it. When all of the Obligations have been fully paid, Lender promptly shall: (i) deliver to Borrower the original Note, marked "cancelled"; and (ii) assign, indorse, deliver and transfer to Borrower, against receipt, without recourse to or warranty by Lender, any and all Collateral (if any) that is

then held by Lender under this Agreement and has not been sold or otherwise applied pursuant to the terms of this Agreement. On termination of this Agreement and at the request and at the expense of Borrower, Lender shall terminate all effective financing statements in favor of Lender that are then on file or recorded with respect to the Collateral.

12.    **Legal Proceedings**. The validity, construction, interpretation, and enforceability of this Agreement are governed by the laws of the State of Delaware except to the extent the UCC provides for the application of the law of another state. Borrower consents to the personal jurisdiction of the state and federal courts in the State of Alabama, stipulates that the proper and convenient venue for any legal proceeding between them that pertains to either this Agreement or the Note is in Birmingham, Alabama, and waives any defenses, whether asserted by motion or pleading, that this venue is improper or inconvenient.

Except as expressly prohibited by law, Borrower waives any right it might have to claim or recover any special, exemplary, punitive, or consequential damages or any damages other than, or in addition to, actual damages. Borrower certifies that neither Lender, nor any agent, attorney, or representative of Lender has represented, expressly or otherwise, that Lender would not seek to enforce the foregoing waivers or other waivers contained in this Agreement, and acknowledge that Lender has relied on, among other things, the foregoing waivers and certification.

In any legal proceeding between Borrower and Lender that arises out of this Agreement and pertains to the validity or enforcement of this Agreement or Lender's security interests in the Collateral granted under it, the non-prevailing Party will reimburse the prevailing Party for all reasonable costs incurred by the prevailing Party as a result of the legal proceeding. The phrase "prevailing party" as used in this Section shall mean the party who receives substantially the relief desired whether by dismissal, summary judgment or otherwise. If Lender becomes a party to any legal proceeding arising out of this Agreement that is initiated by any person other than Borrower and that pertains to the validity or enforcement of this Agreement or Lender's security interests in the Collateral granted under it, Borrower shall reimburse Lender for all reasonable costs incurred by it in connection with the legal proceeding, regardless of who prevails.

**BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A JURY TRIAL IN ANY LAWSUIT BY LENDER TO ENFORCE THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS.**

13.    **Notices**. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, or (iii) delivered by nationally recognized courier service (i.e. UPS or FedEx) with charges prepaid, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective upon the earlier of (a) receipt or (b) the scheduled delivery date if by mail or nationally recognized air courier (if delivered on a business day during normal business hours where such notice is to be received). The addresses for such communications shall be:

If to Borrower:

Mays Mining, Inc.
72 Longview Dr.
Jasper, Alabama 35504
Attention: Rodney L. Mays
Email:  maysrodney@yahoo.com

If to the Lender:

Nexgen Extractions LLC
101 Chase Avenue, Suite 206
Lakewood, NJ 08701
Attention: Legal Notices
Email: isaac@nexgencapital.com

with copies to (which shall not constitute notice):

Maynard Cooper & Gale
1901 Sixth Avenue North
Regions Harbert Plaza, Suite 2400
Birmingham, AL 35203
Attention:  Jim McLaughlin
Email:  JMcLaughlin@maynardcooper.com

**14.** **Waiver and Amendment; Assignment**.

a.    A waiver, amendment, modification, or termination of this Agreement will be valid and effective only if it is in writing and signed by Borrower and Lender. In addition, a written waiver by Lender of a Default under this Agreement will not operate as a waiver of any other Default or of a succeeding Default under the same provision or as a waiver of the provision itself. A delay, omission, or course of dealing on the part of Lender in exercising any right, power, or remedy will not operate as a waiver of it, except when this Agreement expressly requires the right, power, or remedy to be exercised within a specified time, and a single or partial exercise by Lender of any right, power, or remedy does not preclude any further exercise of it or the exercise of any other right, power, or remedy. Lender's exercise or failure to exercise any right, power, or remedy does not constitute a waiver of any Default by Borrower under this Agreement. This Agreement is not assignable (by operation of law or otherwise) by Borrower without the advance written approval of Lender, which it may withhold in its sole discretion.

b.    The assignment of this Agreement by Borrower without the advance written approval of Lender will constitute a Default by Borrower and will be invalid and unenforceable as to Lender.

c.    Lender may assign its rights and interests under this Agreement, and if Lender assigns those rights and interests, Borrower shall render performance under this Agreement to the assignee.

**15.** <u>**Miscellaneous**</u>. Time is of the essence with respect to the performance of Borrower's obligations under this Agreement. When any provision of this Agreement requires or prohibits action to be taken by a person, the provision applies regardless of whether the action is taken directly or indirectly by the person. The headings preceding the sections of this Agreement are solely for convenient reference and neither constitute a part of this Agreement nor affect its meaning, interpretation, or effect. This Agreement inures to the benefit of Lender and its assignees and successors in interest and is binding on Borrower and its assignees and successors in interest and shall bind all persons that become bound as a debtor to this Agreement. No reference in this Agreement to "**Proceeds**" authorizes any sale, transfer, or other disposition of any Collateral by Borrower except in the ordinary course of its business. Each provision of this Agreement should be construed and interpreted so it is valid and enforceable under applicable law. If a provision of this Agreement (or the application of it) is held by a court to be invalid or unenforceable under applicable law, that provision will be deemed separable from the remaining provisions of this Agreement and will not affect the validity or interpretation of the other provisions of this Agreement or the application of that provision to a person or circumstance to which it is valid and enforceable.

**(Signature Page Follows Immediately)**

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the Effective Date.

"**BORROWER**":

Mays Mining, Inc., an Alabama corporation

By _____
Rodney L. Mays, President

Acknowledged by Lender:

"**LENDER**":

Nexgen Extractions LLC,
a New Jersey limited liability company

By: _____
Yitzchak Abadi, Manager

## Exhibit A

## DESCRIPTION OF COLLATERAL

The Collateral includes all of the assets of Borrower including, without limitation, each of the following:

**Equipment:** All equipment means all goods, machinery, furniture, furnishings, fixtures, tools, supplies, motor vehicles and all other property used or useful in the business of Borrower, now or hereafter owned or possessed or hereafter acquired by Borrower, all substitutions and replacements thereof, and all deposits made on any such equipment;

**Deposit Accounts and Other Cash:** All deposits and deposit accounts with any bank, savings and loan association, credit union or like organization, and all funds and amounts therein, and whether or not held in trust, or in custody or safekeeping, or otherwise restricted or designated for a particular purpose, and all other cash or marketable securities on hand, whether held in-vault or otherwise;

**Receivables:** Each and every right of the Borrower to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property, out of a rendering of services, or of a loan, out of the overpayment of taxes or other liabilities, or any other transaction or event, whether such right to payment is created, generated or earned by Borrower or by some other person who subsequently transfers his, her or its interest to Borrower, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and other security interests) which Borrower may at any time have by law or agreement against any account debtor or other person obligated to make such payment or against any property of such account debtor or other persons including, but not limited to, all present and future accounts, contract rights, chattel paper, bonds, notes and other debt instruments, and rights to payment in the nature of general intangibles;

**General Intangibles:** All general intangibles of the Borrower whether now owned or hereafter acquired, including (without limitation) all general intangibles (as defined in the UCC); and

**Securities:** All securities, joint venture and other equity interests now owned or hereafter acquired by the Borrower.

The collateral shall include (i) all substitutes and replacements for and proceeds of any and all of the foregoing property, and in the case of all tangible collateral, all accessions, accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or use in connection with any such goods, and (ii) all warehouse receipts, bills of lading and other documents of titles now or hereafter covering such goods.

# EXHIBIT K

## SECURED GUARANTY

**THIS SECURED GUARANTY** ("Guaranty") is executed as of August 22, 2019, by Rodney L. Mays, an individual ("Guarantor"), with a Social Security Number of 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, for the benefit of Nexgen Extractions LLC, a New Jersey limited liability company ("Lender"), with reference to the following:

A.     Lender has agreed to loan the amount of $350,000.00 (the "Loan") to Mays Mining, Inc., an Alabama corporation ("Borrower"), pursuant to that certain Senior Secured Promissory Note of even date herewith (as such note may be amended from time-to-time, collectively, the "Note") and secured by that certain Security Agreement of even date herewith (the "Security Agreement"). Capitalized terms in this Guaranty not defined in this Guaranty shall have the meaning given to such terms in the Note or the Security Agreement, as applicable. The "Guaranteed Obligations" are the obligations of Guarantor pursuant to Sections 1.1 and 1.2 of this Guaranty; and

B.     Guarantor is the sole shareholder of Borrower and shall derive substantial and material benefits from Lender's granting of the Loan to Borrower. This Guaranty is secured by that certain Equity Pledge Agreeent of even date herewith (the "Pledge Agreement"); and

C.     As a condition to the making of the Loan, Lender has required that Guarantor guarantee the Guaranteed Obligations and execute the Pledge Agreement, and Guarantor desires to do so to induce Lender to make the Loan.

**NOW, THEREFORE**, in consideration of Lender's agreement to make the Loan and as an inducement to Lender to do so, Guarantor covenants and agrees with Lender, for the benefit of the holder of the Note as follows:

## ARTICLE 1 — AGREEMENTS

1.1     <u>Repayment Guaranty</u>.     Guarantor unconditionally and irrevocably guarantees the full and prompt payment and performance, when due, whether upon demand, maturity, by required prepayment, acceleration or otherwise, and at all times thereafter, of: (a) payment of all obligations at any time owing under the Note; (b) payment and performance of all obligations of Borrower under the Security Agreement and the SPA; and (c) payment and performance of all other obligations of Borrower under the Loan Documents. Upon Lender's demand, Guarantor shall assume all responsibility for the payment and/or performance of such obligations in accordance with the Loan Documents, at Guarantor's own cost and expense.

If Guarantor does not perform any of the Guaranteed Obligations (in accordance with the Loan Documents), Lender may, at its option but without obligation to do so, pay such obligations and take such actions as Lender shall deem necessary or desirable. In the event Lender elects to do so, all expenditures made by Lender shall be immediately due and payable from Guarantor to Lender and shall bear interest at the Default Rate, as defined in the Note.

1.2     <u>Expenses</u>.     Guarantor agrees to pay all costs and expenses, including reasonable attorneys' fees, which may be incurred by Lender in any effort to collect the Loan or

enforce any of the Loan Documents or the obligations of Guarantor hereunder, whether or not any lawsuit is filed, including, without limitation, all costs and attorneys' fees incurred by Lender in any Insolvency Proceeding (as defined below) (including, without limitation, any action for relief from the automatic stay of any bankruptcy proceeding) and in any judicial or nonjudicial foreclosure action. Such amounts shall bear interest until paid at a rate equal to the Default Rate as defined in the Note.

        1.3   <u>Nature of Guaranty</u>. The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collection or collectability only and the obligations hereunder shall be absolute, independent and unconditional under any and all circumstances.

        1.4   <u>Obligations Absolute</u>. The obligations of Guarantor hereunder shall remain fully effective without regard to, and shall not be affected or impaired by the following, any of which may be taken, at any time, without the consent of, or notice to, Guarantor, nor shall any of the following give Guarantor any recourse or right of action against Lender:

        (a)   Any express or implied amendment, modification, renewal, addition, supplement, extension (including, without limitation, extensions beyond the original term) or acceleration of or to any provisions of the Loan Documents;

        (b)   Any exercise or non-exercise by Lender of any right or privilege under this Guaranty or any of the Loan Documents;

        (c)   Any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding (each, an "<u>Insolvency Proceeding</u>") relating to Guarantor, Borrower, any affiliate of Borrower or any guarantor (which term shall mean any other party at any time directly or contingently liable for any of the Borrower's obligations under the Loan Documents);

        (d)   Any action taken with respect to this Guaranty by any trustee or receiver, or by any court, in any Insolvency Proceeding, whether or not Guarantor shall have had notice or knowledge of any of the foregoing;

        (e)   Any release, discharge, modification, impairment or limitation of the liability of Borrower from its liability under any of the Loan Documents or any release or discharge of any endorser or guarantor or of any other party at any time directly or contingently liable for the Guaranteed Obligations, whether or not consented to by Lender;

        (f)   Any subordination, compromise, release (by operation of law or otherwise), discharge, compound, collection or liquidation of any or all of the collateral described in any of the Loan Documents or otherwise in any manner, or any substitute or replacement for such collateral;

        (g)   Any assignment or other transfer of this Guaranty in whole or in part or of any of the Loan Documents;

(h)     Any acceptance of partial performance of the Guaranteed Obligations or the obligations of Borrower under the Loan Documents or of any obligations of Guarantor under this Guaranty or of any obligations of any other guarantor;

(i)     Any consent to the transfer of the collateral described in the Loan Documents or any portion thereof; and

(j)     Any bid or purchase at any sale of the collateral described in the Loan Documents or any portion thereof.

1.5     <u>Waivers</u>.     Guarantor unconditionally waives all defenses to the enforcement of this Guaranty, including, without limitation:

(a)     All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty;

(b)     Any right to require Lender to proceed against Borrower or any guarantor at any time, or to proceed against or exhaust any security held by Lender at any time, or to pursue any other remedy whatsoever at any time;

(c)     The defense of any statute of limitations affecting the liability of Guarantor hereunder, the liability of Borrower or any guarantor under the Loan Documents, or the enforcement hereof, to the extent permitted by law;

(d)     Any defense arising by reason of any invalidity or unenforceability of any of the Loan Documents or any provision thereof, or any disability of Borrower or any guarantor or of any manner in which Lender has exercised its rights and remedies under the Loan Documents, or by any cessation from any cause whatsoever of the liability of Borrower or any guarantor;

(e)     Any defense based on any action taken or omitted by Lender in any Insolvency Proceeding involving Borrower or any guarantor, including any election to have Lender's claim allowed as being secured, partially secured or unsecured, any extension of credit by Lender to Borrower in any Insolvency Proceeding and the taking and holding by Lender of any security for any such extension of credit;

(f)     Any defense based upon an election of remedies by Lender;

(g)     Any right Guarantor may have under applicable laws including, without limitation, any right to a hearing with respect to the fair market value of any collateral, either before or after foreclosure, and any right Guarantor may have to require Lender to proceed against any collateral before seeking to obtain a judgment against Guarantor hereunder;

(h)     Any duty of Lender to advise Guarantor of any information known to Lender regarding the financial condition of Borrower and all other circumstances affecting Borrower's ability to perform its obligations to Lender; Guarantor assumes the responsibility for being and keeping informed regarding such condition or any such circumstances;

(i)     Any rights of subrogation, reimbursement, exoneration, contribution and indemnity, and any rights or claims of any kind or nature against Borrower which arise out of or are caused by this Guaranty, and any rights to enforce any remedy which Lender now has or may hereafter have against Borrower, and any benefit of, and any right to participate in, any security now or hereafter held by Lender; and

(j)     Any right Guarantor might have, under any applicable laws or otherwise, to revoke this Guaranty as to any advances made by Lender to or on behalf of Borrower or pursuant to the terms of any of the Loan Documents.

1.6     <u>Waivers to Be Effective to Maximum Permissible Extent</u>.  Guarantor acknowledges and agrees that all waivers of defenses arising from any impairment of Guarantor's rights of subrogation, reimbursement, contribution and indemnification and waivers of any other rights, privileges, defenses or protections available to Guarantor by reason of any applicable laws.

1.7     <u>Waiver of Defense Based on Elimination of Right of Subrogation</u>.

(a)     Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against Borrower by the operation of any applicable laws or otherwise.

(b)     Without limiting the generality of any other provision of this Guaranty, Guarantor understands that, if Lender conducts a non judicial foreclosure sale under the Security Agreement or the Pledge Agreement, Guarantor may have a defense to a deficiency judgment under this Guaranty because the non judicial foreclosure would eliminate Guarantor's right of subrogation. In addition to the other waivers set forth in this Guaranty, Guarantor specifically waives this defense and agrees that Guarantor will be liable for any deficiency remaining after a non judicial foreclosure sale, even though such non judicial foreclosure destroys Guarantor's right of subrogation. Guarantor will not assert any defense arising from such disclosure in any action or proceeding which Lender may commence to enforce this Guaranty.

(c)     Guarantor waives all rights and defenses that Guarantor may have because the Borrower's debt to Lender is secured by the Security Agreement. This means, among other things that Lender may collect from Guarantor without first foreclosing on any collateral pledged by Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the Borrower's debt is secured by the collateral.

1.8     <u>Subrogation</u>.  Guarantor understands that the exercise by Lender of certain rights and remedies under the Pledge Agreement or other Loan Documents may affect or eliminate Guarantor's right of subrogation against Borrower or any guarantor and that Guarantor may therefore incur partially or totally nonreimbursable liability hereunder.  Nevertheless, Guarantor hereby authorizes and empowers Lender, its successors, endorsees and/or assigns, to

exercise in its or their sole discretion, any rights and remedies, or any combination thereof, which may then be available, it being the purpose and intent of Guarantor that the obligations hereunder shall be absolute, continuing, independent and unconditional under any and all circumstances. Notwithstanding any other provision of this Guaranty to the contrary, Guarantor hereby waives any claim or other rights which Guarantor may now have or hereafter acquire against Borrower or any other guarantor of all or any of the obligations of Guarantor hereunder that arise from the existence or performance of Guarantor's obligations under this Guaranty or any of the other Loan Documents, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification, any right to participate in any claim or remedy of Lender against Borrower or any collateral which Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, by any payment made hereunder or otherwise, including, without limitation, the right to take or receive from Borrower, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim or other rights.

       1.9   <u>Additional Waivers</u>. Guarantor shall not be released or discharged, either in whole or in part, by Lender's failure or delay to (a) perfect or continue the perfection of any lien or security interest in any collateral described in the Loan Documents or otherwise, which secures the obligations of Borrower, Guarantor or any other guarantor, or (b) protect the property covered by such lien or security interest.

       1.10   <u>Independent and Separate Obligations</u>. The obligation of Guarantor hereunder is independent of the obligation of Borrower and, after the occurrence of any Default or Event of Default, a separate action or actions may be brought and prosecuted against Guarantor whether or not Guarantor is the alter ego of Borrower, and whether or not Borrower is joined therein or a separate action or actions are brought against Borrower.

       1.11   <u>Bankruptcy No Discharge</u>. So long as any of the obligations guaranteed hereunder shall be owing to Lender, Guarantor shall not, without Lender's prior written consent, commence or join with any other party in commencing any Insolvency Proceedings of or against Borrower. Guarantor understands and acknowledges that by virtue of this Guaranty, Guarantor has specifically assumed any and all risks of a bankruptcy or reorganization case or other Insolvency Proceeding with respect to Borrower. As an example and not in any way of limitation, a subsequent modification of the Guaranteed Obligations or any other obligations of Borrower under the Loan Documents in any reorganization case concerning Borrower shall not affect the obligation of Guarantor to pay and perform the Guaranteed Obligations in accordance with their respective original terms.

       1.12   <u>Repayment</u>. If claim is ever made upon Lender for repayment of any amount or amounts received by Lender in payment of the obligations under the Loan Documents or hereunder (whether or not all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid by Lender) and Lender repays all or any part of said amount, then, notwithstanding any revocation or termination of this Guaranty or the cancellation of the Note or any other instrument evidencing the Loan, Guarantor shall be and remain liable to Lender for the amount so repaid to the same extent as if such amount had never originally been received by Lender.

1.13     Setoff.  Lender shall have a right of setoff against, and Guarantor hereby grants to Lender a security interest in, all moneys, securities and other property of Guarantor now or hereafter in the possession of, or on deposit with Lender, whether held in a general or special account or deposit, or for safekeeping or otherwise.  Such right is in addition to any right of setoff Lender may have by law.  All rights of setoff may be exercised without demand to Guarantor.  No right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right of setoff, or by any delay in doing so.  Every right of setoff shall continue in full force and effect until specifically waived or released by an instrument in writing executed by Lender.

1.14     Subordination.   In the event any default or Event of Default, any indebtedness of Borrower now or hereafter owing to Guarantor (including without limitation all interest thereon accruing after the commencement of any Insolvency Proceeding) is hereby subordinated to the obligations of Borrower to Lender under the Loan Documents (including without limitation all interest thereon accruing after the commencement of any Insolvency Proceeding).  If requested by Lender, such indebtedness shall be collected, enforced and received by Guarantor as trustee for Lender and paid over to Lender on account of the Loan Documents.  However, no such payment shall reduce or affect in any manner the absolute, unconditional and independent liability of Guarantor under this Guaranty, except to the extent such payment is applied against the Guaranteed Obligations, subject to Section 1.11.

1.15     Payments.  Guarantor understands that the obligations of Borrower to Lender may at any time and from time to time exceed the aggregate liability of Guarantor hereunder without impairing this Guaranty.  Guarantor shall not be credited for payment of any of the Guaranteed Obligations unless such payment is received by Lender in immediately available funds and is made by Guarantor after a demand made by Lender pursuant to this Guaranty.  Guarantor agrees that whenever Guarantor shall make any payment to Lender hereunder on account of the liability hereunder, Guarantor will deliver such payment to Lender at the address provided in Section 3.1 below and notify Lender in writing that such payment is made under this Guaranty for such purpose. Lender, without impairing this Guaranty, may apply payments from Borrower to the Guaranteed Obligations, or to such other obligations owed by Borrower to Lender, in such amounts and in such order as Lender in its complete discretion determines. No payment made hereunder by Guarantor to Lender shall cause Guarantor to be or become a creditor of Lender.

1.16     Financial Statements.  Guarantor will deliver to Lender, in form and detail satisfactory to Lender, within twenty (20) days after Lender's written request, a consolidated balance sheet of Guarantor, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP (or other customary accounting method approved by Lender), accompanied by a report and opinion of an independent certified public accountant reasonably acceptable to Lender, which report and opinion shall be prepared in accordance with GAAP (or other customary accounting method approved by Lender).  Guarantor shall promptly provide Lender with any additional financial information that Guarantor may obtain, as well as signed copies of any tax returns and such other information as Lender may reasonably request concerning the affairs and properties of Guarantor.  Guarantor further covenants and agrees to immediately notify Lender of any material adverse change in Guarantor's financial condition.  For purposes of this Guaranty, "GAAP"

means prepared in conformity with accounting principles generally accepted in the United States of America consistently applied in accordance with past practices.

## ARTICLE 2 — REPRESENTATIONS AND WARRANTIES

Guarantor makes the following representations and warranties which shall be continuing representations and warranties until this Guaranty terminates in accordance with its terms:

2.1 <u>Existence and Rights</u>. Guarantor has the power and authority to make and carry out this Guaranty.

2.2 <u>Guaranty Authorized and Binding</u>. The execution, delivery and performance of this Guaranty are duly authorized and do not require the consent or approval of any third party, including, without limitation, any governmental body or other regulatory authority. This Guaranty is a valid and legally binding obligation of Guarantor enforceable in accordance with its terms.

2.3 <u>No Conflict</u>. The execution and delivery of this Guaranty are not, and the performance of this Guaranty will not be, in contravention of, or in conflict with, any agreement, indenture or undertaking to which Guarantor is a party or by which Guarantor or any of Guarantor's property is or may be bound or affected and do not, and will not, cause any security interest, lien or other encumbrance to be created or imposed upon any such property.

2.4 <u>Litigation</u>. There is no litigation or other proceeding pending or, to the best of Guarantor's knowledge, threatened against, or affecting, Guarantor or Guarantor's properties which, if determined adversely to Guarantor, would have a materially adverse effect on the financial condition, properties, businesses or operations of Guarantor, or which prevents or interferes with or adversely affects Guarantor's entering into this Guaranty or the validity of this Guaranty or the carrying out of the terms hereof. Guarantor is not in default with respect to any order, writ, injunction, decree or demand of any court or other governmental or regulatory authority.

2.5 <u>Financial Condition</u>. Guarantor's financial statements, which have been submitted in writing by Guarantor to Lender in connection with the Loan or otherwise, are true and correct and fairly present the financial condition of Guarantor for the period covered thereby. Since the date of said financial statements, there has been no materially adverse change in Guarantor's financial condition. Guarantor has no knowledge of any liabilities, contingent or otherwise, as of the date of said financial statements which are not reflected in said financial statements. Guarantor has not entered into any commitments or contracts which are not reflected in said financial statements or which may have a materially adverse effect upon Guarantor's financial condition.

2.6 <u>Solvency</u>. Guarantor is not Insolvent (as defined below) as of the date hereof and the execution and delivery of this Guaranty will not (a) render Guarantor insolvent under generally accepted accounting principles nor render Guarantor Insolvent (as defined below), or (b) leave Guarantor with remaining assets which constitute unreasonably small capital given the nature of Guarantor's business, or (c) result in the incurrence of Debts (defined below) beyond Guarantor's ability to pay them when and as they mature. For the purposes of this

Section, "<u>Insolvent</u>" means that the present fair salable value of assets is less than the amount that will be required to pay the probable liability on existing Debts as they become absolute and matured. For the purposes of this Section, "<u>Debts</u>" includes any legal liability for indebtedness, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

       2.7   <u>Financial or other Benefit or Advantage</u>. Guarantor hereby acknowledges and warrants that Guarantor has derived or expects to derive a financial or other benefit or advantage from the Loan and from each and every renewal, extension, release of collateral or other relinquishment of legal rights made or granted or to be made or granted by Lender to Borrower in connection with the Loan. Guarantor acknowledges that Borrower is not merely the agent, instrumentality or alter ego of Guarantor, and that Borrower is an independent and separate entity.

       2.8   <u>Advice of Counsel</u>. Guarantor has consulted with its attorneys or had the opportunity to consult with its attorneys, regarding the terms and conditions and waivers set forth in this Guaranty. Guarantor's attorneys have advised Guarantor of the true legal consequences of each waiver set forth in this Guaranty, including the rights Guarantor would have in the absence of such waivers.

## ARTICLE 3 — MISCELLANEOUS

       3.1   <u>Notices</u>. All notices, demands and other communications between Lender and Guarantor pursuant to this Guaranty shall be in writing, shall be addressed to the appropriate address set forth in this Section, or at such other place as Lender or Guarantor, as the case may be, may from time to time designate in writing by ten (10) days prior written notice thereof, and shall be: (a) hand-delivered, effective upon receipt; or (b) sent by a national overnight courier, effective upon receipt; or (c) sent by certified mail, return receipt requested, shall be deposited in the United States mail, with postage thereon fully prepaid and shall be deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three (3) business days after the date of mailing, whichever is the earlier in time. The addresses of the parties are as follows:

| | |
|---|---|
| To Guarantor: | Rodney L. Mays<br>345 20th Street West<br>Jasper, AL 35502 |
| To Lender: | Nexgen Extractions LLC<br>101 Chase Avenue, Suite 206<br>Lakewood, NJ 08701<br>Attention: Legal Notices |
| | with copies to (which shall not constitute notice): |
| | Maynard Cooper & Gale<br>1901 Sixth Avenue North<br>Regions Harbert Plaza, Suite 2400<br>Birmingham, AL 35203 |

3.2     Amendments.  Neither this Guaranty nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

3.3     Successors.  All of the terms of this Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  The term "Borrower" shall mean both the named Borrower and any other person or entity at any time assuming or otherwise becoming primarily liable for all or any part of the obligations set forth in the Loan Documents.

3.4     Miscellaneous.  No delay or failure by Lender to exercise any remedy against Borrower or Guarantor will be construed as a waiver of that right or remedy.  All remedies of Lender are cumulative.  In the event that the provisions of this Guaranty are claimed or held to be inconsistent with any other instrument evidencing or securing the Loan, or the obligations of Guarantor, the terms of this Guaranty shall remain fully valid and effective.  Any married person executing this Guaranty agrees that recourse may be had against community assets and against such person's separate property for the satisfaction of the obligations hereby guaranteed.  When the context in which the words are used in this Guaranty indicates that such is the intent, words in the singular number shall include the plural and vice-versa.  If any one or more of the provisions of this Guaranty should be determined to be illegal or unenforceable, all other provisions shall remain effective.  Guarantor shall not have the right to assign any of Guarantor's rights or obligations under this Guaranty.

3.5     Governing Law and Jurisdiction.  As a further material part of the consideration to Lender to extend the Loan, Guarantor agrees:

(a)     The validity, construction, interpretation, and enforceability of this Agreement are governed by the laws of the State of Delaware;

(b)     That any suit, action or proceeding arising directly or indirectly from this Guaranty or the subject matter thereof shall be litigated only in courts located within Birmingham, Alabama;

(c)     Guarantor hereby irrevocably consents to the jurisdiction of any local, state or federal court located in Birmingham, Alabama;

(d)     Guarantor hereby waives personal service of any and all process upon it and consents to all such service of process in the manner and at the address set forth in Section 3.1 above; and

(e)     Without limiting the generality of the foregoing, Guarantor hereby waives and agrees not to assert by way of motion, defense or otherwise in any suit, action or proceeding any claim that Guarantor is not personally subject to the jurisdiction of the above-named courts, that such suits, action or proceeding is brought in an inconvenient forum or that the venue of such action, suit or proceeding is improper.

3.6	Assignability by Lender.  Lender may, at any time and from time to time, assign, conditionally or otherwise, all of the rights of Lender under the Loan Documents and under this Guaranty, whereupon such assignee shall succeed to all rights of Lender hereunder to the extent of such assignment. Lender, or each successor holder of the Note, may give written notice to Guarantor of any such assignment, but any failure to give, or delay in giving, such notice shall not affect the validity or enforceability of any such assignment.

3.7	Demands.	Each demand by Lender for performance or payment hereunder shall be in writing and shall be made in the manner set forth in Section 3.1.  A dated statement signed by an officer of Lender setting forth the amount of indebtedness at the time owing to Lender by Borrower under the Loan Documents shall be conclusive evidence thereof as between Guarantor and Lender in any legal proceedings against Guarantor in connection with this Guaranty.

3.8	Term.	The obligations of Guarantor under this Guaranty and any instrument which grants collateral to secure such obligations and the rights of Lender under this Guaranty shall continue in full force and effect until the earlier of:

(a)	The last date that all of the following have occurred: the obligations under the Loan Documents have been fully paid and performed, Lender's commitment to make advances under the Loan Documents has been terminated or has expired and the period of time has expired during which any payment received by Lender under the Loan Documents may be deemed to be a preferential or fraudulent transfer under the United States Bankruptcy Code or other similar applicable laws; or

(b)	The last date that all of the following have occurred: Guarantor has performed all of its obligations under this Guaranty and paid any amounts payable hereunder in accordance with the terms of this Guaranty and the period of time has expired during which any payment received by Lender under the Loan Documents or act performed by Guarantor may be determined to be a preferential or fraudulent transfer under the United States Bankruptcy Code or other similar applicable laws.

3.9	Complete Agreement.  This Guaranty, together with the Note and the Loan Documents, supersedes any prior negotiations-discussions or communications between Guarantor and Lender and constitutes the entire agreement between Lender and Guarantor with respect to the Guaranteed Obligations.

3.10	Waiver of Right to Trial by Jury.  To extent permitted by applicable law and to facilitate the desire of Lender and Guarantor to resolve disputes in an efficient and economical manner, Lender, by its acceptance of this Guaranty, and Guarantor, by its execution hereof, expressly waive any right to trial by jury of any claim, demand, action or cause of action: (a) arising under this Guaranty or any other Loan Document, or (b) in any way connected with or related or incidental to the dealings of Lender and Guarantor or either of them with respect to this Guaranty or any other Loan Document, or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether arising in contract or tort or otherwise.  Any such claim, demand, action or cause of action shall be decided by court trial without a jury.  Guarantor or Lender may file an original counterpart or a copy of this Section

with any court as written evidence of the consent of the Guarantor and Lender hereto to the waiver of their right to trial by jury.

**[No Further Text on this Page; Signature of Guarantor Follows Immediately]**

**IN WITNESS WHEREOF**, the undersigned has executed this Guaranty as of the date first set forth above.

"**Guarantor**":

_____
Rodney L. Mays, an individual

## SPOUSAL CONSENT TO GUARANTY

The undersigned individual, being the spouse of Rodney L. Mays, hereby acknowledges that she has read, understands and consents to the execution of the attached Guaranty dated as of August 22, 2019, for the benefit of Nexgen Extractions LLC, a New Jersey limited liability company, to the extent that her community property or spousal interest may be affected thereby.

By: _____

Name: Crystal Mays, an individual

Date: August 22, 2019

# EXHIBIT L

# EQUITY PLEDGE AGREEMENT

**THIS EQUITY PLEDGE AGREEMENT** (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "<u>Agreement</u>") is entered into as of August 22, 2019, between Rodney L. Mays, an individual ("<u>Pledgor</u>"), and Nexgen Extractions LLC, a New Jersey limited liability company (together with its successors and assigns in such capacity, "<u>Nexgen</u>").

A.      Nexgen has agreed to loan the amount of $350,000.00 (the "<u>Loan</u>") to Mays Mining, Inc., an Alabama corporation ("<u>Borrower</u>"), pursuant to that certain Senior Secured Promissory Note of even date herewith (as such note may be amended from time-to-time, collectively, the "<u>Note</u>") and secured by that certain Security Agreement of even date herewith (the "<u>Security Agreement</u>").

B.      Pledgor is the President and sole shareholder of Borrower and shall derive substantial direct and indirect benefits from the transactions contemplated by the Note. As a condition to Lender's grant of the Loan, Pledgor has guaranteed the obligations of Borrower under the Note, the Security and the loan documents executed in connection therewith, pursuant to that certain Secured Guaranty of even date herewith ("<u>Guaranty</u>" and collectively with the Note, the Security Agreement and the loan documents executed in connection therewith, the "<u>Loan Documents</u>").

C.      To induce Nexgen to grant the Loan and enter into the Security Agreement, Pledgor has agreed to pledge all of its right, title and interest in, to and under the Pledged Equity Interests.  Pledgor acknowledges and agrees that Nexgen would not have granted the Loan or entered into the Security Agreement without Pledgor's execution and delivery of this Agreement.

**NOW, THEREFORE**, in consideration of Lender's agreement to make the Loan and as an inducement to Lender to do so, Pledgor covenants and agrees with Lender, for the benefit of the holder of the Note as follows:

## ARTICLE 1

## DEFINITIONS

**1.1      <u>Terms Defined in the Loan Documents or UCC</u>**.  All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Documents. Terms defined in the Uniform Commercial Code ("<u>UCC</u>") which are not otherwise defined in this Agreement are used herein as defined in the UCC.

**1.2      <u>Definitions of Certain Terms Used Herein</u>**. As used in this Agreement the following terms shall have the corresponding meanings:

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph hereto.

"<u>Article 8 Matter</u>" means any action, decision, determination or election by the Borrower or its owners that the equity interests of the Borrower, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to

any such action, decision, determination or election.

"Borrower" has the meaning set forth in the recitals hereto.

"Event of Default" means (i) any failure by Borrower to pay the Obligations as and when the same are due and payable under the Loan Documents and the SPA; (ii) any Event of Bankruptcy with respect to Borrower; (iii) any other failure on the part of Borrower to perform or observe any covenant to be performed on its part under the Loan Documents; and (iv) any failure on the part of Pledgor to perform or observe any covenant to be performed on its part under this Agreement and/or the Guaranty.

"Obligations" means, collectively, (i) each and all of the obligations of the Borrower under the Loan Documents and the SPA, and (ii) each and all of the obligations of the Pledgor under the Guaranty.

"Nexgen" has the meaning set forth in the introductory paragraph hereto.

"Pledged Collateral" has the meaning set forth in Section 2.1 of this Agreement.

"Pledged Equity Interests" means 100% of all of the outstanding stock of Borrower, together with stock certificates, options or rights of any nature whatsoever which may be issued or granted by Borrower to Pledgor while this Agreement is in effect.

"Pledgor" has the meaning set forth in the introductory paragraph hereto.

"Proceeds" means (i) Pledgor's share, right, title and interest in and to all distributions, monies, fees, payments, compensations and proceeds now or hereafter becoming due and payable to Pledgor by the Borrower with respect to the Pledged Equity Interests whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Pledgor relating to the foregoing; and (iii) all cash or non-cash proceeds of any of the foregoing.

"Securities Act" means the Securities Act of 1933, as amended.

## ARTICLE 2

## GRANT OF SECURITY INTEREST

**2.1     Pledge; Grant of Security Interest**.  Pledgor hereby pledges and grants to Nexgen, as collateral security for the prompt and complete payment of the Obligations, a first priority security interest in all of Pledgor's right, title and interest to the following (collectively, the "Pledged Collateral"):

(a)     all Pledged Equity Interests;

(b)     all securities, moneys or property representing dividends or interest on any of the Pledged Equity Interests, or representing a distribution in respect of the Pledged Equity

Interests, or resulting from a split-up, revision, reclassification or other like change of the Pledged Equity Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity Interests;

(c)     any policy of insurance payable by reason of loss or damage to the Pledged Equity Interests;

(d)     all "accounts", "general intangibles", "instruments" and "Pledged Collateral" (in each case as defined in the UCC) constituting or relating to the foregoing; and

(e)     all Proceeds of any of the foregoing property of Pledgor (including any proceeds of insurance thereon, all "accounts", "general intangibles", "instruments" and "Pledged Collateral", in each case as defined in the UCC, constituting or relating to the foregoing).

**2.2**     **Certificates**.  Concurrently with the execution of this Agreement, Pledgor shall deliver to Nexgen each original certificate evidencing the Pledged Equity Interests (which certificates shall constitute "security certificates" (as defined in the UCC)), together with an undated stock power covering each such certificate, duly executed in blank.

**2.3**     **Financing Statements**.     Pledgor hereby authorizes the filing of financing statements, and continuation statements and amendments thereto and assignments thereof, describing the Pledged Collateral covered thereby (a) as "all of debtor's right, title and interest in, to and under all Pledged Collateral, whether now owned or hereafter acquired, now existing or hereafter created, and wherever located" or words to that effect, notwithstanding that such wording may be broader in scope than the collateral described in this Article II and regardless of whether any particular asset comprised in the Pledged Collateral falls within the scope of Article 9 of the UCC or (b) as being of an equal or lesser scope or with greater detail, and any other filing, recording or registration (including any filing, recording or registration that may be necessary or appropriate under Article II that Nexgen may deem necessary or appropriate to further protect or maintain the perfection of the security interests).  A photocopy or other reproduction of this Agreement shall be sufficient as a financing statement where permitted by law.  This Agreement shall constitute a security agreement under applicable law.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Pledgor represents and warrants to Nexgen as of the date hereof as follows:

**3.1**     **Ownership of Pledged Collateral**.  Pledgor is the direct and beneficial owner of all Pledged Equity Interests, including all Pledged Equity Interests which have been delivered to Nexgen by or on behalf of Pledgor free and clear of any Liens, except for the security interest granted to Nexgen hereunder.  Pledgor further represents and warrants that all such Pledged Equity Interests have been duly and validly issued and, as of the date hereof, constitute 100% of the equity interests of Pledgor in Borrower.

**3.2**     **No Prohibition on Pledge**.  Except for restrictions and limitations imposed by

securities laws generally, (a) the Pledged Collateral is and will continue to be freely transferable and assignable and (b) none of the Pledged Collateral is or will be subject to any option, right of first refusal, contractual restriction or applicable laws of any nature that might prohibit, impair, delay or otherwise affect in any manner material and adverse to Nexgen (i) the pledge of such Pledged Collateral hereunder, (ii) the sale or disposition thereof pursuant hereto, or (iii) the exercise by Nexgen of rights and remedies hereunder.

3.3     **Perfection**.  Upon the (a) delivery to Nexgen of the original certificates evidencing the Pledged Equity Interests, and (b) filing of the financing statement referred to in Section 2.3 with the Secretary of State of the state or states where the Pledged Collateral is located, the Lien granted pursuant to this Agreement will constitute a valid, perfected Lien on the Pledged Collateral, enforceable against all creditors of Pledgor and any Persons purporting to purchase any Pledged Collateral and related Proceeds from Pledgor, free from any adverse claim, enforceable against all creditors of Pledgor and any Persons purporting to purchase any Pledged Equity Interests and related Proceeds from Pledgor.  No financing statement or security agreement describing all or any portion of the Pledged Collateral which has not lapsed or been terminated naming Pledgor as debtor has been filed or is of record in any jurisdiction except financing statements naming Nexgen as the secured party.

3.4     **Certificated Securities**.  The Pledged Equity Interests are (a) "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC) and (b) "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC).  The certificates evidencing the Pledged Equity Interests state that the Pledged Equity Interests are "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC).  There currently exist no certificates, instruments or writings representing the Pledged Equity Interests other than those delivered to Nexgen.

## ARTICLE 4

## COVENANTS

From the date of this Agreement and thereafter until the indefeasible payment in full of the Obligations, Pledgor agree as follows:

4.1     **Acknowledgements of Parties**.

(a)     If Pledgor shall, as a result of his ownership of the Pledged Equity Interests, become entitled to receive or shall receive any equity ownership certificate (including any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any shares of the Pledged Equity Interests, or otherwise in respect thereof, Pledgor shall accept the same as Nexgen's agent, hold the same in trust for Nexgen and deliver the same forthwith to Nexgen in the exact form received, duly endorsed by Pledgor to Nexgen, together with an undated stock power covering such certificate duly executed in blank, to be held by Nexgen hereunder as additional security for the Obligations. Any sums paid upon or in respect of the Pledged Equity Interests upon the liquidation or dissolution of the Borrower shall be paid over to Nexgen to be held by it hereunder as additional security for the Obligations, and in case any

distribution of capital shall be made on or in respect of the Pledged Equity Interests or any property shall be distributed upon or with respect to the Pledged Equity Interests pursuant to the recapitalization or reclassification of the capital of the Borrower or pursuant to the reorganization thereof, the property so distributed shall be delivered to Nexgen to be held by it, subject to the terms hereof, as additional security for the Obligations. If any sums of money or property so paid or distributed in respect of the Pledged Equity Interests shall be received by Pledgor, Pledgor shall deliver the same to Nexgen and, until such money or property is paid or delivered to Nexgen, hold such money or property in trust for Nexgen, segregated from other funds of Pledgor, as additional security for the Obligations.

(b)       Without the prior written consent of Nexgen, Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit, the Borrower to issue any additional equity interests or to issue any other securities convertible into or granting the right to purchase or exchange for any equity interests in the Borrower, or (ii) except as permitted by Nexgen in writing, sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Pledged Collateral, or any interest therein, except for the Lien provided for by this Agreement. Pledgor shall defend the right, title and interest of Nexgen in, to and under the Pledged Collateral against the claims and demands of all Persons whomsoever.

(c)       At any time and from time to time, upon the written request of Nexgen, and at the sole expense of Pledgor, Pledgor shall promptly and duly give, execute, deliver file and/or record such further instruments and documents and take such further actions as Nexgen may reasonably request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including filing UCC financing or continuation statements, provided that the amount of the Obligations shall not be increased thereby. Pledgor hereby authorizes Nexgen to file any such financing statement or continuation statement without the signature of Pledgor to the extent permitted by law.

**4.2**       **UCC Article 8**.  The Pledged Equity Interests shall at all times continue to be (a) "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC) and (b) "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC).  The certificates evidencing the Pledged Equity Interests each shall at all times state that the Pledged Equity Interests are "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC).

**4.3**       **Cash Dividends; Voting Rights**.  Unless an Event of Default shall have occurred and be continuing, Pledgor shall be permitted to receive all distributions or cash dividends paid in the normal course of business of the Borrower and to exercise all voting or other rights with respect to the Pledged Equity Interests, provided that no vote shall be cast or right exercised or other action taken which could reasonably be expected to impair the Pledged Collateral.

**4.4**       **Registration and Exercise of Rights**.  At any time after the occurrence and during the continuance of an Event of Default: (a) at the request of Nexgen, Pledgor will permit any registrable Pledged Collateral owned by Pledgor to be registered in the name of Nexgen or its nominee, and (b) Pledgor will permit Nexgen or its nominee, without notice, to exercise or

refrain from exercising any and all voting and other consensual rights pertaining to the Pledged Collateral owned by Pledgor or any part thereof, and to receive all dividends and interest in respect of such Pledged Collateral.

**ARTICLE 5**

**REMEDIES UPON EVENT OF DEFAULT**

**5.1**     **Acceleration and Remedies**.

(a)     Upon the occurrence and during the continuation of an Event of Default, Nexgen may exercise any or all rights and remedies at law or in equity or otherwise including, without limitation, the following:

(i)     Those rights and remedies available to a secured party under the UCC or under any other applicable law when a debtor is in default under a security agreement;

(ii)     Upon notice to Pledgor, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Pledged Collateral or any part thereof in one or more parcels at public or private sale or sales (which sales may be adjourned or continued from time to time with or without notice and may take place at Pledgor's premises of elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as Nexgen may deem commercially reasonable;

(iii)     Concurrently with written notice to Pledgor, transfer, exchange and register in its name or in the name of its nominee the whole or any part certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations, to exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon and to otherwise act with respect to the Pledged Collateral as though Nexgen was the outright owner thereof; or

(iv)     The right to exercise sole voting power and control on all of the Pledged Equity Interests.

(b)     Nexgen may comply with any applicable state or federal law requirements in connection with a disposition of the Pledged Collateral, and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Pledged Collateral.

(c)     Nexgen shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of Nexgen, the whole or any part of the Pledged Collateral so sold, free of any right of equity redemption, which equity redemption Pledgor hereby expressly release.

(d)     Until Nexgen is able to effect a sale, lease, or other disposition of Pledged

Collateral, Nexgen shall have the right to hold or use Pledged Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Pledged Collateral or its value or for any other purpose deemed appropriate by Nexgen. Nexgen may, if it so elects, seek the appointment of a receiver or keeper to take possession of Pledged Collateral and to enforce any of Nexgen's remedies, with respect to such appointment without prior notice or hearing as to such appointment.

(e)     Notwithstanding the foregoing, Nexgen shall not be required to (i) make any demand upon, or pursue or exhaust any of its rights or remedies against Pledgor, any other obligor, guarantor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any of its rights or remedies with respect to any Pledged Collateral therefor, any other Pledged Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Pledged Collateral, any such other Pledged Collateral or any guarantee of the Obligations or to resort to the Pledged Collateral, any such other Pledged Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Pledged Collateral.

**5.2     Certain Rights Relating to Equity Interests**.

(a)     Pledgor recognizes that Nexgen may be unable to effect a public sale of any or all Pledged Equity Interests, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for its own account for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Nexgen shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit Pledgor to register such Pledged Collateral for public sale under the Securities Act or under applicable state securities laws, even if Pledgor would agree to do so.

(b)     Pledgor further shall use its best efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Pledged Equity Interests pursuant to this Section 5.2 valid and binding and in compliance with any and all applicable laws. Pledgor further agrees that a breach of any of the covenants contained in this Section 5.2 will cause irreparable injury to Nexgen, that Nexgen has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 5.2 shall be specifically enforceable against Pledgor, and Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Loan Documents and SPA.

(c)     The UCC states that Nexgen is able to purchase the Pledged Equity Interests only if it is sold at a public sale. Nexgen has advised Pledgor that SEC staff personnel have issued various No-Action Letters describing procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9

of the UCC, yet not public for purposes of Section 4(2) of the Securities Act. The UCC permits Pledgor to agree on the standards for determining whether Nexgen has complied with its obligations under Article 9. Pursuant to the UCC, Pledgor specifically agrees (i) that it shall not raise any objection to Nexgen's purchase of the Pledged Equity Interests (through bidding on the Obligations or otherwise), and (ii) that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (A) shall be considered to be a "public" sale for purposes of the UCC; (B) will be considered commercially reasonable notwithstanding that Nexgen has not registered or sought to register the Pledged Equity Interests under applicable securities laws, even if Pledgor agree to pay all costs of the registration process; and (C) shall be considered to be commercially reasonable notwithstanding that Nexgen purchases the Pledged Collateral at such a sale.

(d)     Pledgor agrees that Nexgen shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Pledged Collateral sold by Nexgen pursuant to this Agreement. Nexgen may, among other things, accept the first offer received, or decide to approach or not to approach any potential purchasers.

**5.3     Pledgor's Obligations Upon an Event of Default**. Upon the request of Nexgen after the occurrence of an Event of Default, Pledgor will: (a) furnish to Nexgen, or cause the Pledgor's Companies to furnish to Nexgen, any information regarding the Pledged Collateral in such detail as Nexgen may reasonably require, and (b) take, or cause the Borrower to take, any and all actions necessary to register or qualify the Pledged Collateral to enable Nexgen to consummate a public sale or other disposition of the Pledged Collateral.

**5.4     Notice of Disposition of Pledged Collateral; Condition of Pledged Collateral**. Pledgor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Pledged Collateral may be made. To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Pledgor, addressed as set forth in <u>Section 6.13</u>, at least five (5) days (but no more than thirty (30) days) prior to (a) the date of any such public sale, or (b) the time after which any such private sale or other disposition may be made. To the maximum extent permitted by applicable law, Pledgor waives all claims, damages, and demands against Nexgen arising out of the repossession, retention or sale of the Pledged Collateral, except such as arise solely out of the gross negligence, fraud or willful misconduct of Nexgen. To the extent it may lawfully do so, Pledgor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against Nexgen, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Pledged Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise. Except as otherwise specifically provided herein, Pledgor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Pledged Collateral.

**5.5     Limitation on Nexgen's Duty with Respect to the Pledged Collateral**. Nexgen shall have no obligation to prepare the Pledged Collateral for sale. Nexgen shall use reasonable care with respect to the Pledged Collateral in its possession or under its control. Nexgen shall

not have any other duty as to any Pledged Collateral in its possession or control or in the possession or control of any agent or nominee of Nexgen, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

**5.6** <u>**Nexgen Performance of Pledgor's Obligations**</u>.  Without having any obligation to do so, after the occurrence and during the continuance of (a) a Default, if Nexgen reasonably determines it to be necessary or advisable to preserve or protect the Pledged Collateral, upon three (3) days' notice to Pledgor (unless Nexgen reasonably determines such notice is not practical given the nature of Default), or (b) an Event of Default, Nexgen may perform or pay any obligation which Pledgor have agreed to perform or pay in this Agreement and Pledgor shall reimburse Nexgen for any reasonable amounts paid by Nexgen pursuant to this <u>Section 5.6</u>. Pledgor's obligation to reimburse Nexgen pursuant to the preceding sentence shall be an Obligation payable on demand.

**5.7** <u>**Authorization for Nexgen to Take Certain Action**</u>.  Pledgor irrevocably authorizes Nexgen at any time and from time to time in the sole discretion of Nexgen and irrevocably appoints Nexgen as its attorney in fact, coupled with an interest, (a) to execute on behalf of Pledgor as debtor and to file financing statements necessary or desirable in Nexgen's sole discretion to perfect and to maintain the perfection and priority of Nexgen's security interest in the Pledged Collateral, (b) to indorse and collect any cash Proceeds of the Pledged Collateral, (c) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Pledged Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as Nexgen deems necessary or desirable to perfect and to maintain the perfection and priority of Nexgen's security interest in the Pledged Collateral, (d) to apply the Proceeds of any Pledged Collateral received by Nexgen to the Obligations, and (e) to discharge past due taxes, assessments, charges, fees or Liens on the Pledged Collateral (except for such Liens as are specifically permitted hereunder), and Pledgor agrees to reimburse Nexgen on demand for any reasonable payment made or any reasonable expense incurred by Nexgen in connection therewith, provided that this authorization shall not relieve Pledgor of any of its Obligations under this Agreement.  Nexgen agrees not to exercise the power of attorney granted under clauses (b), (d) and (e) of this <u>Section 5.7</u> except after the occurrence and during the continuance of an Event of Default.

**5.8** <u>**Irrevocable Proxy**</u>. Solely with respect to Article 8 Matters, Pledgor hereby irrevocably grants and appoints Nexgen, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as such Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Pledged Equity Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy granted and appointed in this <u>Section 5.8</u> shall include the right to sign Pledgor's name to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Equity Interests that applicable law may permit or require, to cause the Pledged Equity Interests to be voted in accordance with the preceding sentence.  Pledgor hereby represents and warrants that there are no other proxies and powers of attorney with respect to any Article 8 Matter that such Pledgor may have granted or appointed. Pledgor shall not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Equity Interests with respect to any Article 8 Matter and any attempt to do so with

respect to any Article 8 Matter will be void and of no effect. The proxies and powers granted by Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of the Obligations.

**5.9** **Specific Performance of Certain Covenants**. Pledgor acknowledges and agrees that a breach of any of the covenants contained in Sections 2.2 or 5.3 hereof will cause irreparable injury to Nexgen, that Nexgen has no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of Nexgen to seek and obtain specific performance of other Obligations of Pledgor contained in this Agreement, that the covenants of Pledgor contained in the sections referred to in this Section 5.9 shall be specifically enforceable against Pledgor.

## ARTICLE 6

## GENERAL PROVISIONS

**6.1** **Reinstatement**. This Agreement shall remain in full force and effect and continue to be effective should any Event of Bankruptcy occur with respect to the Borrower or Pledgor, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**6.2** **Benefit of Agreement**. The terms and provisions of this Agreement shall be binding upon and inure to the benefit of Pledgor, Nexgen and its respective successors and assigns (including all persons who become bound as a debtor to this Agreement), except that Pledgor shall not have the right to assign its rights or delegate its Obligations under this Agreement or any interest herein, without the prior written consent of Nexgen. No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to Nexgen hereunder and any attempted assignment without consent will be null and void. Nexgen shall have the right to assign or transfer its rights under this Agreement in connection with any assignment of its rights under the Loan Documents and the SPA, and any assignee or transferee shall be entitled to all the benefits afforded to Nexgen under this Agreement.

**6.3** **Survival**. Without prejudice to the survival of any other agreement of Pledgor under this Agreement, the agreements and obligations of Pledgor contained in Sections 6.1 and 6.12, and the representations and warranties of Pledgor contained in this Agreement shall (a) survive until the Obligations have been paid in full and (b) be deemed to have been relied upon by Nexgen notwithstanding any investigation heretofore or hereafter made by Nexgen or on its behalf. This Agreement and the interests of Nexgen under it will terminate when all the Obligations have been paid in full in cash or otherwise fully satisfied in accordance with the Loan Documents and the SPA, but only if the Borrower does not file (and none of the creditors of Borrower files against it), within 91 calendar days after the first date when all the Obligations

are paid and performed in full, a petition seeking relief under any bankruptcy, insolvency, reorganization, or debtor relief law and a claim for recovery or repayment of any amount paid on the Obligations.

6.4    **Principles of Construction**.    The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Assignment unless otherwise specified.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Assignment shall refer to this Assignment as a whole and not to any particular provision hereof or thereof.  When used in this Assignment, the word "including" shall mean "including but not limited to".  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

6.5    **Termination and Release**.    This Agreement and the security interests granted herein shall continue in full force and effect until, subject to reinstatement pursuant to Section 6.1, payment in full of the Obligations. In connection with any termination or release pursuant to this Section 6.6, Nexgen shall execute and deliver to Pledgor, at Pledgor's expense, all documents that Pledgor shall reasonably request to evidence such termination or release and shall perform such other actions reasonably requested by Pledgor to effect such release, including delivery of certificates, securities and instruments.  Any execution and delivery of documents pursuant to this Section 6.6 shall be without recourse to or warranty by Nexgen.

6.6    **Entire Agreement**.    This Agreement embodies the entire agreement and understanding between Pledgor and Nexgen relating to the Pledged Collateral and supersedes all prior agreements and understandings between the Pledgor and Nexgen relating to the Pledged Collateral.

6.7    **Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a)    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.

(b)    CONSENT TO JURISDICTION.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST PLEDGOR OR NEXGEN ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN BIRMINGHAM, ALABAMA.  PLEDGOR AND NEXGEN HEREBY (i) IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (ii) IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (iii) IRREVOCABLY CONSENT  TO SERVICE OF PROCESS BY MAIL, PERSONAL SERVICE OR IN  ANY  OTHER  MANNER  PERMITTED  BY

APPLICABLE LAW, AT THE ADDRESS SPECIFIED ON THE SIGNATURE PAGES HERETO (AND AGREES THAT SUCH SERVICE AT SUCH ADDRESS IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER ITSELF IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT).

(c)     WAIVER OF JURY TRIAL.  PLEDGOR AND NEXGEN, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY NEXGEN AND PLEDGOR AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  NEXGEN AND PLEDGOR ARE EACH HEREBY INDIVIDUALLY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

**6.8     Modifications**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor or Nexgen therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on, Pledgor shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Nexgen in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, Nexgen shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or to declare a default for failure to effect prompt payment of any such other amount.  Nexgen shall have the right to waive or reduce any time periods that Nexgen is entitled to under this Agreement in its sole and absolute discretion.

**6.9     Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid pursuant to all applicable laws, but if any provision of this Agreement shall be prohibited by or invalid pursuant to applicable laws, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**6.10     Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Copies of originals, including copies delivered by facsimile, pdf or other electronic means, shall have the same import and effect as original

counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

**6.11** **Payment of Expenses**.

(a)     Pledgor shall reimburse Nexgen for any and all costs and expenses (including attorneys' fees and expenses and auditors' and accountants' fees) paid or incurred by Nexgen in connection with the preparation, execution, delivery, administration, collection and enforcement of this Agreement and in the audit, analysis, administration, collection, preservation or sale of the Pledged Collateral (including the expenses and charges associated with any periodic or special audit of the Pledged Collateral).  Any and all costs and expenses incurred by Pledgor in the performance of actions required pursuant to the terms hereof shall be borne solely by Pledgor.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (OTHER THAN INTEREST, FEES AND OTHER AMOUNTS DUE AND PAYABLE UNDER THE LOAN DOCUMENTS, THE SPA AND/OR ARISING OUT OF CLAIMS BY THIRD PARTIES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY.

(c)     All amounts due under this Section shall be payable promptly (and in any event within ten (10) days after demand therefor).

**6.12** **Notices**.  All notices, consents, approvals and requests required or permitted hereunder shall be given in writing by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of delivery or attempted delivery, addressed as set forth on the signature pages hereto (except that any party hereto may change its address and other contact information for purposes hereof at any time by sending a written notice to the other parties to this Agreement in the manner provided for in this Section).  A notice shall be deemed to have been given when delivered or upon refusal to accept delivery.

(Signature Page Immediately Follows)

IN WITNESS WHEREOF, Pledgor and Nexgen have executed this Agreement as of the date first above written.

**"PLEDGOR"**:

Rodney L. Mays

Address:
345 20th Street West
Jasper, AL 35502
Email: maysrodney@yahoo.com

**"NEXGEN"**:

Nexgen Extractions LLC,
a New Jersey limited liability company

By: _____
    Yitzchak Abadi, Manager

Address:
Nexgen Extractions LLC
101 Chase Avenue, Suite 206
Lakewood, NJ 08701
Attention: Legal Notices
Email: isaac@nexgencapital.com

# EXHIBIT M

## <u>RESTATED PROFIT PARTICIPATION AGREEMENT</u>

**THIS RESTATED PROFIT PARTICIPATION AGREEMENT** (this "**Agreement**") is dated as of December 19, 2019 (the "**Effective Date**"), and entered into between Nexgen Extractions LLC, a New Jersey limited liability company ("**Nexgen**"), and Mays Mining, Inc., an Alabama corporation ("**Mays**"). Each of Nexgen and Mays are referred to individually as a "**Party**" and collectively as the "**Parties**."

A.     Pursuant to that certain Membership Interest Purchase Agreement dated December 19, 2019, by and among Brian A. Lewis and Jason E. Rudakas, collectively, as "Sellers," and Mays, as "Buyer" (the "**Yellowhammer Purchase Agreement**"), Mays acquired 100% of the membership interests of Yellowhammer Energy Solutions, LLC, an Alabama limited liability company (the "**Company**").

B.     The Company engages in (i) the mining, processing, transportation and sale of coal produced by the Company in the State of Alabama, (ii) the domestic trading of coal, including the purchase and resale of coal produced by others, and (iii) activities related to the foregoing and certain other operations.

C.     Subject to the approval of the Alabama Department of Insurance, pursuant to that certain Membership Interest Purchase Agreement by and among Brian A. Lewis, Jason E. Rudakas, Robert A. Lewis, and Thomas A. Lewis, collectively, as "Sellers," and Company, as "Buyer" (the "**Endeavor Purchase Agreement**"), Company shall indirectly acquire 100% of the shares of Endeavor Insurance Company, Inc., an Alabama corporation ("**Endeavor**"). Endeavor is a captive insurance company formed to transact business as a pure captive insurance company and engages in the sale of certain bonds and other products related to the mining of coal in the State of Alabama, and activities related to the foregoing (collectively, the "**Endeavor Business**").

D.     In accordance with this Agreement, in connection with the acquisition of the Company, Nexgen has agreed to provide Mays the amount of $2,536,776.20 (the "**Investment**") in exchange for a return on the Investment and 50% of any and all revenue received by Mays from any source whatsoever (the "**Business**"). In accordance with this Agreement, in exchange for the Investment, Mays agrees to pay Nexgen a return on the Investment and 50% of any and all Revenue (as defined below) received by Mays.

E.     The Parties entered into that certain Profit Participation Agreement dated as of December 19, 2019 ("**Original Agreement**"). The Parties acknowledge and agree that this Agreement shall amend, restate and supersede the Original Agreement in its entirety.

**NOW, THEREFORE,** in consideration of the foregoing, the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

1.     **Term**.  The term of this Agreement ("**Term**") shall commence on the Effective Date and shall expire on the date that the Parties agree that Mays is no longer able to generate any Revenue.  For purposes of this Agreement, term "**Revenue**" shall mean any and all revenue

generated by Mays and/or any assets owned and/or controlled by Mays from any source whatsoever, but excluding any revenue generated by Endeavor or the Endeavor Business.

2. **Investment by Nexgen**. Concurrently with the execution of this Agreement, Nexgen agrees to deliver the Investment to Mays by wire transfer of immediately available federal funds of the United States. Mays shall utilize the Investment exclusively to fund the acquisition of the Company and Endeavor in accordance with the Yellowhammer Purchase Agreement and the Endeavor Purchase Agreement, as applicable. Mays has delivered to Nexgen true, correct and complete copies of both the Yellowhammer Purchase Agreement and the Endeavor Purchase Agreement. In no event shall Nexgen be required to provide Mays with any additional capital or other funds.

3. **Distributions**. In consideration of the payment of the Investment to Mays, Nexgen shall be entitled to a preferred return equal to 12% per annum on the Investment until cumulative distributions to Nexgen from the Revenue equal 100% of the amount of the Investment. Once cumulative distributions to Nexgen from the Revenue equal 100% of the amount of the Investment, then Nexgen and Mays shall share equally (50%/50%) any and all revenue received by Mays from any source whatsoever. The applicable amounts payable by Mays to Nexgen pursuant to this Agreement shall be referred to as the "**Nexgen Share**".

4. **Segregated Accounts**.

(a) Mays shall open and maintain separate bank accounts for the existing operations of Mays and the Company and deposit all funds paid to Mays and the Company in such separate bank accounts with a bank approved by the Parties ("**Lockbox Accounts**"). Each Party shall have online access to such bank accounts. Mays shall provide Nexgen on a monthly basis reasonable accounting records for the Business and any other reasonable business records with respect to the Business within two (2) business days upon notice of such request.

(b) Mays shall deposit all Revenue in the Lockbox Accounts. On the fifth (5th) day of each calendar month after the Effective Date (each, a "**Payment Date**"), the applicable Nexgen Share of the Revenue in the preceding month shall be swept into an account designated by Nexgen.

5. **Books and Records**. Mays shall keep and maintain complete and accurate books and records of all of its financial activities including, without limitation, any financial activity relating to Mays, the Company, Endeavor and the Business and all supporting documentation (collectively, "**Books and Records**"). Upon Nexgen's request, Mays shall permit Nexgen and its accountants and representatives to have access to, inspect, review and copy the Books and Records at Mays' office or at such other location where such Books and Records are maintained, and, upon Nexgen's request, Mays shall provide Nexgen with copies of all such Books and Records. If any such audit reveals an underpayment by Mays of amounts due under this Agreement, Mays shall pay to Nexgen such underpaid amount within ten (10) days of Nexgen's demand, and if such underpayment exceeds three percent (3%) of the amounts due to Nexgen during any period, Mays shall reimburse Nexgen for its costs and expenses incurred in connection with such inspection and review plus a ten percent (10%) administrative fee. If any such audit reveals an overpayment by Mays of amounts due under this Agreement, Nexgen may

retain such overpaid amounts, which shall be credited towards the amounts due to Nexgen on the next Payment Date. The terms and provisions of this Section shall survive the expiration or earlier termination of this Agreement.

**6.** **Operation of the Business**. Subject to the terms of this Agreement, Mays shall have sole and exclusive authority and control of the Business and the administration of all aspects of the Business and generation of the Revenue including, without limitation, the Endeavor Business. Mays shall continuously operate the Business in accordance with all applicable laws and shall use its best efforts to maximize the Revenue. At least once monthly or earlier upon Nexgen's request, Mays shall provide Nexgen with regular updates regarding the Business and supporting documentation, as requested by Nexgen. Mays shall cause to be filed such instruments or certificates and amendments thereto and do such other acts as may be required by law to qualify and maintain Mays, the Company and Endeavor as a company licensed to operate in all states or jurisdictions in which such entities operate. The Parties shall meet at least once each month after the Effective Date to discuss the operation of the Business.

**7.** **Intentionally Omitted**.

**8.** **Competition**.

(a) Mays shall devote as much time to the Business as may be reasonably required to conduct its business and affairs which such time shall maximize the Revenue of the Business. Except as provided below, nothing contained in this Agreement shall be construed to prohibit a Party or any affiliate of a Party from conducting or possessing an interest in any other business activities whatsoever, independently or with others. Notwithstanding the foregoing, however, without the prior written approval of both Parties, each Party and its affiliates shall be prohibited from (a) owning, managing or developing a Business similar to the Business until the date two (2) years after the expiration of the Term, and (b) owning, receiving and/or controlling an interest (beneficial or otherwise) in an entity that owns, manages or develops a business similar to the Business until the date two (2) years after the expiration of the Term. The restrictions on each Party and the affiliates of each Party in this Section against competing with a business similar to the Business of the Company shall apply solely to the State of Alabama.

(b) Subject to the terms of this Section, each Party acknowledges that the restrictions on competition and the geographical restrictions set forth in Section 8(a) above, in view of the unique nature of the Business, are reasonable and necessary to protect the legitimate interests of the Investment and each Party and that any violation thereof would result in irreparable injuries to each Party. Therefore, each Member expressly agrees that, in the event of the violation of any of the restrictions set forth in Section 8(a) above, each Party shall be entitled to obtain from any court of competent jurisdiction, preliminary and injunctive relief, in addition to any other rights or remedies to which they may be entitled at law or in equity, against the violating Party. Each Party has carefully read, considered and had the opportunity to contact an attorney concerning the provisions of this Section and, each having done so, agrees that the restrictions set forth in this Section are fair and reasonable and are reasonably required for the protection of the interests of the Parties. Notwithstanding the foregoing, if any part of the restrictions set forth in this Section shall be held to be invalid or unenforceable, the remaining parts thereof shall nevertheless continue to be valid and enforceable as though the invalid or

unenforceable parts had not been included therein.  In the event that any provision of this Section relating to time period or scope of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time period or scope such court deems reasonable and enforceable, said time period or scope of restriction shall be deemed to become and thereafter be the maximum time period or scope which such court deems reasonable and enforceable.

     **9.**    **Confidentiality**.  The Parties agree to keep confidential all aspects of this Agreement and the Business, and shall not disclose to any person other than the members, managers, partners, employees, officers, advisors, attorneys or accountants of the Parties (collectively, "**Representatives**") on a need-to-know basis, any confidential or proprietary information or data concerning this Agreement, the Business, dealings or finances of the other Party furnished directly or indirectly by such other Party.  As used in this Section, the term "confidential information" does not include any information which:  (a) at the time of disclosure is generally available to and known by the public (other than as a result of a disclosure directly or indirectly by either Party or their Representatives); (b) was available to either Party on a non-confidential basis from a source other than a Party or its Representatives; or (c) is required by law to be disclosed.

     **10.**    **Representations**.

     (a)    Each Party represents and warrants to the other Party as follows: (i) it has full power, authority and legal right to execute, deliver and perform all obligations under this Agreement; (ii) this Agreement constitutes legal, valid and binding obligations, enforceable in accordance with its terms; and (iii) the execution, delivery and performance of the obligations under this Agreement will not violate, conflict with or result in a default under any agreement or other instrument to which it is a party.

     (b)    Mays represents and warrants to Nexgen that (i) to the best of its knowledge and to the best knowledge of Guarantor (as defined below), all statements, analyses and any other documents provided by or on behalf of Mays to Nexgen prior to the execution of this Agreement including, without limitation, the Business analysis attached to this Agreement as Exhibit A, are true, correct and complete; (ii) Mays is the sole owner of the Company and Endeavor; (iii) no consent, approval, authorization, registration, or filing with, any federal, state or local governmental authority is required on the part of Mays to conduct the Business; (iv) Mays has all permits, licenses and any authority necessary for the conduct of the Business and is not in default in any material respect under any of such permits, licenses or other similar authority; and (v) Mays is not in violation or default of in any material respect under any lease, agreement, permit, license, or contract to which it is a party.

     **11.**    **Late Payment**.  If Nexgen does not receive any portion of the Nexgen Share of Revenue within three (3) days after the applicable Payment Date, Mays shall pay Nexgen a late payment charge equal to ten percent (10%) of the delinquent payment.  The Parties agree that such amounts represent a fair and reasonable estimate of the damages Nexgen will incur by reason of such late payment and Nexgen's right to such compensation for the delinquency is in addition to all of Nexgen's other rights and remedies under this Agreement, at law or in equity.

**12.** **Indemnification**. Mays shall protect, defend (with counsel designated by Nexgen), indemnify and hold harmless Nexgen and its shareholders, members, managers, partners, officers, owners, officers, directors, employees, agents, representatives, and their respective agents, executors, heirs, representatives and assigns, from and against any claims, losses, costs, penalties, damages, charges and/or expenses (including reasonable attorneys' and consultants' fees) imposed or resulting from, arising out of or attributable in whole or in part to: (i) the execution and delivery of this Agreement; (ii) any breach of this Agreement; (iii) any misrepresentation of Mays' representations set forth in this Agreement; and/or (iv) the operation of the Business. The terms and provisions of this Section shall survive the expiration of the Term or earlier termination of this Agreement.

**13.** **Specific Performance**. Each Party acknowledges and agrees that the terms of this Agreement are unique, that in the event of a default by a Party of its obligations under this Agreement, the other Party would suffer injury for which it would not be fully compensated with monetary damages and accordingly, in the event of a default by a Party of its obligations under this Agreement, the other Party shall be entitled to specifically enforce the terms, covenants and conditions of this Agreement or any part hereof in addition to any and all other remedies available to a Party at law or in equity. Accordingly, if any Party enters into any action or proceeding to enforce the provisions of this Agreement, the Party against whom the action or proceeding is brought waives the claim or defense that the moving Party has or shall have an adequate remedy at law, and such Party shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

**14.** **Attorneys' Fees**. Upon the Nexgen's demand, Mays shall reimburse Nexgen for all costs and expenses, including attorneys, accountants, consultants, and expert witness fees and costs, which are incurred by the Nexgen in connection with the enforcement of this Agreement, whether or not any legal proceedings are instituted. Further, if either Party hereto fails to perform any of its obligations under this Agreement or if a dispute arises between the Parties hereto concerning the meaning or enforcement of any provision of this Agreement, then the defaulting Party or the Party not prevailing in such dispute shall pay any and all costs and expenses incurred by the prevailing Party on account of such dispute and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs and attorneys' fees and disbursements. The phrase "prevailing Party" as used in this Section shall mean the Party who receives substantially the relief desired whether by dismissal, summary judgment or otherwise. The terms and provisions of this Section shall survive the expiration of the Term or termination of this Agreement.

**15.** **Notices**. All notices, demands and consents of any kind which any Party may be required or may desire to give or serve upon another shall be made in writing and shall be delivered by personal service, overnight courier or sent by email to the address of that Party set forth below. Any such notice sent shall be deemed to have been received by the addressee upon receipt. A Party may change his address by giving the other Party written notice of its new address as provided in this Section.

Nexgen:           Nexgen Extractions LLC
                      101 Chase Ave., Suite 206

Lakewood, New Jersey 08701
Attention: Isaac Abadi
Email: iabadi@nexgencapital.com

with copies to (which shall not constitute notice):

Maynard Cooper & Gale
1901 Sixth Avenue North
Regions Harbert Plaza, Suite 2400
Birmingham, AL 35203
Attention: Jim McLaughlin
Email: JMcLaughlin@maynardcooper.com

Mays:        Mays Mining, Inc.
72 Longview Dr.
Jasper, AL 35504
Attention: Rodney L. Mays
Email: maysrodney@yahoo.com

**16.**    **No Partnership or Joint Venture**. Nothing contained in this Agreement shall be deemed or construed to create the relationship of principal and agent, or partnership, or joint venturer, or any other relationship between the Parties other than as Parties to this Agreement. Further, nothing contained in this Agreement shall be construed to mean that Nexgen is a joint venturer or partner in connection with the Business.

**17.**    **Governing Law; Jurisdiction and Venue**. This Agreement shall be governed by the laws of the State of Alabama. The Parties agree that any suit, action or proceeding arising out of or related to this Agreement shall be brought only in the applicable Federal or State Court in Birmingham, Alabama. To the fullest extent permissible by law, the Parties consent to the personal jurisdiction, venue and forum of such courts.

**18.**    **Successors and Assigns**. This Agreement shall be binding upon the successors and assigns of the Parties hereto; provided, however, in no event shall Mays assign this Agreement to any third party without the prior written consent of Nexgen (in its sole discretion). Any attempted transfer or assignment in violation of this Section shall be void.

**19.**    **Entire Agreement; Amendments**. This Agreement contains the entire agreement between the Parties hereto with respect to the subject matter hereof. All representations, promises and prior or contemporaneous undertakings between the Parties are merged into and expressed in this Agreement, and any and all prior agreements between such Parties are hereby canceled. This Agreement shall not be amended, modified, or supplemented except by a written agreement duly executed by the Parties.

**20.**    **Time of the Essence**. Time is of the essence in the performance of each of the Parties' respective obligations contained in this Agreement.

21. **Severability**.  In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

22. **Further Assurances**. Each Party agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

23. **Advice of Counsel**.  Each Party agrees and represents that it (a) has had advice of counsel of its choosing or had the opportunity of obtaining advice of counsel, in the negotiation and the preparation of this Agreement, (b) has read this Agreement, and (c) is fully aware of the contents and legal effect of this Agreement.

24. **Counterparts**. This Agreement may be executed in counterparts, all of which shall constitute the same Agreement, notwithstanding that all parties to this Agreement are not signatory to the same or original counterpart.  Delivery of an executed counterpart of this Agreement by facsimile or email shall be equally as effective as delivery of an original executed counterpart.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one (1) document.

(Signature Page Follows Immediately)

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Agreement as of the Effective Date.

"NEXGEN":                                          "MAYS":

Nexgen Extractions LLC,                            Mays Mining, Inc.,
a New Jersey limited liability company             an Alabama corporation

By: _____                By: _____
    Isaac Abadi, its Manager                    Rodney L. Mays,
                       its President and Secretary

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Agreement as of the Effective Date.

| | |
|---|---|
| **"NEXGEN":** | **"MAYS":** |
| Nexgen Extractions LLC,<br>a New Jersey limited liability company | Mays Mining, Inc.,<br>an Alabama corporation |

By: _____
      Isaac Abadi, its Manager

By: *Rodney Mays*
      Rodney L. Mays,
      its President and Secretary

## Exhibit A

**(Business Analysis)**

[To Be Attached]